**LOWENSTEIN SANDLER LLP**

Katie Rose Glynn, California Bar No. 300524
KGlynn@lowenstein.com
390 Lytton Avenue
Palo Alto, California 94301
Tel. 650.433.5800

*Attorneys for Plaintiffs*

*Additional Attorneys Listed*
*on Signature Page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP, HIGHFIELDS CAPITAL III L.P., HIGHFIELDS CAPITAL IV LP, and HIGHFIELDS CAPITAL LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SEAWORLD ENTERTAINMENT, INC., JAMES ATCHISON, JAMES HEANEY, and MARC SWANSON, <br><br> Defendants. | Case No.: '18CV1276 L   BLM <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE COMMON LAW** <br><br><br> **DEMAND FOR JURY TRIAL** |

Line numbers (left margin): 1–28

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................ 2

JURISDICTION AND VENUE ........................................................... 6

PARTIES ............................................................................................ 7

    I.    Plaintiffs ................................................................................ 7

    II.   Defendants ............................................................................ 8

FACTUAL ALLEGATIONS ............................................................. 9

    I.    Events Prior to Plaintiffs' Investment in SeaWorld ............... 9

        A.   The Theme Park Industry .............................................. 9

        B.   SeaWorld's Business ................................................... 11

        C.   *Blackfish* ................................................................... 12

        D.   The *Blackfish* Effect ................................................... 14

        E.   The *Blackfish* Bill ...................................................... 19

        F.   SeaWorld's Public and Private Response to *Blackfish* ....................... 20

    II.   Defendants' Representations to Induce Plaintiffs to Invest in SeaWorld ............................................................................ 23

    III.  Plaintiffs Purchase SeaWorld Common Stock in Reliance on Defendants' Representations ................................................ 28

    IV.  Defendants' Representations to Plaintiffs Were Materially False and Misleading When Made ......................................... 30

    V.   The Truth is Revealed to the Market on August 13, 2014, Causing the Price of SeaWorld's Stock to Plummet and Plaintiffs to Suffer Significant Damages ............................... 33

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ................................................ 36

SUMMARY OF DEFENDANTS' SCIENTER ................................. 41

PLAINTIFFS' ACTUAL RELIANCE ...................................................................43

PRESUMPTION OF RELIANCE .......................................................................44

LOSS CAUSATION ..........................................................................................46

NO SAFE HARBOR ..........................................................................................48

FIRST CAUSE OF ACTION .............................................................................48

SECOND CAUSE OF ACTION ........................................................................52

THIRD CAUSE OF ACTION ............................................................................54

PRAYER FOR RELIEF ....................................................................................55

JURY DEMAND ...............................................................................................55

Plaintiffs Highfields Capital I LP, Highfields Capital II LP, Highfields Capital III L.P., Highfields Capital IV LP, and Highfields Capital Ltd. ("Plaintiffs") are investment funds which purchased the publicly listed and traded common stock of Defendant SeaWorld Entertainment, Inc. ("SeaWorld" or the "Company") and were damaged in connection therewith.[1]   Plaintiffs, through their undersigned attorneys, by way of this Complaint and Demand for Jury Trial, bring this action against SeaWorld and certain of its former and present officers, Defendants James Atchison ("Atchison"), James Heaney ("Heaney"), and Marc Swanson ("Swanson" and, collectively with Atchison and Heaney, the "Individual Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which includes, among other things, a review and analysis of: SeaWorld's filings with the SEC; the decision in *Secretary of Labor v. SeaWorld of Florida, L.L.C.*, OSHRC Docket No. 1705 (June 11, 2012) (the "OSHA Proceeding"); pleadings, motion papers, and exhibits to declarations filed in *Baker v. Seaworld Entertainment, Inc.*, No. 3:14-cv-02129-MMA-KSC (S.D. Cal.) (the "Class Action Proceeding"); decisions,

---

[1] "SeaWorld" as used herein refers to the corporate entity defined above.  Defendants' references to attendance at "SeaWorld" in filings with the U.S. Securities and Exchange Commission ("SEC"), in press releases, and on earnings calls means the collective attendance at all eleven theme parks owned by SeaWorld, including SeaWorld, Busch Gardens, Aquatica, Discovery Cove, Sesame Place, Water Country USA, and Adventure Island.  In contrast, Plaintiffs' allegations regarding the attendance declines caused by *Blackfish* (as detailed below) refer only to the three SeaWorld-branded theme parks in Orlando, Florida, San Diego, California, and San Antonio, Texas, which house and feature killer whales (the "SeaWorld-branded theme parks").

opinions, and orders issued by the Court in the Class Action Proceeding; and other public documents and media reports concerning SeaWorld.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action under the federal securities laws and the common law to recover the investment losses they suffered as a result of numerous false and misleading statements that SeaWorld and its executives made to induce Plaintiffs to purchase SeaWorld's common stock.  Plaintiffs suffered significant investment losses when the truth about those statements was revealed to the market and the price of SeaWorld's common stock plummeted as a result.

2.      SeaWorld is a marine-life theme park brand and company which was led – until recently – by Defendant Atchison.  Atchison has since resigned.

3.      Plaintiffs are investment funds managed by a common adviser based in Massachusetts.

4.      In 2013, the critically acclaimed documentary *Blackfish* was released. *Blackfish* tells the story of Tilikum, a killer whale involved in the death of three people and the consequences of keeping killer whales in captivity at places like SeaWorld.

5.      The public outcry and resulting boycott of SeaWorld was so significant that it came to be known as the "*Blackfish* effect."  Ultimately, *Blackfish* caused a significant

decline in attendance at SeaWorld-branded theme parks – those that house and feature killer whales – and spurred a fundamental, cultural shift in the public perception of SeaWorld and its brand.

6.     Nonetheless, Defendants sought to induce investors like Plaintiffs to invest in SeaWorld by covering up the *Blackfish* effect and intentionally refusing to admit to – or even acknowledge – the company-changing effects of the film.  Indeed, rather than provide accurate information about the company, Defendants employed extreme cloak-and-dagger tactics to discredit and downplay *Blackfish*.  For example, Defendants asked SeaWorld employees to "flood" polls surveying the public's perception of the Company, had one of its employees pose as a PETA activist to infiltrate anti-SeaWorld protests, and made numerous misrepresentations to induce Plaintiffs' investment adviser to cause Plaintiffs to purchase SeaWorld stock.

7.     Specifically, Defendants misrepresented that the declining attendance at SeaWorld theme parks over the course of 2013 and 2014 was due to temporary, transitory events like the weather and ill-timed holidays.  Because attendance is one of SeaWorld's key business metrics and the largest factor affecting the Company's revenue and results of operations, statements concerning attendance at SeaWorld theme parks were highly material to Plaintiffs.  In that same vein, the reasons for a decline in attendance at SeaWorld's theme parks were also highly material to Plaintiffs.  There is a meaningful difference between a temporary dip in attendance due to weather or ill- timed holidays and a steady decline in attendance caused by a fundamental, cultural shift in the public

perception of SeaWorld and its brand.  Highly aware of this truism, Defendants sought to deflect attention away from the actual and devastating effects of *Blackfish* to convince investors, like Plaintiffs, that the film was not actually a foundation-shifting event for the Company.

8.     Defendants repeatedly and unequivocally denied that *Blackfish* had any impact on the declining attendance at the SeaWorld theme parks.  For example, SeaWorld's Vice President of Communications Fred Jacobs stated in an August 29, 2013 *Los Angeles Times* article that "**'Blackfish' has had no attendance impact.**" [2]

9.     Atchison repeated this same party line in a November 13, 2013 interview with the Wall Street Journal: "**I scratch my head if there's any notable impact from [Blackfish] at all, and I can't attribute one to it . . . [i]ronically, our attendance has improved since the movie came out.**"

10.     A few weeks later, on December 20, 2013, Atchison re-affirmed in an Orlando Sentinel article that "**[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on [SeaWorld's] business.**"  But as would later be revealed – and as Defendants knew all along – the truth was otherwise.  The attention given to, and negative publicity generated by, Blackfish had a profoundly negative effect on SeaWorld, including eventually forcing the Company to abandon its killer whale program altogether.

---

[2] Unless otherwise noted, emphasis in quotations has been added to the original.

11.     Defendants doubled-down on these misrepresentations during the earnings call announcing SeaWorld's annual results for 2013.  In response to a question about *Blackfish*'s impact on SeaWorld's attendance, Atchison stated: "as much as we're asked it, *we can see no noticeable impact on our business*"; that the Company did not perceive "*any shift in sentiment about intent to visit our parks*"; and actually credited *Blackfish* with increasing interest in SeaWorld.

