# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIGHFIELDS CAPITAL I, LP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SEAWORLD ENTERTAINMENT, INC., et al., <br><br> Defendants. | Case No.: 18cv1276-MMA (AGS) <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL DISMISSAL OF PLAINTIFFS' COMPLAINT** <br><br> [Doc. No. 28] |

    Plaintiffs Highfields Capital I LP, Highfields Capital II LP, Highfields Capital III LP, Highfields Capital IV LP, and Highfields Capital Ltd. (collectively, "Plaintiffs") bring this securities fraud action against Defendants SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, and Marc Swanson (collectively, "Defendants") asserting claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 (Counts I and II), as well as a Florida common-law fraud claim (Count III). *See* Compl. On October 19, 2018, Defendants filed a motion for partial dismissal of Plaintiffs' Complaint. *See* Doc. No. 28. Plaintiffs filed an opposition, to which Defendants replied. *See* Doc. Nos. 35, 39. The Court found the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1. *See* Doc. No. 40. For the reasons set forth below, the Court **GRANTS** Defendants' motion.

## BACKGROUND

This case involves statements and omissions made by Defendants in the wake of the 2013 documentary *Blackfish*. *Blackfish* tells the story of Tilikum, a 12,000-pound bull orca implicated in the deaths of three people, and chronicles the cruelty of killer whale capture methods, the dangers trainers face performing alongside killer whales during SeaWorld Entertainment Inc.'s (hereinafter "SeaWorld") popular shows, and the physical and psychological strains killer whales experience in captivity. Through interviews with former trainers, spectators, employees of regulatory agencies, and scientists, *Blackfish* makes the case that keeping killer whales in captivity for human entertainment is cruel, dangerous, and immoral. *Blackfish* premiered at the Sundance Film Festival on January 19, 2013.

Plaintiffs are investment funds which purchased SeaWorld common stock between September 2013 and July 2014. SeaWorld is a theme park and entertainment company best known for its parks with shows featuring orca whales and its famous "Shamu" mascot. SeaWorld is headquartered in Orlando, Florida, and owns and operates eleven theme parks within the United States, including: three SeaWorld-branded theme parks in Florida, Texas, and California; two Busch Gardens theme parks in Florida and Virginia; two water parks in Florida and California; Discovery Cove, an attraction in Florida; Sesame Place, a seasonal theme park in Pennsylvania; Water Country USA in Virginia; and Adventure Island in Florida. SeaWorld's financial health is directly tied to its ability to attract and grow attendance at its parks.

Shortly after the premiere of *Blackfish* at the Sundance Film Festival, CNN Films and Magnolia Pictures acquired the rights to *Blackfish*, and announced their plans for a summer theatrical release. On July 19, 2013, *Blackfish* was released in select theaters across the United States, and played in theaters nationwide throughout July and August 2013. CNN aired *Blackfish* on October 24, 2013, where it had "the highest cable news viewership that evening with 1.36 million viewers." Compl. ¶ 59. *Blackfish* was also made available for viewing on Netflix on December 13, 2013, where it was viewed

nearly 600,000 times in the first two weeks it was available.

SeaWorld reported the following declines in attendance as compared to 2012: a 6% decline in the first six months of 2013; a 4.7% decline in the third quarter of 2013; and a 4.1 % decline in overall attendance for 2013. SeaWorld further reported a 13% decrease in attendance for the first quarter of 2014.

SeaWorld attributed the declines in attendance to adverse weather conditions, school and holiday schedules, and a new pricing strategy. However, other major theme parks, including Disney and Universal, experienced increased attendance in 2013 and 2014, even though both groups maintain parks in some of the same geographic locations SeaWorld does, and were therefore subject to some of the same adverse weather conditions. Disney and Universal were similarly subject to the same school and holiday schedules, as well as increased prices as some of their parks in 2013.