12.     These statements were false and misleading when made and omitted material facts.  The decrease in attendance at SeaWorld-branded theme parks was not – as the Company claimed – the result of the weather and ill-timed holidays, but *Blackfish* and its crippling effect on SeaWorld's brand and public image.  And Defendants plainly knew as much while they were downplaying *Blackfish* and omitting the crippling effect it was having on attendance at SeaWorld-branded theme parks.

13.     Plaintiffs purchased their SeaWorld common stock between September 2013 and July 2014 in reliance on Defendants' misrepresentations.  Investors like Plaintiffs are much more likely to initiate and maintain an investment in a company experiencing temporary headwinds – as SeaWorld was claiming – than in one suffering an existential crisis which undermines its long-term value and earnings potential.  In making the decisions to invest in SeaWorld common stock, Plaintiffs' investment adviser read, reviewed, listened to, and justifiably relied on Defendants' materially misleading statements.  Plaintiffs, through their investment adviser, also relied on the integrity of the market price of SeaWorld's common stock.  Plaintiffs and their investment adviser were

unaware of the falsity of Defendants' statements when Plaintiffs purchased SeaWorld common stock.

14.     Defendants' misrepresentations caused Plaintiffs to purchase SeaWorld common stock at artificially-inflated prices.  Had it not been for these repeated material misrepresentations, Plaintiffs either would not have purchased their SeaWorld common stock, or, if they had, would not have paid the prices they paid.

15.     When accurate information about the declining attendance at SeaWorld-branded theme parks and the *Blackfish* effect was publicly disclosed and processed by the market in August 2014, SeaWorld stock dropped nearly 33% from a close of $28.15 per share to close at $18.90 per share.

16.     As a result of this significant price drop, Plaintiffs suffered millions of dollars of investment losses.

17.     Plaintiffs therefore bring this action to recover the damages suffered as a result of the materially false and misleading statements and omissions of material fact made by Defendants.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331, and has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

### I.     Plaintiffs

22.     Plaintiff Highfields Capital I LP is a Delaware limited partnership whose investment adviser has its main office in Boston, Massachusetts.  A list of the dates on which it purchased SeaWorld common stock during the relevant period is attached hereto as Exhibit A.

23.     Plaintiff Highfields Capital II LP is a Delaware limited partnership whose investment adviser has its main office in Boston, Massachusetts.  A list of the dates on which it purchased SeaWorld common stock during the relevant period is attached hereto as Exhibit B.

24.     Plaintiff Highfields Capital III L.P. is a Cayman Islands exempted limited partnership whose investment adviser has its main office in Boston, Massachusetts.  A list of the dates on which it purchased SeaWorld common stock during the relevant period is attached hereto as Exhibit C.

25.     Plaintiff Highfields Capital IV LP is a Delaware limited partnership whose investment adviser has its main office in Boston, Massachusetts.  A list of the dates on which it purchased SeaWorld common stock during the relevant period is attached hereto as Exhibit D.

26.     Plaintiff Highfields Capital Ltd. is a Cayman Islands exempted company whose investment adviser has its main office in Boston, Massachusetts.  A list of the dates on which it purchased SeaWorld common stock during the relevant period is attached hereto as Exhibit E.

27.     At all relevant times, Highfields Capital Management LP ("Highfields") acted as investment adviser to Plaintiffs in connection with their purchases of SeaWorld common stock.

**II.     <u>Defendants</u>**

28.     Defendant SeaWorld is Delaware corporation with its principal executive office located at 9205 South Park Center Loop, Suite 400, Orlando, Florida 32819.

29.     Defendant Atchison is the former President and Chief Executive Officer and a current Director of SeaWorld.  Upon information and belief, Atchison resides at 900 Cinnamon Beach Way, Apartment 852, Palm Coast, Florida 32137.

30.     Defendant Heaney is the former Chief Financial Officer of SeaWorld.  Upon information and belief, Heaney resides at 8525 SW 100th Street, Miami, Florida 33156.

31.     Defendant Swanson is the current Chief Financial Officer and former Chief Accounting Officer of SeaWorld.   Upon information and belief, Swanson resides in Orlando, Florida.

## FACTUAL ALLEGATIONS

I.     **Events Prior to Plaintiffs' Investment in SeaWorld**
   A.     **The Theme Park Industry**

32.     SeaWorld is one of the largest theme park and entertainment companies in the United States.

33.     According to the 2017 IBISWorld Industry Report 71311: Amusement Parks in the US (the "IBISWorld Report") and the 2016 TEA/AECOM Theme Index: The Global Attractions Attendance Report (the "TEA/AECOM Report"), the United States is the largest theme park industry in the world and is expected to generate approximately $17.7 billion in revenues this year.[3]

34.     Increased tourism in a particular geographical area tends to boost attendance at all theme parks in that area.  As a general matter, then, attendance at theme parks in the same geographical area should move in lockstep.

---

[3]  SeaWorld has referenced and explicitly relied on the yearly IBISWorld and TEA/AECOM Reports in public statements and in its filings with the SEC.

35.     For this reason, SeaWorld, The Walt Disney Company ("Disney") and Universal Studios ("Universal") – though each other's biggest competitors – operate theme parks nearby to each other in Florida and Southern California.

36.     In Florida, Disney operates Magic Kingdom, Epcot, Disney's Hollywood Studios, Disney's Animal Kingdom, Disney's Typhoon Lagoon, and Disney's Blizzard Beach, while Universal operates Universal Studios Florida, Islands of Adventure, and Volcano Bay.  In Southern California, Disney operates Disneyland and Disney California Adventure Park, while Universal operates Universal Studios Hollywood.

37.     SeaWorld, Disney, and Universal also participate in joint programs designed to provide visitors to Florida and Southern California with vacation options, flexibility, and value.  SeaWorld has partnered with Universal to create a "FlexTicket" which allows guests to purchase one ticket for access to both SeaWorld and Universal theme parks in Orlando, Florida, and San Diego, California.

38.     SeaWorld – like all theme parks – generates revenue from attendance at its theme parks.  In 2013, for example, theme park admissions accounted for approximately 63% of SeaWorld's total revenue, while in-park spending, *i.e.*, food and merchandise, accounted for the remaining 37% of total revenue.   SeaWorld's revenue – whether attributable to park admissions or in-park spending – is therefore based *entirely* upon attendance at its theme parks.

39.     Because "[i]ncreased attendance drives increased admissions revenue to [SeaWorld's] theme parks as well as total in-park spending[,]" maintaining and

increasing attendance levels at its theme parks is a fundamental part of SeaWorld's business model and critical to its revenue and results of operations.  Attendance is also one of SeaWorld's key business metrics.

40.     Information about SeaWorld's attendance – and the factors driving it – is therefore highly material to investors.

41.     Though attendance at each of its theme parks can be affected by different factors, *e.g.*, weather, SeaWorld does not provide attendance information for each individual theme park, but rather, on a Company-wide basis.

42.     Similarly, the yearly TEA/AECOM Report – on which SeaWorld refers to and relies in its SEC filings – provides park-by-park attendance, but only for the largest theme parks in the United States and only on an annual basis.

43.     Investors are therefore forced to rely solely on the Company for accurate information about SeaWorld's attendance – the most significant factor affecting the Company's revenue and results of operations and its most critical business metric.

**B.     SeaWorld's Business**

44.     SeaWorld owns and operates 11 theme parks across the United States, including SeaWorld-branded theme parks in Orlando, Florida, San Diego, California, and San Antonio, Texas; Busch Gardens theme parks in Tampa, Florida, and Williamsburg, Virginia; Aquatica theme parks in Orlando, Florida and San Diego, California; Discovery Cove in Orlando, Florida; Sesame Place in Langhorne, Pennsylvania; Water Country USA in Williamsburg, Virginia; and Adventure Island in Tampa, Florida.

-11-

45.     SeaWorld has over 600 attractions at its 11 theme parks, including 85 animal habitats, 105 shows, and 196 rides.  In 2018, SeaWorld had one of the largest collections of animals in the world.

46.     The crown jewel of SeaWorld's collection is its killer whales.  In 2018, SeaWorld had the largest group of killer whales in captivity.

47.     SeaWorld-branded theme parks – those housing and featuring killer whales – showcase killer whales in specially designed amphitheaters featuring live shows, underwater viewing, and specialty dining experiences.

48.     But SeaWorld does not just showcase killer whales; its key attraction – and what separates it from ordinary aquariums and makes it special – *is* killer whales. According to Atchison, SeaWorld's killer whales and killer whale shows are "emblematic of [the Company's] whole brand."