Plaintiffs claim that unlike Disney and Universal, SeaWorld was subject to significant negative publicity as a result of the *Blackfish* documentary. "*Blackfish* ignited national outrage almost immediately upon the film's theatrical release." *Id.* ¶ 61. For example, celebrities urged their followers on Twitter to watch *Blackfish* and boycott SeaWorld. A CNN poll taken in October 2013 revealed that "86% of respondents would no longer take their children to SeaWorld" in light of the allegations in *Blackfish*. *Id.* ¶ 63. Schools canceled field trips to SeaWorld parks. In November 2013, a number of artists slated to perform at a series of concerts at SeaWorld's "Bands, Brew & BBQ" event cancelled their performances, citing concerns relating to *Blackfish* as the reason for their withdrawal. Moreover, in July 2014, Southwest Airlines announced it would not renew its 26-year partnership with SeaWorld. Other corporate sponsors similarly ended their relationships with SeaWorld in late 2014 and early 2015.

In March 2014, reports surfaced that a California Assembly member had introduced a bill that would ban orca performances, breeding, and artificial insemination in California. On March 17, 2016, SeaWorld announced that it would end its orca breeding program and phase out its orca whale shows. The bill was colloquially referred

to as the "*Blackfish* bill." The bill was signed into law on September 13, 2016.

On August 14, 2013, SeaWorld filed its quarterly report for the second quarter of 2013 with the SEC, indicating SeaWorld had experienced a 6% decline in attendance in the first six months of 2013, compared to the same period the prior year. SeaWorld attributed the decline to a new pricing strategy, adverse weather conditions, and the timing of school and holiday schedules. Two weeks later, SeaWorld Entertainment Vice President of Communications Fred Jacobs stated, "'*Blackfish*' has had no attendance impact." *Id.* ¶ 99. In SeaWorld's quarterly report for the third quarter of 2013, filed with the SEC on or about November 13, 2013, SeaWorld again attributed the 4.7% attendance decline to the new pricing strategy, adverse weather conditions, and the unfavorable timing of the Easter holiday, omitting any mention of *Blackfish*. In an article dated that same day, SeaWorld Entertainment Chief Executive Officer James Atchison stated, "I scratch my head if there's any notable impact from this film at all," and that "[i]ronically, our attendance has improved since the movie came out." *Id.* ¶ 103. In December 2013, Defendant Atchison also stated that, "[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business." *Id.* ¶ 105. In a fourth quarter earnings call, Defendant Atchison indicated that SeaWorld did not perceive "any shift in sentiment about intent to visit our parks" and credited *Blackfish* with increasing interest in SeaWorld. *Id.* ¶ 108. Finally, in May 2014, SeaWorld attributed its 13% decrease in attendance for the first quarter of 2014 to adverse weather and "a shift in the timing of Easter[.]" *Id.* ¶ 109.

On August 13, 2014, SeaWorld admitted in its quarterly report for the second quarter of 2014 that attendance was "impacted by demand pressures we believe were related to recent media attention surrounding proposed legislation in the state of California." *Id.* ¶ 139. During the earnings call, Defendant Atchison acknowledged that SeaWorld was aware of the legislation in May, but that SeaWorld was "'still grappling with . . . what impact there would be related to the news attention around that legislation. . . . So, in that regard, I think it was too early to call and tell what kind of impact we

might have over the rest of the summer.'" *Id.* at 140. That same day, SeaWorld's common stock price dropped nearly 33% (from $28.15 per share to $18.90 per share). News outlets subsequently reported that the statements made in the quarterly report for the second quarter of 2014 served as "an admission that, despite claims to the contrary, [*Blackfish*] has indeed had an adverse effect on the business." *Id.* ¶ 145. Plaintiffs allege that "[a]s a result of this significant price drop [in SeaWorld common stock], Plaintiffs suffered millions of dollars of investment losses." *Id.* ¶ 16.