49.     As the *Miami Herald* explained:  "SeaWorld built its brand on a leaping and splashing killer whale named Shamu.  The whale, who appeared in SeaWorld shows in the 1960s, was part of its logo, gave her name to stadiums in the theme parks and was the inspiration for rides.  The orca image sold T-shirts and soft, stuffed animals for the kids to take home.  She died in 1971, but her name kept its place at [SeaWorld's] parks."

## C.     *Blackfish*

50.     *Blackfish* – a documentary by director Gabriela Cowperthwaite – tells the story of Tilikum, a killer whale involved in the death of three people, including SeaWorld Orlando trainer Dawn Brancheau in 2010.

-12-

51.   *Blackfish* examines the dangers of working with killer whales and the consequences of keeping them in captivity.  The film shows killer whales raked and bleeding after being attacked by fellow whales in captivity; a trainer crushed between two killer whales, his body held together by only his wetsuit; and another trainer repeatedly dragged to the bottom of a pool by a killer whale before he manages to escape.

52.   To provide context and insight into these behaviors, *Blackfish* interviews former SeaWorld trainers and whale researchers who describe killer whales as highly-intelligent, social creatures meant to live in the open ocean and thus ill-suited to theme parks.

53.   In one clip, Jane Velez-Mitchell, a CNN anchor, wonders aloud: "If you were in a bathtub for 25 years, don't you think you'd get a little psychotic?"

54.   *Blackfish* accuses SeaWorld of cover-ups and disseminating false information and blames the Company – not only for Branchau's death – but for abusing animals and carelessly putting its employees in constant danger and ultimately serves as an indictment of SeaWorld's entire brand.

55.   *Blackfish* also "shatters any remaining childhood illusions you might have that orcas are happy performing tricks and splashing tourists."  As explained by Canada's *Alternatives Journal*:  "[i]f you grew up watching the Flipper television series in the 1960s or 90s, you probably developed an affinity for charismatic marine mammals.  You may have also begged your parents to take you to a marine amusement park to see

-13-

dolphins and whales 'in real life.' . . . It turns out Free Willy just scratched the surface of the wrongs that captive orcas endure."

56.    *Blackfish* premiered at the Sundance Film Festival in Park City, Utah on January 19, 2013.

57.    A few days later, on January 22, 2013, CNN Films and Magnolia Pictures partnered to acquire the rights to *Blackfish* and announced their plans for a summer theatrical release for the film.

58.    *Blackfish* was released in theaters in New York, New York and Los Angeles, California on July 19, 2013, and played in theaters nationwide throughout July and August 2013.

59.    CNN aired *Blackfish* on October 24, 2013.  It had the highest cable news viewership that evening with 1.36 million viewers.  As of mid-2016, *Blackfish* had aired on CNN 28 times to 28 million viewers.

60.    *Blackfish* was released on the streaming service Netflix on December 13, 2013, and viewed nearly 600,000 times in the first two weeks it was available.

### D.    The *Blackfish* Effect

61.    *Blackfish* ignited national outrage almost immediately upon the film's theatrical release.   The public outcry and resulting boycott of SeaWorld was so significant that it came to be known as the "*Blackfish* effect."

62.    The *Blackfish* effect began with celebrities expressing their outrage on Twitter and urging their millions – and sometimes tens of millions – of followers to watch *Blackfish* and boycott SeaWorld.

- I highly recommend all of my fans watch #Blackfish and never go to @Seaworld again.  Used to love that place.  Beyond heartbroken.  #FreeTilly – Ariana Grande, 57.4 million followers.

- Please watch BLACKFISH #befree – Miley Cyrus, 41.1 million followers.

- Just watched #Blackfish, a documentary on whales.  Made me so sad & angry to see the truth.  I will never look at Seaworld the same again. :(  –  Paris Hilton, 18.1 million followers.

- Finally watched @blackfishmovie blackfishmovie.com – I hope Seaworld goes out of business.  Horrifying. – Stephen Fry, 13.1 million followers.

- Do watch "Black Fish".  Don't go to SeaWorld, a stain upon humanity posing as entertainment.  #liftedfromanearlyreviewofmine – Russell Brand, 12.3 million followers.

- Dear @SeaWorld, You are terrible.  Sincerely, Everyone who actually cares about living creatures.  Release your slaves. – Aaron Paul, 2.8 million followers.

- Only movie I want to go see this week: Blackfish.  Watch out, Sea World.  We are on to you.  – Olivia Wilde, 1.9 million followers.

- OMFG to see @blackfishmovie Just floored by it Hey @seaworld -- you are the worst – Ellen Page, 1.4 million followers.

- 'Blackfish' and 'The Cove' should be watched before deciding to take your kids to any sea life parks. – Ewan McGregor, 1.4 million followers.

63.     The *Blackfish* effect hit a fever pitch after the film aired on CNN on October 24, 2013.  A CNN poll taken the next day revealed that 86% of respondents would no longer take their children to SeaWorld.

64.     On October 30, 2013, students from Point Loma High School in San Diego, California released a public service announcement protesting SeaWorld's treatment of animals.

65.     The next week, students at California State University – Long Beach organized a protest to demand that the school stop selling discounted tickets to SeaWorld at the student union.  Minutes before the demonstration was scheduled to start, however, school administrators confirmed that they were cutting ties with SeaWorld and all ticket sales and promotions.

66.     Shortly thereafter, People for the Ethical Treatment of Animals ("PETA") started an online petition demanding that Macy's outlaw a SeaWorld-themed float in its annual Thanksgiving Day Parade in New York, New York.  When Macy's refused to do so, PETA staged anti-SeaWorld protests at the Thanksgiving Day Parade and the Rose Parade in Pasadena, California.

67.     By the third quarter of 2013, SeaWorld's attendance had declined by 4.7% compared to the same period in 2012.  Before they were forced to acknowledge SeaWorld's abysmal attendance during the earnings call announcing the third quarter

results, Defendants began looking for a way to explain away *Blackfish* to investors. According to a document publicly filed in the Class Action Proceeding, Heaney emailed Jacobs asking him to "draft a response for [Atchison] on the inevitable 'is Blackfish affecting your business?' question on the call and post call meetings?"

68.     But the *Blackfish* effect could not be stopped or explained away.   For example, in December 2013, Point Dume Marine Science Elementary School in Malibu, California cancelled its annual overnight field trip to SeaWorld as a result of concerns raised by the film.

69.     A barrage of petitions were also started on the website Change.org asking musical performers to withdraw from SeaWorld's live concert series "Bands, Brew & BBQ" in February and March 2014.

70.     Beginning with the Barenaked Ladies in November 2013, nearly every musical act slated to perform in Bands, Brew & BBQ – including Willie Nelson, Cheap Trick, Heart, Martina McBride, 38 Special, Trisha Yearwood, REO Speedwagon, Pat Benatar, and the Beach Boys – withdrew over concerns relating to *Blackfish*.

71.     SeaWorld was powerless to stop the onslaught of negative publicity, a fact that its senior executives acknowledged internally in no uncertain terms.   According to documents publicly filed in the Class Action Proceeding, Jacobs wrote an email to SeaWorld's Public Relations Director Nick Gollattscheck in response to Willie Nelson's withdrawal from Bands, Brew & BBQ, stating:

[t]his whole fucking thing pisses me off.  What relentless amateurism we've shown in booking these fucking people and managing the whole fucking chocolate mess.  All of this could have been easily avoided.  To wit:

"Willie, on our best day SeaWorld is controversial, but right now we're being attacked from all sides.  **We are positively radioactive.  If you don't want the SeaWorld stink on you, we have to know now and we'll walk away.**"

And then the kicker:

"Oh yes.   Willie and his people say it's a scheduling conflict."

**God we look like idiots.**

72.    In addition to performers withdrawing from Bands, Brew & BBQ, groups began cancelling catered events at SeaWorld.  According to documents publicly filed in the Class Action Proceeding, at least six groups had cancelled events as of January 24, 2014, all citing *Blackfish* or related activist commentary.   The cancellations were discussed in an email chain with the subject line "CATERING IMPACT DUE TO [BLACKFISH]."    Both Atchison and Heaney received the emails, and Atchison responded "Thanks.  Frustrating . . ."

73.    By the fourth quarter of 2013, SeaWorld's attendance had declined by 4.1% compared to the same period in 2012.

74.    The Company was also losing sponsors.  Taco Bell cut ties with SeaWorld in May 2014 and STA Travel, Savings.com, and Outdoor Play followed suit soon thereafter.

75.     On July 31, 2014, Southwest Airlines ended its official partnership with SeaWorld after 26 years.  Though Southwest's announcement attributed the decision to "shifting priorities," a Change.org petition urging Southwest to end its relationship with SeaWorld had garnered over 30,000 signatures as of the date of the announcement.