In September 2014, purchasers or acquirers of SeaWorld common stock between April 18, 2013, and August 12, 2014, filed a securities class action (hereinafter "the Class Action") against Defendants arising out of alleged misleading statements and omissions made by Defendants concerning the impact of *Blackfish* on attendance at SeaWorld. *See* 14-cv-2129-MMA (AGS). On November 29, 2017, the Court certified a class of all persons and entities who purchased SeaWorld common stock between August 29, 2013, and August 12, 2014, who did not sell such acquired securities before August 13, 2014, and were damaged. *See* 14-cv-2129-MMA (AGS), Doc. No. 259.

Plaintiffs opted-out of the Class Action, and filed this individual action on June 14, 2018. *See* Compl. Similar to the Second Amended Complaint in the Class Action, Plaintiffs allege "Defendants sought to induce investors like Plaintiffs to invest in SeaWorld by covering up the *Blackfish* effect and intentionally refusing to admit to—or even acknowledge—the company-changing effects of the film." *Id.* ¶ 6. Plaintiffs' claims, however, differ from those of the certified class in at least two respects: (1) Plaintiffs allege that the 2Q 2013 Earnings Statements regarding a 6% decline in attendance in the first six months of 2013 were misleading; and (2) Plaintiffs assert a common-law fraud claim under Florida law premised on the same allegations as their federal securities fraud allegations.

///
///
///

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims made in the complaint. Accordingly, dismissal under Rule 12(b)(6) is proper where the complaint fails to set forth a "cognizable legal theory," or where there is "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, brackets, and citations omitted). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all "allegations of material fact," and construe them "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

"A securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA [Private Securities Litigation Reform Act of 1995]." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Under Rule 9(b), when the complaint includes allegations of fraud, a party must "state with particularity the circumstances constituting fraud or mistake," even though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "In other words, the complaint must set forth what is false or misleading about a statement, and why it is false." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted). Additionally, fraud claims made pursuant to the Securities Exchange Act must "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

/ / /

# DISCUSSION

Defendants limit their arguments to those claims that are not part of the Class Action: (1) claims based on purported misrepresentations or omissions arising out of the 2Q 2013 Earnings Statements; and (2) Plaintiffs' Florida common-law fraud claim. *See* Doc. No. 28-1 at 1. Specifically, Defendants contend Plaintiffs fail to sufficiently allege that the 2Q 2013 Earnings Statements were materially false or misleading, or that they were made with the requisite scienter. *See id.* at 2. Further, Defendants assert Plaintiffs' Florida common-law fraud claim is precluded by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb ("SLUSA"). The Court addresses Defendants' arguments in turn.

**1. Plaintiffs Fail to Sufficiently Allege a Material Misrepresentation or Omission Arising Out of the 2Q 2013 Earnings Statements**

Defendants move to dismiss Plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, as they pertain to the 2Q 2013 Earnings Statements.[1]

In the Complaint, Plaintiffs allege that SeaWorld's quarterly report for the second quarter of 2013, filed with the SEC on August 14, 2013, misrepresented to investors the impact that *Blackfish* was having on attendance in the first six months of 2013. *See* Compl. ¶ 149. Specifically, Defendants claimed that SeaWorld's 6% decrease in attendance was due to:

> ***the expected impact of these . . . pricing and yield management strategies, along with the impact of adverse weather conditions***, particularly at our Florida and Virginia parks during the second quarter. These weather conditions also impacted all but one of our park locations in the month of

---

[1] As an initial matter, Defendants request the Court take judicial notice of two documents in their reply brief: 1) a copy of an excerpt of SeaWorld's Q3 2013 Earnings Transcript from the November 13, 2013 call; and 2) a copy of an excerpt of SeaWorld's IPO Prospectus, filed with the SEC on April 14, 2013. *See* Doc. No. 39-1. The Court **DENIES AS MOOT** Defendants' request for judicial notice, as the Court need not rely on either document in reaching its conclusion below.

<blockquote>
June.  ***The unfavorable timing of Easter on March 31 in 2013 also contributed to the attendance decline*** as it caused an overlap with the spring break holiday period for schools in many of our key markets
</blockquote>

*Id.* (emphasis in original).  "These purported reasons for the declining attendance at SeaWorld . . . were repeated in the Company's press release announcing its second quarter results and by Heaney during the quarterly earnings call that day." *Id.* ¶ 150.