76.     By the first quarter of 2014, SeaWorld's attendance had declined by a staggering 13% compared to the same period in 2013.

77.     Unsurprisingly, the failed Bands, Brew & BBQ, cancelled catered events, loss of sponsors, and low attendance caused SeaWorld to lose revenue.  According to documents publicly filed in the Class Action Proceeding, the Company was "keeping a list" of its declining revenue caused by the film and prepared and circulated to its senior management a spreadsheet entitled "Lost Blackfish Revenue" at the beginning of 2014.

78.     Given the obvious connection between SeaWorld's business downturn and *Blackfish*, it would have been absurd to suggest that the film was ***not*** an existential threat to the Company.  But, as described below, that is precisely what Defendants did.

### E.     The *Blackfish* Bill

79.     On March 7, 2014, reports surfaced that California Assembly Member Richard Bloom had introduced a bill to ban killer whale performances, breeding, and artificial insemination in the State of California.  The bill also sought to ban the import and export of killer whales across state lines and would permit killer whales to be kept in captivity only for purposes of rehabilitation and release.

-19-

80. Bloom announced the so-called "*Blackfish* Bill" later that week alongside Cowperthwaite, former SeaWorld trainers who participated in the film, and Naomi Rose, a marine mammal scientist from the Animal Welfare Institute.

81. Within a few short weeks, an online petition in support of the *Blackfish* Bill had amassed over a million signatures.

82. Sensing the inevitable, SeaWorld announced on March 17, 2016, that it would do "the best thing for our whales, our guests, our employees and SeaWorld" by ending its killer whale breeding program and phasing out its killer whale shows. The last killer whale calf to be born in captivity – Kyara – died after only three months at SeaWorld San Antonio.

83. The *Blackfish* Bill was signed into law on September 13, 2016.

84. On June 23, 2017, SeaWorld filed a Form 8-K with the SEC disclosing "an investigation by the U.S. Department of Justice concerning disclosures and public statements made by [SeaWorld] and certain executives and/or individuals on or before August 2014, including those regarding the impact of the 'Blackfish' documentary, and trading in the Company's securities." The government's investigation of SeaWorld and its executives remains ongoing.

## F.   SeaWorld's Public and Private Response to *Blackfish*

85. SeaWorld's response to *Blackfish* was deliberate and premeditated. Indeed, even before *Blackfish*'s theatrical release, SeaWorld was working behind the scenes to

discredit the film.  According to *Orlando Weekly*, "[SeaWorld] hired Manhattan PR firm 42West to help it discredit *Blackfish* before it got out to the public."

86.    SeaWorld also published an open letter on its website and in eight newspapers, including the *New York Times*, *Los Angeles Times*, *Wall Street Journal*, *Orlando Sentinel*, and *USA Today* to "set the record straight" about its treatment of killer whales.

87.    In the open letter, SeaWorld attempted to discredit *Blackfish* by rebutting some of the claims made in the film, namely: that it captures killer whales, separates killer whale mothers and calves, and that its killer whales do not live as long those in the wild.  SeaWorld also claimed that it invests millions of dollars in caring for its killer whales and, incredibly, that "[t]he killer whales in [SeaWorld's] care benefit those in the wild."

88.    At the same time the Company was professing in its open letter that "[t]he truth about SeaWorld is right here in our parks and people," its senior management, including the Individual Defendants, were using covert, nefarious means to further discredit and downplay *Blackfish*.

89.    For example, the *Orlando Business Journal* posted a poll in December 2013 asking whether *"CNN's 'Blackfish' documentary changed your perception of SeaWorld?"* An overwhelming 99% of respondents voted "No."   The *Journal* later reported that more than half of the votes had been cast from a single IP address –

SeaWorld.com.   The results of the poll changed dramatically thereafter, with 73% of respondents voting "Yes," *Blackfish* changed my perception of SeaWorld.

90.    According to documents publicly filed in the Class Action Proceeding, Gollattscheck sent an email to the Company's executives on December 24, 2013, asking them to "flood" a similar poll in the *Orlando Sentinel*:

> the Sentinel poll is still running.  Let's keep flooding it.  Have also heard if you click "no," them [sic] click on "vote" multiple times, it will count multiple votes.  Like a hundred or so.
>
> Happy holidays and keep voting.
>
> Ho ho vote.

91.    SeaWorld also admitted that one of its employees – Paul McComb, alias Thomas Jones – had gone undercover as a PETA activist to infiltrate protests and obtain inside information from other members.  McComb was one of the "activists" arrested during PETA's protest at the Rose Parade and was part of other anti-SeaWorld efforts throughout 2014.

92.    As detailed above, *Blackfish* caused a precipitous attendance decline at SeaWorld-branded theme parks and spurred a fundamental, cultural shift in the public perception of SeaWorld and its brand.  But instead of disclosing these facts to the market, Defendants employed extreme cloak-and-dagger tactics to discredit and downplay *Blackfish* while publicly misrepresenting that the film had no impact on attendance.

## II.      Defendants' Representations to Induce Plaintiffs to Invest in SeaWorld

93.      At the same time *Blackfish* was decimating SeaWorld and its brand, Defendants made numerous misrepresentations downplaying and covering up the effects of the film to induce Plaintiffs and other public investors to purchase SeaWorld's common stock.  Specifically, Defendants misrepresented that the declining attendance at SeaWorld theme parks was due to temporary, transitory events like the weather and ill-timed holidays and not *Blackfish* and its crippling effect on SeaWorld's brand and public image.

94.      SeaWorld's attendance – one of the Company's key business metrics and the largest factor affecting its revenues and results of operations – was extremely important to Plaintiffs' decision to initiate and maintain an investment in SeaWorld common stock.  Knowing whether SeaWorld experienced a change in attendance and the drivers behind that change allowed Plaintiffs to evaluate SeaWorld's financial health and long-term viability and compare it to that of other companies and theme parks.  Simply put, a SeaWorld without killer whales – which are "emblematic of [its] whole brand" – is a fundamentally different company than one suffering temporary headwinds and poised to recover.

95.      SeaWorld's quarterly report for the second quarter of 2013, filed with the SEC on Form 10-Q on or about August 14, 2013, revealed that the Company had experienced a 6% decline in attendance in the first six months of 2013 compared to the same period the prior year.  SeaWorld attributed the attendance decline to:

> *the expected impact of . . . new pricing and yield management strategies, along with the impact of adverse weather conditions,* particularly at our Florida and Virginia parks during the second quarter. These weather conditions also impacted all but one of our park locations in the month of June. ***The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline*** as it caused an overlap with the spring break holiday period for schools in many of our key markets

96.   The 2013 second quarter report, signed by Heaney and Swanson, omitted any mention of *Blackfish* whatsoever.

97.   The Company repeated these reasons for SeaWorld's 6% decline in attendance in the press release announcing the results for the second quarter and during the quarterly earnings call that day.

98.   Two weeks later on August 29, 2013, the *Los Angeles Times* published an article questioning whether SeaWorld's 6% decline in attendance was "due to bad publicity or bad weather?"   The article pointed out that SeaWorld "has endured some harsh publicity lately with the debut this summer of '*Blackfish*,' a documentary about the mistreatment of orca whales in captivity, particularly at SeaWorld Orlando in Florida."

99.   In the article, Jacobs denied the *Blackfish* effect in no uncertain terms, stating: "'***Blackfish' has had no attendance impact.***"

100.   SeaWorld's quarterly report for the third quarter of 2013, filed with the SEC on Form 10-Q on or about November 13, 2013, revealed that the Company had experienced a 4.7% decline in attendance in the first nine months of 2013 compared to the same period the prior year.   SeaWorld again attributed the attendance decline to:

-24-

*the anticipated impact of . . . new pricing and yield management strategies*, which increased revenue but reduced low yielding and free attendance.  Also contributing to the decline was *unexpected adverse weather conditions,* particularly during the second quarter and in July of 2013.  *The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline* as it caused an overlap with the spring break holiday period for schools in many of our key markets.

101.   The 2013 third quarter report, signed by Heaney and Swanson, omitted any mention of *Blackfish* whatsoever.

102.   The Company repeated these reasons for SeaWorld's 4.7% decline in attendance in the press release announcing the results for the third quarter and during the quarterly earnings call that day.

103.   After the markets closed on November 13, 2013, the *Wall Street Journal* published an article entitled "Sea World Profit Up 30%; Downplays 'Blackfish' Effect." According to the article, Atchison stated in an interview: "*I scratch my head if there's any notable impact from [Blackfish] at all, and I can't attribute one to it . . . [i]ronically, our attendance has improved since the movie came out.*"

104.   As the news worsened for the Company and *Blackfish* continued to decimate attendance at its parks, Defendants' denials became more strident.