Plaintiffs claim the August 14, 2013 statements were misleading for two reasons. First, SeaWorld's competitors—Disney and Universal—saw an increase in attendance during this time, despite the fact that Disney and Universal operate in some of the same geographic regions and are subject to the same weather and school calendars as SeaWorld parks. *See id.* ¶¶ 129-130.  Second, Plaintiffs contend that the SEC has now revealed that SeaWorld's top management was concerned about the film's impact before its theatrical release in July 2013.  *See* Doc. No. 35-1 (hereinafter "Glynn Decl."), Ex. 1 at 5; Ex. 2 at 3.[2]  Moreover, Defendants "even went as far as hiring a public relations firm to help 'discredit *Blackfish* before it got out to the public[.]'" Doc. No. 35 at 14 (quoting Compl. ¶ 85).

In order to state a claim under § 10(b) and Rule 10b-5, Plaintiffs must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  A misrepresentation or omitted fact is material if there is a substantial likelihood that the misstatement or omitted fact "would have been viewed by the reasonable investor as

---

[2] On September 8, 2018, the SEC filed suit (the "SEC Complaints") against SeaWorld, Defendant Atchison, and Defendant Jacobs alleging violations of Section 17(a) of the Securities Act and Sections 13(a) and 20(a) of the Exchange Act.  *See* Glynn Decl., Ex. 1 at 15-17; Ex. 2 at 6-7.  The cases settled the same day the SEC Complaints were filed.  *See* Doc. No. 35 at 10.

having significantly altered the 'total mix' of information made available." *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005). To plead falsity with the requisite particularity, "a securities fraud complaint must . . . specify each statement alleged to have been [false or] misleading, the reason or reasons why the statement is [false or] misleading, and, if an allegation regarding the statement or omission is made on information or belief, . . . all facts on which that belief is formed." *Zucco*, 552 F.3d at 990-91 (internal quotation marks omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Here, the Court finds Plaintiffs' falsity allegations insufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA. With respect to attendance at Disney and Universal, the attendance figures alleged in the Complaint pertain to the full year 2013. *See* Compl. ¶¶ 129-130. As Defendants note, because there are no figures provided that relate to only the first half of 2013, there is no basis by which to compare attendance at SeaWorld, Disney, and Universal parks during the relevant time period. *See* Doc. No. 28-1 at 8 n.6. Moreover, Plaintiffs' allegation that SeaWorld's competitors "should have seen a similar decline in attendance" due to "new pricing and yield management strategies, adverse weather conditions, and the unfavorable timing of Easter" is conclusory. Compl. ¶ 132. Plaintiffs' Complaint does not include any data to show that attendance figures at Disney, Universal, and SeaWorld parks ordinarily rise and fall together.

Additionally, Plaintiffs' allegations that Defendants were concerned about *Blackfish* and hired a PR firm to help discredit the film before it premiered are insufficient to demonstrate a material misrepresentation or omission arising out of the 2Q 2013 Earnings Statements. First, the allegations contained in the SEC complaints are unproven, and Defendants note that in resolving the SEC actions, "Defendants neither

admitted nor denied the allegations." Doc. No. 39 at 1 n.1. Second, Plaintiffs fail to link any concern about the impact of *Blackfish* to Plaintiffs' contention that *Blackfish* contributed to SeaWorld's attendance declines in the first half of 2013. For example, that SeaWorld hired a PR firm to discredit the film does not support the inference that *Blackfish* was negatively affecting attendance at SeaWorld-branded parks in the first six months of 2013. Aside from the fact that *Blackfish* premiered in January 2013 at the Sundance Film Festival, Plaintiffs do not allege any facts to demonstrate that the statements regarding attendance declines were false when made. In fact, Plaintiffs acknowledge that "[t]he *Blackfish* effect hit a fever pitch after the film aired on CNN on October 24, 2013"—several months after the statements in question were made. Compl. ¶ 63.