105.   On December 20, 2013, the *Orlando Sentinel* published an article entitled "SeaWorld launches 'Blackfish' counterattack in ads."  The article stated that "[d]espite its high-profile response today, Atchison insisted that 'Blackfish' and the negative publicity it has spawned have not hurt SeaWorld's business."  Atchison went on to state

"*[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on [SeaWorld's] business.*"

106.   SeaWorld's annual report for 2013, filed with the SEC on form 10-K on or about March 13, 2014, revealed that the Company had experienced an overall 4.1% decline in attendance in 2013 compared to the same period the prior year.   SeaWorld again attributed the decline in attendance to:

> *the anticipated impact of . . . new pricing and yield management strategies,* which increased revenue but reduced low yielding and free attendance. Also contributing to the decline was *unexpected adverse weather conditions*, particularly during the second quarter and in July of 2013. *The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline* as it caused an overlap with the spring break holiday period for schools in many of our key markets.

107.   The 2013 annual report, signed by Atchison, Heaney, and Swanson, omitted any mention of *Blackfish* whatsoever.

108.   Not only were these purported reasons for the declining attendance at SeaWorld theme parks repeated in the press release announcing the SeaWorld's annual results, but the Company doubled down on its misrepresentations during the earnings call that day.   During the earnings call, Atchison was asked about "the big thing . . . that's been in the media" – *Blackfish* – and its impact on attendance.   He responded that "as much as we're asked it, *we can see no noticeable impact on our business.*"   Atchison

also stated that SeaWorld did not perceive "***any shift in sentiment about intent to visit our parks***" and actually credited *Blackfish* with increasing interest in SeaWorld.

109.   SeaWorld's quarterly report for the first quarter of 2014, filed with the SEC on form 10-Q on or about May 14, 2014, revealed that the Company had experienced a staggering 13% decrease in attendance in the first quarter of 2014 compared to the same period the prior year.   Once again, SeaWorld attributed the decline in attendance to:

> ***a shift in the timing of Easter*** into the second quarter in 2014, which caused a shift in the spring break holiday period for schools in many key source markets. Attendance was also impacted by ***adverse weather, particularly above average precipitation in the Florida market as well as below average temperatures in the Texas market*** for the first quarter of 2014.

110.   The 2014 first quarter report, signed by Heaney and Swanson, omitted any mention of *Blackfish* whatsoever.

111.   The Company repeated the same purported reasons for its declining attendance in the press release announcing its first quarter results, adding in during the quarterly earnings call that the drop in attendance was also attributable to fewer operating days in 2014.

112.   As described below, these representations were false and misleading when made and/or omitted material facts.   The decline in attendance at SeaWorld-branded theme parks was not – as Defendants claimed – due to weather, ill-timed holidays, or other temporary and transitory events, but instead to *Blackfish* and its crippling effect on SeaWorld and its brand.

113.   Knowing that an acknowledgment of the *Blackfish* effect was tantamount to an admission of an existential crisis at the Company, Defendants kept up their ruse as long as they could.  Unsurprisingly, when the truth came out, it had a devastating effect on the Company's stock price.

### III.   Plaintiffs Purchase SeaWorld Common Stock in Reliance on Defendants' Representations

114.   Plaintiffs are investment funds managed by Highfields.

115.   Plaintiffs, through Highfields, specifically relied on the representations set forth above prior to purchasing SeaWorld stock, as well as on the integrity of the market price of SeaWorld common stock.

116.   Highfields began directing Plaintiffs to purchase SeaWorld stock in September 2013.

117.   Prior to purchasing SeaWorld stock for Plaintiffs, one or more analysts at Highfields reviewed SeaWorld's public disclosures, investor presentations, and financial statements.

118.   As Plaintiffs continued to purchase SeaWorld stock throughout 2013 and 2014, one or more analysts at Highfields kept abreast of publicly-disclosed developments concerning SeaWorld by, among other things, reviewing the Company's SEC filings and media reports concerning SeaWorld.

119.   SeaWorld viewed investors like Highfields as significant investors whose purchases of SeaWorld stock was necessary to the Company's success and to drive the

stock price higher.   Defendants Atchison, Heaney, and Swanson had a significant economic interest in inducing Plaintiffs to purchase SeaWorld stock.

120.   When purchasing SeaWorld stock on behalf of Plaintiffs, one or more analysts at Highfields actually read (or heard) and relied on each of the statements described above.

121.   Each of the representations made by Defendants was material to Plaintiffs.

122.   Because attendance is one of SeaWorld's key business metrics and the largest factor affecting the Company's revenue and results of operations, statements concerning attendance at SeaWorld theme parks were highly material to Plaintiffs.   In that same vein, the reasons for a decline in attendance at SeaWorld theme parks were highly material to Plaintiffs.   There is a meaningful difference between a temporary dip in attendance due to weather or ill-timed holidays and a steady decline in attendance caused by a fundamental, cultural shift in the public perception of SeaWorld and its brand.   A reasonable investor would perceive the former as having only a transitory impact, while the latter would be perceived as a serious blow which significantly decreases the fundamental value of the business.

123.   Because SeaWorld's brand *is* killer whales, a SeaWorld without killer whales is not SeaWorld at all.   As the Company's former Vice President for Entertainment Dave Goodman put it: "[r]eplacing Shamu to Seaworld is like getting rid of Mickey to Disney."   Or, as Debanjan Mitra, branding expert at the University of

Florida's Warrington College of Business explained: "[a] comparable situation would be if McDonald's says, 'Tomorrow we are taking down the Big Mac.'"

124. Thus, Defendants' representations that the declining attendance at SeaWorld theme parks was due to everything *but Blackfish* lulled Plaintiffs into a false sense of security that SeaWorld's brand would not change and would remain just as valuable.

125. Had Highfields known the truth (as described below), it would not have purchased SeaWorld common stock on behalf of Plaintiffs or, if it had done so, would not have paid the prices it did.

## IV. **Defendants' Representations to Plaintiffs Were Materially False and Misleading When Made**

126. Unbeknownst to Highfields at the time, the material representations that Defendants made concerning the significant, marked decline in attendance at SeaWorld-branded theme parks were false and/or omitted truthful information that rendered the representations materially misleading.

127. Contrary to Defendants' representations, the declining attendance at SeaWorld-branded theme parks was due in large part to *Blackfish*.

128. SeaWorld blamed the declining attendance at its theme parks on new pricing and yield management strategies, adverse weather conditions, and the unfavorable timing of Easter. But these factors were not the sole reasons for the declining attendance at SeaWorld-branded theme parks.

129. According to the 2013 and 2014 TEA/AECOM Reports, nearly every major theme park in the United States saw increased attendance in 2013 and 2014. The top 20

theme parks in the United States boasted an average 2.7% increase in attendance in 2013 and an average 2.2% increase in 2014.

130.   SeaWorld's competitors in Florida and Southern California saw an even more significant increase in attendance in 2013 and 2014:

| Park | Location | 2013 Attendance | Change (%) | 2014 Attendance | Change (%) |
|---|---|---|---|---|---|
| Disney's Magic Kingdom | Lake Buena Vista, Florida | 18,588,000 | + 6.0% | 19,332,000 | + 4.0% |
| Disney's Epcot | Lake Buena Vista, Florida | 11,229,000 | + 1.5% | 11,454,000 | + 2.0% |
| Disney's Animal Kingdom | Lake Buena Vista, Florida | 10,198,000 | + 2.0% | 10,402,000 | + 2.0% |
| Disney's Hollywood Studios | Lake Buena Vista, Florida | 10,110,000 | + 2.0% | 10,312,000 | + 2.0% |
| Universal's Islands of Adventure | Orlando, Florida | 8,141,000 | + 2.0% | 8,141,000 | 0.0% |
| Universal Studios Florida | Orlando, Florida | 7,062,000 | + 14.0% | 8,263,000 | + 17.0% |
| **SeaWorld Orlando** | **Orlando, Florida** | **5,090,000** | **- 5.0 %** | **4,683,000** | **- 8.0 %** |
| Disneyland | Anaheim, California | 16,202,000 | + 1.5% | 16,769,000 | + 3.5% |
| Disney's California Adventure | Anaheim, California | 8,514,000 | + 9.5% | 8,769,000 | + 3.0% |
| Universal Studios Hollywood | Universal City, California | 6,148,000 | + 4.0% | 6,824,000 | + 11.0% |
| **SeaWorld San Diego** | **San Diego, California** | **4,311,000** | **- 3.0%** | **3,794,000** | **- 12.0%** |

-31-

131.   As noted, theme parks are clustered in certain geographic areas and provide guests with incentives to visit multiple theme parks during their trips to Florida and Southern California.