In sum, unlike the allegations set forth in the Second Amended Complaint in the Class Action, Plaintiffs have not identified any confidential witnesses, nor do Plaintiffs offer any additional facts supporting their allegations that it was misleading for SeaWorld to tell investors on August 14, 2013, that its declining attendance was only caused by bad weather, the timing of school holidays, and pricing strategies. Accordingly, the Court finds that Plaintiffs fail to successfully allege a material misrepresentation or omission, and **DISMISSES** Counts I and II[3] of Plaintiffs' Complaint to the extent they concern the 2Q 2013 Earnings Statements. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017) (noting that the current allegations, "without more," do not "transform the misbehavior into an actionable material omission under the securities laws."); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998) (noting that although a court must assume the truth of all well-pleaded factual

---

[3] Because the Court finds that Plaintiffs fail to allege a material misrepresentation or omission arising out of the 2Q 2013 Earnings Statements, Plaintiffs' Section 20(a) claim (Count II) based on such statements necessarily fails. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (noting that in order to state a Section 20(a) claim, a plaintiff must show: 1) a primary violation of federal securities law; and 2) that the defendant exercised actual power or control over the primary violator).

allegations, "unwarranted inferences are not sufficient to defeat a motion to dismiss.").[4]

## 2. SLUSA Preempts Plaintiffs' Common-Law Fraud Claim

Defendants also move to dismiss Plaintiffs' common-law fraud cause of action, arguing that the claim is preempted by SLUSA. *See* Doc. No. 28-1 at 10. Specifically, Defendants contend that "[t]he assignment of an individual action (or 'opt-out action') to the same judge overseeing a related securities class action is sufficient to satisfy both of SLUSA's 'covered class action' requirements." *Id.* at 10-11. In opposition, Plaintiffs assert that "without formal consolidation or joinder of an individual action with a 'covered class action,' there is no SLUSA preemption." Doc. No. 35 at 17.

"SLUSA was enacted to stem the shift of class-action securities lawsuits from federal courts to state courts after passage of the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 904 F.3d 821, 828 (9th Cir. 2018). "In order to avoid PSLRA's heightened pleading requirements for class-action securities lawsuits, plaintiffs began asserting what were essentially federal securities law claims as state law causes of action in state courts." *Id.*

SLUSA "provides that '[n]o covered class action' based on state law and alleging 'a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security' 'may be maintained in any State or Federal court by any private party.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 74 (2006) (quoting 15 U.S.C. § 78bb(f)(1)(A)). Importantly, SLUSA "does not actually preempt any state law cause of action—it simply precludes using a class action as a device to vindicate claims collectively on behalf of fifty or more plaintiffs." *Northstar Fin. Advisors, Inc.*, 904 F.3d at 829.

The Supreme Court and Ninth Circuit have instructed courts to interpret the

---

[4] The Court declines to address Defendants' scienter arguments at this time, as the Court finds it more appropriate to consider these arguments after Plaintiffs have pleaded a material misrepresentation or omission arising out of the 2Q 2013 Earnings Statements.

provisions of SLUSA broadly. *See Dabit*, 547 U.S. at 86 ("The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment."); *Hampton v. Pac. Inv. Mgmt. Co. LLC*, 705 F. App'x 558, 559 (9th Cir. 2017) ("Congress envisioned a broad construction of SLUSA in order to effectuate its 'stated purpose' of preventing state-law claims from making an end-run around the safeguards imposed by the Private Securities Litigation Reform Act.") (quotation marks omitted).

Plaintiffs do not dispute that their fraud claim alleges a misrepresentation or omission in connection with the purchase of SeaWorld securities, or that SeaWorld common stock qualifies as a "covered security" under SLUSA. Thus, the parties' dispute centers on whether the individual action constitutes a "covered class action." A "covered class action" includes "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which (I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii). Plaintiffs do not contest that their lawsuit is pending in the same court as the Class Action, their suit and the Class Action involve common questions of law or fact, or that together with the Class Action, their suit seeks damages on behalf of more than fifty (50) persons. Moreover, Plaintiffs' lawsuit and the Class Action have not been formally joined or consolidated. Accordingly, the sole remaining issue is whether the two lawsuits "otherwise proceed as a single action for any purpose."[5] 15 U.S.C. § 78bb(f)(5)(B)(ii)(II).