132.   Had SeaWorld truly been plagued by new pricing and yield management strategies, adverse weather conditions, and the unfavorable timing of Easter, its competitors should have seen a similar decline in attendance due to these generally applicable factors.  But they did not.

133.   With respect to weather and the timing of the Easter holiday, both Disney and Universal operate theme parks in the same geographic area with the same school calendars as SeaWorld-branded theme parks.  But neither Disney nor Universal-owned theme parks experienced a decline in attendance in 2013 and 2014.

134.   As a May 14, 2014 *Motley Fool* article pointed out:  "Mickey's theme parks saw increased attendance in the first quarter [of 2014], while SeaWorld's dropped 13%, which it attributed to a late Easter (that wasn't in the first quarter) and weird spring-break timing.  But why didn't late Easter eggs and confused spring breakers have the same effect on Disney World?"

135.   The supposed effect of SeaWorld's price increases was also a pretext. SeaWorld, Disney, and Universal all raised their ticket prices in 2013 and 2014, but only SeaWorld-branded theme parks experienced a decline in attendance.

136.   The only plausible explanation for the decrease in attendance at SeaWorld-branded theme parks and increase at its competitors' similarly situated theme parks is

*Blackfish*. Even if temporary and transitory events like the weather and ill-timed holidays had some impact on attendance, it was highly misleading for Defendants to fail to disclose that *Blackfish* was also a substantial contributing factor. Having chosen to address the reasons for the declining attendance at SeaWorld theme parks – and explain away the problem – Defendants had a duty to truthfully and fully admit that *Blackfish* was a contributing factor (if not the most significant one).

137. Members of SeaWorld's senior management were well aware of *Blackfish*'s impact on attendance yet failed to disclose that fact to the market. Indeed, because management recognized the film as a fundamental attack on SeaWorld's brand, Defendants began employing extreme cloak-and-dagger tactics to discredit and downplay *Blackfish* even before its theatrical release, all while publicly denying that the film had any impact and blaming SeaWorld's declining attendance on weather and poorly timed holidays. As the *Blackfish* effect escalated, so did Defendants' duplicity – they "flooded" polls, infiltrated PETA, and increased the stridency of their denials to investors about the purported non-impact of the film.

**V.    The Truth is Revealed to the Market on August 13, 2014, Causing the Price of SeaWorld's Stock to Plummet and Plaintiffs to Suffer Significant Damages**

138. When the corrective disclosure concerning the above-described misrepresentations was released to the market, the price of SeaWorld common stock precipitously declined, and Plaintiffs suffered significant losses on their purchases of SeaWorld stock.

-33-

139.   The truth about the impact *Blackfish* had on attendance at SeaWorld-branded theme parks was revealed on August 13, 2014, when the Company admitted in its quarterly report for the second quarter of 2014 that attendance was "impacted by demand pressures we believe were related to recent media attention surrounding proposed legislation in the state of California."   SeaWorld also admitted that the media attention relating to the *Blackfish* Bill – a direct result of the film's shocking allegations – adversely impacted its reputation and results of operations.

140.   SeaWorld's admissions in the quarterly report for the second quarter of 2014 were echoed in the Company's press release and during the quarterly earnings call that day.   During the earnings call, Atchison acknowledged that the Company was aware of the *Blackfish* Bill in May but "were really still grappling with . . . what impact there would be related to the news attention around that legislation. . . . So, in that regard, I think it was too early to call and tell what kind of impact we might have over the rest of the summer."   Now, however – and for the first time – the Company confirmed that attendance at SeaWorld-branded theme parks had been negatively impacted by *Blackfish*.

141.   Though the Company did not mention *Blackfish* by name, it was obvious that Defendants were referring to the film, its effect, and the legislation it spawned. Indeed, the market understood these admissions as SeaWorld's long overdue recognition of the *Blackfish* effect and its negative impact on attendance at SeaWorld-branded theme parks.

-34-

142. For example, a *Cinemablend.com* article entitled "SeaWorld Finally Admits That The Documentary Blackfish Is Hurting Attendance" stated that, while the Company "didn't specify *Blackfish*'s impact by name, the [admissions in the 2014 second quarter report] is actually a huge step when compared to the amount of denial that was coming out of the company about the documentary."

143. The *Wall Street Journal* had the same reaction, deeming the admissions in the 2014 second quarter report "an about face for SeaWorld, which late last year was singing a much different tune."

144. So did *New York Magazine*. In an article entitled "SeaWorld: Remember When We Said That *Blackfish* Movie Didn't Hurt Us? Well Never Mind," the magazine reported: "Today, SeaWorld changed course, and admitted, finally, that the backlash is taking a toll after all. . . . In today's press release, SeaWorld admitted for the first time that *Blackfish* may be hurting attendance, blaming people skipping their parks owing to 'recent media attention surrounding proposed legislation in the state of California.'"

145. And so did *Adweek.com*. Its article "SeaWorld Finally Confirms a *Blackfish* Backlash to Investors" recognized that SeaWorld has "changed its tune in a telling press release" and that "this release effectively serves as an admission that, despite claims to the contrary, the movie has indeed had an adverse effect on the business."

146. Upon the Company's admissions, SeaWorld stock dropped nearly 33% from a close of $28.15 per share on August 12, 2014, to close at $18.90 per share on August 13, 2014.

147.   As a result of this significant price drop, Plaintiffs suffered millions of dollars of investment losses.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

148.   Defendants made numerous false and misleading statements of fact, and omitted to disclose material facts, concerning *Blackfish* and the crippling effect the film was having on attendance – the Company's most important business metric.

149.   SeaWorld's quarterly report for the second quarter of 2013, filed with the SEC on Form 10-Q on or about August 14, 2013, and signed by Heaney and Swanson, misrepresented to investors the impact that *Blackfish* was having on attendance in the first six months of 2013.   Specifically, Defendants misrepresented that SeaWorld's 6% decrease in attendance compared to the same period the prior year was due to:

> *the expected impact of these . . . pricing and yield management strategies, along with the impact of adverse weather condition*s, particularly at our Florida and Virginia parks during the second quarter. These weather conditions also impacted all but one of our park locations in the month of June. *The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline* as it caused an overlap with the spring break holiday period for schools in many of our key markets

150.   These purported reasons for the declining attendance at SeaWorld theme parks – new pricing and yield management strategies, adverse weather conditions, and the unfavorable timing of Easter – were repeated in the Company's press release announcing its second quarter results and by Heaney during the quarterly earnings call that day.

151.   On August 29, 2013, the *Los Angeles Times* published an article questioning whether SeaWorld's 6% decline in attendance was "due to bad publicity or bad weather?"   The article pointed out that SeaWorld "has endured some harsh publicity lately with the debut this summer of '*Blackfish*,' a documentary about the mistreatment of orca whales in captivity, particularly at SeaWorld Orlando in Florida."

152.   In the article, Jacobs denied the *Blackfish* effect in no uncertain terms, stating: "***'Blackfish' has had no attendance impact.***"

153.   SeaWorld's quarterly report for the third quarter of 2013, filed with the SEC on Form 10-Q on or about November 13, 2013, and signed by Heaney and Swanson, misrepresented to investors the impact that *Blackfish* was having on attendance in the first nine months of 2013.   Specifically, Defendants misrepresented that SeaWorld's 4.7% decrease in attendance compared to the same period the prior year was due to:

> *the anticipated impact of . . . new pricing and yield management strategies*, which increased revenue but reduced low yielding and free attendance.  Also contributing to the decline was *unexpected adverse weather conditions,* particularly during the second quarter and in July of 2013. *The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline* as it caused an overlap with the spring break holiday period for schools in many of our key markets.

154.   These purported reasons for the declining attendance at SeaWorld theme parks – new pricing and management strategies, adverse weather conditions, and the unfavorable timing of Easter – were echoed in the Company's press release announcing its third quarter results and by Heaney during the quarterly earnings call that day.