Plaintiffs contend that in applying principles of statutory construction to SLUSA, "lawsuits 'otherwise proceed as a single action for any purpose' only when they are formally joined or consolidated. By interpreting the 'otherwise proceed' phrase as encompassing lawsuits that are merely 'coordinated' or 'related,' the [cases relied upon

---

[5] This phrase is commonly referred to as SLUSA's "catchall" provision.

by Defendants] . . . render the terms 'joined' and 'consolidated' superfluous." Doc. No. 35 at 18.

In support of their argument, Plaintiffs rely primarily on *Liberty Media Corporation v. Vivendi Universal, S.A.* 842 F. Supp. 2d 587 (S.D.N.Y. 2012).[6] There, the plaintiffs filed an individual action asserting securities claims that were similar to those asserted in a separate class action. *See id.* at 589. Shortly thereafter, the district judge consolidated the individual action with the pending securities class action for pretrial purposes. *See id.* The cases proceeded together for several years; however, the court subsequently vacated the consolidation order because the issue of SLUSA preemption "never surfaced" prior to consolidation. *Id.* at 590. The defendants then moved for partial judgment on the pleadings, arguing that the plaintiffs' state common-law claims were preempted by SLUSA. *See id.* at 593-94. The court found that because the cases were no longer consolidated, the individual action "no longer qualifies as a 'covered class action' for purposes of the statute." *Id.* at 594; *see also Ventura v. AT&T Corp.*, No. 5-cv-5718 LLS, 2006 WL 2627979, at *1 (S.D.N.Y. Sept. 13, 2006) (holding that the individual action did not proceed with the class action as a single action for purposes of SLUSA because the cases were "neither joined nor consolidated" and were on "separate procedural track[s].").

Defendants cite to, among several other cases, *Hound Partners Offshore Fund, LP v. Valeant Pharmaceuticals International, Inc.*, wherein the district court considered the defendants' respective motions to dismiss the plaintiffs' state law claims based on SLUSA preemption. No. 18-8705 (MNAS) (LHG), 2018 WL 4401731, at *3 (D.N.J. Sept. 14, 2018). Similar to the case at bar, the opt-out plaintiffs argued their lawsuit was not a "covered class" because "they have undertaken every possible effort to avoid coordination with all other plaintiff groups that have brought actions arising out of the

---

[6] Neither party cites, nor is the Court aware of, any Supreme Court or Ninth Circuit authority that directly addresses the issue before the Court.

same alleged Valeant fraud scheme[.]" *Id.* at *4. The court held that the opt-out plaintiffs' suit "is a covered class action for purposes of SLUSA." *Id.* The court reasoned that the plaintiffs' action "is centered on the same allegations that form the foundation of the Class Action[.]" *Id.* Moreover, "[t]he cases will be subject to overlapping orders from the Court and will undoubtedly encounter the same discovery concerns." *Id.* "To find for Plaintiffs on this issue . . . would create a loophole in SLUSA that would incentiv[ize] opt-out plaintiffs to object to every act of judicial efficiency that could eventually lead to a finding that the matter is a 'covered class action.'" *Id.* at *5.

      Here, in considering the language of the statute itself, the purpose underlying SLUSA, and the relevant case law, the Court finds that Plaintiffs' individual opt-out action constitutes a "covered class action" as defined by SLUSA. As an initial matter, several courts have criticized or distinguished the cases Plaintiffs rely upon. *See Hound Partners Offshore Fund, LP*, 2018 WL 4401731, at *4 (noting that *Liberty Media* involved a "very different" procedural posture, as the court in *Liberty Media* did not address SLUSA preemption for several years after the individual action was filed); *North Sound Capital LLC v. Merck & Co., Inc.*, 314 F. Supp. 3d 589, 614 n.26 (D.N.J. 2018) (noting "the analysis in *Liberty Media* pertained to . . . the grouping provision [of SLUSA], and thus, is of limited persuasive value in determining whether a group of lawsuits constitute a covered class action under SLUSA's catchall 'otherwise proceed' provision."); *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 813 (S.D.N.Y. 2015) ("*Ventura* offered little explanation or analysis and thus is of limited persuasive value").