-37-

155.   After the markets closed on November 13, 2013, the *Wall Street Journal* published an article entitled "Sea World Profit Up 30%; Downplays 'Blackfish' Effect." According to the article, Atchison stated in an interview: "***I scratch my head if there's any notable impact from [Blackfish] at all, and I can't attribute one to it . . . [i]ronically, our attendance has improved since the movie came out.***"

156.   On December 20, 2013, the *Orlando Sentinel* published an article entitled "SeaWorld launches 'Blackfish' counterattack in ads."  The article states that "[d]espite its high-profile response today, Atchison insisted that 'Blackfish' and the negative publicity is has spawned have not hurt SeaWorld's business."  Atchison went on to state "***[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on [SeaWorld's] business.***"

157.   SeaWorld's annual report for 2013, filed with the SEC on form 10-K on or about March 13, 2014, and signed by Atchison, Heaney, and Swanson, again misrepresented to investors the impact that *Blackfish* was having on attendance. Specifically, Defendants misrepresented that SeaWorld's 4.1% decrease in attendance compared to the same period the prior year was due to:

> ***the anticipated impact of . . . new pricing and yield management strategies,*** which increased revenue but reduced low yielding and free attendance. Also contributing to the decline was ***unexpected adverse weather conditions***, particularly during the second quarter and in July of 2013***. The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline*** as it caused an

-38-

overlap with the spring break holiday period for schools in many of our key markets.

158. Not only were these purported reasons for the declining attendance at SeaWorld theme parks repeated in the press release announcing the SeaWorld's annual results, but the Company doubled down on its misrepresentations during the annual earnings call that day. During the earnings call, Atchison was asked about "the big thing . . . that's been in the media" – *Blackfish* – and its impact on attendance. He responded that "as much as we're asked it, *we can see no noticeable impact on our business.*" Atchison also stated that SeaWorld did not perceive "*any shift in sentiment about intent to visit our parks*" and actually credited *Blackfish* with increasing interest in SeaWorld.

159. SeaWorld's quarterly report for the first quarter of 2014, filed with the SEC on form 10-Q on or about May 14, 2014, and signed by Heaney and Swanson, once again misrepresented to investors the impact that *Blackfish* was having on attendance in the first three months of 2014. Specifically, Defendants misrepresented that SeaWorld's staggering 13% decrease in attendance compared to the same period the prior year was due to:

> *a shift in the timing of Easter* into the second quarter in 2014, which caused a shift in the spring break holiday period for schools in many key source markets. Attendance was also impacted by *adverse weather, particularly above average precipitation in the Florida market as well as below average temperatures in the Texas market* for the first quarter of 2014.

160. The Company repeated the same purported reasons for the declining attendance at SeaWorld theme parks in the press release announcing its first quarter

-39-

results, and Heaney added in during the quarterly earnings call that the drop in attendance was also attributable to fewer operating days in 2014.

161. These statements were materially false and misleading. The decrease in attendance at SeaWorld-branded theme parks was not – as the Company claimed – the result of new pricing and yield management strategies, adverse weather conditions, and the unfavorable timing of Easter, but *Blackfish*. Yet, Defendants made a concerted and consistent effort to downplay the film and omit the crippling effect it was having on attendance at SeaWorld-branded theme parks.

162. Members of SeaWorld's senior management knew that *Blackfish* was impacting attendance but failed to disclose that fact to the market. Indeed, Defendants began employing extreme cloak-and-dagger tactics to discredit and downplay *Blackfish* even before its theatrical release, all while publicly denying that the film had any impact and blaming the declining attendance at SeaWorld theme parks on weather and poorly timed holidays. As the *Blackfish* effect escalated, so did Defendants' duplicity – they "flooded" polls, infiltrated PETA, and increased the stridency of their denials to investors about the purported non-impact of *Blackfish*. There would have been no need for these duplicitous tactics had the film been having no impact on SeaWorld's attendance – as Defendants represented to investors.

## SUMMARY OF DEFENDANTS' SCIENTER

163.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

164.   Defendants Atchison, Heaney, and Swanson acted with scienter – the intent to defraud or recklessness with regard to the truth – with respect to the materially false and misleading statements described above.

165.   As senior executives of SeaWorld, Atchison, Heaney, and Swanson knew of or recklessly disregarded the *Blackfish* effect and its impact on attendance at SeaWorld-branded theme parks throughout 2013 and 2014 and made numerous public statements to investors intended to downplay the film's impact.

166.   *Blackfish* ignited national outrage almost immediately upon the film's theatrical release.   Schools severed ties with SeaWorld, PETA staged protests at the Macy's Thanksgiving Day Parade and Rose Parade, and SeaWorld's attendance declined.

167.   Before they were forced to acknowledge the declining attendance at SeaWorld theme parks during the earnings call announcing the Company's third quarter results, Defendants began looking for a way to explain away *Blackfish* to investors. According to a document publicly filed in the Class Action Proceeding, Heaney emailed Jacobs asking him to "draft a response for [Atchison] on the inevitable 'is Blackfish affecting your business?' question on the call and post call meetings?"

-41-

168. But *Blackfish* could not be explained away. SeaWorld's attendance continued to decline and public relations disasters – like nearly every musical act slated to perform in Bands, Brew & BBQ withdrawing over concerns relating to *Blackfish* - ensued. Defendants Atchison, Heaney, and Swanson were aware of the withdrawals and were also kept apprised of the cancelled catered events, lost sponsors, and declining revenue attributable to *Blackfish*. Yet, they continued to downplay *Blackfish* and omit the crippling effect it was having on attendance at SeaWorld-branded theme parks.

169. Plainly, Defendants knew of *Blackfish*'s actual effect and any statement to the contrary was at least reckless with regard to the truth.

170. Even before the lost events, sponsors, and visitors to its parks, SeaWorld hired a public relations firm to discredit *Blackfish*. The Company also published an open letter on its website and in eight newspapers to "set the record straight" about its treatment of killer whales.

171. When the open letter failed to stop the bleeding, the Company employed more surreptitious measures to downplay and discredit *Blackfish*. SeaWorld instructed its employees "flood" at least two polls relating to *Blackfish* and even had one of its employees pose as a PETA activist to infiltrate anti-SeaWorld protests and obtain inside information from other members.

172. The lengths to which the Company was willing to go, and the lies it was willing to tell, demonstrates Defendants' knowledge or reckless disregard of the profound impact that *Blackfish* had on attendance at SeaWorld-branded theme parks. It also

-42-

demonstrates the Individual Defendants' propensity for duplicity with regard to *Blackfish*, the *Blackfish* effect, and SeaWorld's misrepresentations regarding the declining attendance at SeaWorld theme parks.

173.   As a senior executive of SeaWorld, Jacobs's knowledge is imputable to Defendant SeaWorld.

174.   As senior executives of SeaWorld, Atchison's, Heaney's, and Swanson's knowledge is imputable to Defendant SeaWorld.

## **PLAINTIFFS' ACTUAL RELIANCE**

175.   Plaintiffs, through Highfields, actually read (or heard), reviewed, and justifiably relied on Defendants' misrepresentations prior to purchasing SeaWorld stock.

176.   Highfields began purchasing SeaWorld common stock for Plaintiffs in September 2013.

177.   Prior to purchasing SeaWorld stock for Plaintiffs, one or more analysts at Highfields actually read (or heard), reviewed, and justifiably relied on SeaWorld's public disclosures, investor presentations, and financial statements, including the August 29, 2013 *Los Angeles Times* article and the quarterly report for the second quarter of 2013 and the press release and earnings call announcing the Company's results for that quarter.

178.   As Plaintiffs continued to purchase SeaWorld stock throughout 2013 and 2014, one or more analysts at Highfields kept abreast of publicly-disclosed developments concerning SeaWorld, and prior to purchasing stock, as applicable, actually read (or heard), reviewed, and justifiably relied on SeaWorld's public disclosures, investor

presentations, and financial statements, including the November 14, 2013 *Wall Street Journal* article, the December 20, 2013 *Orlando Sentinel* article, the quarterly report for the third quarter of 2013 and the press release and earnings call announcing the Company's results for that quarter, the 2013 annual report and the press release and earnings call announcing the Company's results for that year, and the quarterly report for the first quarter of 2014 and the press release and earnings call announcing the Company's results for that quarter.

179.   When purchasing SeaWorld stock on behalf of Plaintiffs, one or more analysts at Highfields actually read (or heard) and relied on each of the statements described above.

180.   Plaintiffs' reliance on the statements described above was reasonable and justifiable.  Plaintiffs were open-market purchasers of SeaWorld common stock that did so based on Defendants' public representations.  Because of the way in which SeaWorld disclosed attendance at its theme parks, Plaintiffs were forced to rely on the Company's representations about this key business metric.

181.   Had Highfields known the truth, it would not have purchased SeaWorld common stock on behalf of Plaintiffs or, if it had done so, would not have paid the prices it did.

## **PRESUMPTION OF RELIANCE**

182.   In addition to Plaintiffs' actual reliance, Plaintiffs intend in the alternative to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in

that, among other things:  (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) SeaWorld common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of SeaWorld common stock; and (e) Plaintiffs purchased SeaWorld common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

183.   The market for SeaWorld common stock was open, well-developed, and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, SeaWorld common stock traded at artificially inflated prices during the relevant period.