      Courts have also explained that to interpret SLUSA as only applying to lawsuits that are formally joined or consolidated "would be to render the statute's description of the latter category of covered actions—lawsuits that 'otherwise proceed as a single action for any purpose'—entirely redundant." *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 517 (S.D.N.Y. 2009), *aff'd*, 409 F. App'x 412, 417 (2d Cir. 2011). "Such an

interpretation would run counter to the canons of statutory construction, which require courts 'to give effect, if possible, to every clause and word of a statute.'" *Id.* (quoting *State Street Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003)); *see also In re Citigroup Inc. Sec. Litig.*, 987 F. Supp. 2d at 377, 387 (S.D.N.Y. 2013) ("This Court agrees with this view of SLUSA preemption: that, even if two actions have not been formally joined or consolidated, they are proceeding 'as a single action for any purpose' within the meaning of SLUSA when they are grouped together as part of an MDL."); *Discovery Global Citizens Master Fund, Ltd. v. Valeant Pharm. Int'l, Inc.*, No. 16-7321 (MAS) (LHG), 2018 WL 406046, at *5 (D.N.J. Jan. 12, 2018) ("Contrary to Plaintiffs' argument, the statutory language indicates that a group of lawsuits can trigger preemption without any formal joinder or consolidation."). The Court agrees, and finds that SLUSA may apply to lawsuits that are not formally joined or consolidated.

Additionally, the Court finds persuasive the cases cited by Defendants wherein the district courts considered similar individual opt-out actions, and found them to "otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii)(II). Like *Hound Partners Offshore Fund, LP*, Plaintiffs' claims are nearly identical to those asserted in the Class Action, except that Plaintiffs also assert a common-law fraud claim and contend that the 2Q 2013 Earnings Statements were misleading. *See Kuwait Inv. Office*, 128 F. Supp. 3d at 812 ("The Individual Actions indisputably share common questions of law and fact and rely on allegations that are virtually identical to those in the Class Action complaint.").

Moreover, shortly after Plaintiffs commenced this action, Plaintiffs filed a Notice of Related Action or Proceeding pursuant to Civil Local Rule 40.1.f.[7] *See* Doc. No. 4.

---

[7] Civil Local Rule 40.1.f provides in pertinent part that "[w]henever counsel has reason to believe that a pending action or proceeding on file . . . is related to another pending action or proceeding on file . . ., counsel must promptly file and serve" a notice of related case that includes, among other things, "a brief statement of their relationship and the reasons why assignment to a single district judge is or is not likely to effect a saving of judicial effort and other economies." CivLR 40.1.f.

Although Plaintiffs were required to file this document, Plaintiffs concede in their Notice that "[d]iscovery and evidence in this action will center on many of the same documents, witnesses, and testimony as the SeaWorld Class Action, which is currently in discovery." *Id.* at 3. Plaintiffs requested the case be transferred to the Undersigned, claiming "[a]bsent assignment to the same judge, the disposition of the instant action will likely entail the unnecessary duplication of judicial labor from the SeaWorld Class Action as well as a risk of inconsistent findings and rulings based on *the same evidentiary record*." *Id.* (emphasis added). Thereafter, the case was transferred to the Undersigned. The transfer of this action to the Undersigned supports a finding that the actions are proceeding "as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii)(II); *see also Hound Partners Offshore Fund, LP*, 2018 WL 4401731, at * 4 ("If the other action[] w[as] not already pending here, Plaintiffs also would not be before this Court. Upon transfer, therefore, the case joined the other actions pending before the Undersigned in 'otherwise proceed[ing] as a single action.'"); *Gearing v. China Agritech, Inc.*, No. 11-CV-4417-RGK (PJWx), 2011 WL 11682735, at *5 (C.D. Cal. Oct. 31, 2011) (holding that the plaintiffs' complaint and related class action which "involve nearly identical questions of law and fact[,] . . . are currently proceeding 'as a single action *for any purpose*'" because "[t]he fact that this case was transferred to this Court where the *Dean* class action is also pending represents a strong inference that the cases were intended to be adjudicated concurrently.") (emphasis in original).