184.   At all relevant times, the market for SeaWorld common stock was efficient for the following reasons, among others:  (a) SeaWorld filed periodic reports with the SEC; (b) the stock was listed and actively traded on the NYSE; (c) numerous analysts, including analysts from Wells Fargo, JPMorgan, Goldman Sachs, and Barclays followed SeaWorld; and (d) SeaWorld regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

185.   Plaintiffs purchased SeaWorld common stock in reliance on the market price of SeaWorld common stock, which reflected all the information in the market, including the misstatements and omissions by Defendants.

## LOSS CAUSATION

186.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased SeaWorld common stock, as set forth in Exhibits A through E, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.

187.   On August 12, 2014, SeaWorld's common stock closed at a price of $28.15 per share.

188.   On August 13, 2014, SeaWorld admitted in its quarterly report for the second quarter of 2014 that its attendance was "impacted by demand pressures we believe were related to recent media attention surrounding proposed legislation in the state of California."  This admission was echoed in the Company's press release and during the quarterly earnings call that day.  That legislation – the *Blackfish* Bill – was a direct result of, and reflected the national outrage at, SeaWorld caused by the film.  As the analyst reports discussed above make clear, the market perceived this announcement to be an admission by Defendants that *Blackfish* was responsible for the declining attendance at SeaWorld-branded theme parks.

189.   The August 13, 2014 corrective disclosure caused SeaWorld stock to drop nearly 33% to close at a price of $18.90 per share.  The stock has never recovered; indeed, it has not closed at over $20.00 since the August 13, 2014 corrective disclosure. This demonstrates both the degree to which Defendants' misrepresentations inflated SeaWorld's stock price and the monumental importance of killer whales to SeaWorld's brand and fundamental value.

190.   Moreover, the aforementioned drop in stock price reflected the materialization of the risk that the attendance decline at SeaWorld-branded theme parks was not due to weather or poorly timed holidays, but a fundamental shift in the public's perception of SeaWorld and its brand.

191.   As highlighted by Defendants' statements, SeaWorld desperately sought to assure investors that the precipitously declining attendance at its theme parks was due to isolated events like weather and poorly timed holidays.  In doing so, Defendants concealed the foreseeable risk that *Blackfish* caused the attendance decline at SeaWorld-branded theme parks, spurred a fundamental, cultural shift in the public's perception of SeaWorld and its brand, and resulted in a radical decline in the value of SeaWorld's business.  That risk eventually materialized with SeaWorld's August 13, 2014 admission that its attendance had been "impacted by demand pressures . . . related to recent media attention surrounding proposed legislation in the state of California" – *i.e.*, the *Blackfish* Bill – and caused the Company's stock price to decline nearly 33% from $28.15 per share on August 12, 2014, to $18.90 per share on August 13, 2014.

-47-

## NO SAFE HARBOR

192.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.   Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SeaWorld who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

193.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

-48-

194.   This Cause of Action is asserted against Defendants SeaWorld, Atchison, Heaney, and Swanson for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

195.   Defendants SeaWorld, Atchison, Heaney, and Swanson, both directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and/or omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of SeaWorld common stock; and (iii) cause Plaintiffs to purchase SeaWorld common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants SeaWorld, Atchison, Heaney, and Swanson took the actions set forth above.

196.   Defendants SeaWorld, Atchison, Heaney, and Swanson both directly and indirectly: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of SeaWorld common stock in an effort to artificially inflate and maintain the market prices for SeaWorld common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

197.   By virtue of their high-level positions at the Company, Defendants Atchison, Heaney, and Swanson were authorized to make public statements, and made public statements on SeaWorld's behalf.  These senior executives were privy to and participated

in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

198.   In addition, Defendants SeaWorld, Atchison, Heaney, and Swanson had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete and accurate information.

199.   Defendants SeaWorld, Atchison, Heaney, and Swanson acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.   SeaWorld's, Atchison's, Heaney's and Swanson's material misrepresentations and/or omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to SeaWorld's operations, business, performance, and prospects from the investing public, including misstating the reason for the declining attendance at SeaWorld-branded theme parks.   By concealing these material facts from investors, SeaWorld, Atchison, Heaney, and Swanson supported the artificially inflated price of SeaWorld's common stock.

200.   The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of SeaWorld's common stock.   In ignorance of the fact that the market prices were

artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by SeaWorld, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants SeaWorld, Atchison, Heaney, and Swanson, but not disclosed in public statements by SeaWorld, Atchison, Heaney, and Swanson, Plaintiffs purchased SeaWorld common stock at artificially inflated prices.  Once the corrective disclosure was issued, the price of SeaWorld's securities substantially declined.

201.   Plaintiffs reasonably and justifiably relied on the misrepresentations and/or omissions set forth above.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of SeaWorld, which was concealed by Defendants SeaWorld, Atchison, Heaney, and Swanson, Plaintiffs would not have purchased SeaWorld common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

202.   By virtue of the foregoing, Defendants SeaWorld, Atchison, Heaney, and Swanson have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants SeaWorld, Atchison, Heaney, and Swanson in *Baker v. Seaworld Entertainment, Inc.*, No. 3:14-cv-02129-MMA-KSC (S.D. Cal.), Plaintiffs have brought this claim within two years of discovery of the violations

alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Atchison, Heaney, And Swanson

204.   Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

205.   This Cause of Action is asserted against Defendants Atchison, Heaney, and Swanson and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

206.   Each of Defendants Atchison, Heaney, and Swanson was at the time of the wrongs alleged herein a controlling person of SeaWorld within the meaning of Section 20(a) of the Exchange Act.

207.   By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements and/or omissions filed with the SEC and disseminated to the investing public, Defendants Atchison, Heaney, and Swanson had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

208.   Defendants Atchison, Heaney, and Swanson were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of

the statements or cause the statements to be corrected.   In particular, Defendants Atchison, Heaney, and Swanson each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

209.   By reason of the conduct alleged in the First Cause of Action, SeaWorld is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Atchison, Heaney, and Swanson are liable pursuant to Section 20(a) based on their control of SeaWorld.

210.   Defendants Atchison, Heaney, and Swanson are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of SeaWorld common stock.

211.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants SeaWorld, Atchison, Heaney, and Swanson in *Baker v. Seaworld Entertainment, Inc.*, No. 3:14-cv-02129-MMA-KSC (S.D. Cal.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.   Consequently, this action is timely.

## **THIRD CAUSE OF ACTION**

### **Common Law Fraud
(Pursuant To Florida Law)
Against All Defendants**

212.   Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

213.   Defendants SeaWorld, Atchison, Heaney, and Swanson made, authorized or caused the representations and/or omissions set forth above.

214.   Those representations and omissions were material.

215.   The material misrepresentations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' misrepresentations omitted and concealed material statements of fact from Plaintiffs.

216.   Each such Defendant knew his or its representations were false and/or misleading, and their omissions were material and rendered their representations misleading at the time they were made or omitted.

217.   Defendants knew that investors like Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase SeaWorld common stock at inflated prices.

218.   Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions.  Plaintiffs would not have purchased SeaWorld common stock at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, the declining attendance at SeaWorld-branded theme parks.

219.   As a direct and proximate result of such reliance, and Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

220.   Moreover, based on the intentional, malicious, willful and wanton conduct alleged herein, which indicates that Defendants acted with improper motive and/or vindictiveness, Plaintiffs seek punitive damages in an amount to be determined at trial.

221.   Plaintiffs have brought this claim within four years of discovery of the violations alleged herein.  Consequently, this action is timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)   Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b) Awarding Plaintiffs punitive damages for Defendants' intentional, malicious, willful and wanton conduct as detailed above;

(c) Awarding Plaintiffs their attorneys' fees and costs; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:  June 14, 2018          Respectfully submitted,


**LOWENSTEIN SANDLER LLP**


*/s/ Katie Rose Glynn*
Katie Rose Glynn, California Bar No. 300524
KGlynn@lowenstein.com
390 Lytton Avenue
Palo Alto, California 94301
Tel. 650.433.5800


Lawrence M. Rolnick, NY Bar No. 2024784
lrolnick@lowenstein.com
Marc B. Kramer, NY Bar No. 2167146
mkramer@lowenstein.com
Michael J. Hampson, NY Bar No. 4699120
mhampson@lowenstein.com
1251 Avenue of the Americas
New York, NY  10020
Tel. 212.262.6700


Thomas E. Redburn, Jr., NJ Bar No. 033661995
tredburn@lowenstein.com
One Lowenstein Drive
Roseland, NJ 07068
Tel. 973.597.2500


***Attorneys for Plaintiffs***