Furthermore, the instant action will "necessarily be handled in coordination" with the Class Action. *Amorosa*, 672 F. Supp. 2d at 517. For example, Plaintiffs' Complaint expressly incorporates "documents publicly filed in the Class Action Proceeding." Compl. ¶¶ 71, 72, 77, 90. Moreover, although the case at bar and the Class Action are currently at different stages of litigation, "[o]f significant importance to the Court, Plaintiffs actually rely on the Court's decision in the Class Action in connection with th[is] motion[] [to dismiss]." *Discovery Global Citizens Master Fund, Ltd.*, 2018 WL 406046, at * 6. Specifically, in noting that Defendants did not challenge claims that were

already addressed by the Court in the Class Action, Plaintiffs assert that "Defendants concede – as they must, based on this Court's prior rulings" that "Plaintiffs' Complaint states claims for violations of the Securities Exchange Act of 1934[.]" Doc. No. 35 at 1. Plaintiffs even acknowledge that the "bulk of Plaintiffs' claims . . . will be going forward into discovery regardless of the outcome of this Partial Motion[.]" *Id.* Thus, the Court is not persuaded that this action is "separate and independent from" the Class Action. *Discovery Global Citizens Master Fund, Ltd.*, 2018 WL 406046, at * 6.

Finally, from 2014 to 2017, Plaintiffs were putative members of the Class Action. In November 2017, the Court certified the class in *Baker*, "rendering Plaintiffs actual class members[.]" *North Sound Capital LLC*, 314 F. Supp. 3d at 610. As class members in the Class Action, Plaintiffs were "privy to the pleadings" and derived a benefit from the Class Action, as evidenced by their reliance on the Court's previous rulings in this action. *Id.* at 610-11. Therefore, under these circumstances, the Court finds that the two cases are sufficiently coordinated to "otherwise proceed as a single action for *any* purpose," and therefore Plaintiffs' lawsuit falls under SLUSA's "covered class action" definition. 15 U.S.C. § 78bb(f)(5)(B)(ii)(II) (emphasis added); *see also In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 672 (S.D.N.Y. 2007) ("[P]laintiffs cannot reap the considerable benefits flowing from the joint prosecution of their claims, yet through artful pleading . . . avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages.") (internal quotation marks and citation omitted).

Accordingly, because SLUSA preempts Plaintiffs' common-law fraud claim, the Court **DISMISSES** Plaintiffs' fraud claim (Count III). *See North Sound Capital LLC*, 314 F. Supp. 3d at 612 (dismissing the plaintiffs' common-law fraud claim "in light of the indicia of coordination between the Individual Actions and the Vytorin Class Actions"); *Kuwait Inv. Office*, 128 F. Supp. 3d at 813 ("SLUSA precludes Plaintiffs' attempt to engage in further litigation of their securities fraud claims under state law standards.").

/ / /

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' motion for partial dismissal and **DISMISSES** Plaintiffs' Section 10(b) and 20(a) claims (Counts I and II), to the extent they are based on the 2Q 2013 Earnings Statements, **without prejudice**. The Court further **DISMISSES** Plaintiffs' common-law fraud claim (Count III), as it is preempted by SLUSA. Plaintiffs may file an amended complaint addressing the deficiencies identified above with respect to Counts I and II on or before **March 1, 2019**.

**IT IS SO ORDERED.**

Dated: February 7, 2019

HON. MICHAEL M. ANELLO
United States District Judge