1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIGHFIELDS CAPITAL I, LP, et al.,<br><br>                                        Plaintiffs,<br><br>v.<br><br>SEAWORLD ENTERTAINMENT, INC. et al.,<br><br>                                        Defendants. | Case No. 18-cv-1276-MMA (AGS)<br><br>**ORDER AFFIRMING TENTATIVE RULINGS RE: EVIDENTIARY OBJECTIONS, DAUBERT MOTIONS, AND MOTIONS FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 169, 170, 174, 176, 177, 178]<br><br>**<u>REDACTED</u>** |

        On March 16, 2022, Plaintiffs Highfields Capital I LP, Highfields Capital II LP, Highfields Capital III L.P., Highfields Capital IV LP, and Highfields Capital LTD. (collectively, "Plaintiffs" or "Highfields") and Defendants SeaWorld Entertainment, Inc. ("SeaWorld"), James Atchison, James Heaney, and Marc Swanson (collectively, "Defendants") appeared before the Court for a hearing on Defendants' evidentiary objections as well as the parties' *Daubert* motions and cross-motions for summary judgment.  In anticipation of the hearing, the Court issued tentative rulings on the pending motions.  *See* Doc. No. 199.  For the reasons set forth below, the Court **AFFIRMS** its tentative rulings.

# I. BACKGROUND[1]

Plaintiffs bring this securities fraud action against Defendants asserting claims pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. *See* Doc. No. 1 ("Compl."). This case involves statements made by Defendants in the wake of the 2013 documentary *Blackfish*. *Blackfish* tells the story of Tilikum, a killer whale, who killed a SeaWorld trainer in February 2010. Doc. No. 137-2 ("Plaintiffs' Separate Statement" or "PSS") Nos. 12–13; Doc. No. 139-2 ("Defendants' Separate Statement" or "DSS") No. 13.[2] The film is generally about killer whales in captivity as well as the death of trainer Dawn Brancheau at SeaWorld in 2010. PSS Nos. 11–12; DSS No. 13. *Blackfish* premiered at the Sundance film festival on January 19, 2013. PSS No. 9; DSS No. 14. *Blackfish* then premiered in theaters on July 19, 2013. PSS No. 9; DSS No. 15. On October 24, 2013, CNN aired *Blackfish* to approximately 1.36 million viewers. DSS No. 16. Thereafter, in 2013 and 2014, *Blackfish* was aired on CNN multiple times. PSS No. 15. Blackfish became available to stream on Netflix in December 2013. DSS No. 17.

SeaWorld is a theme park and entertainment company. PSS No. 1; DSS No. 2. During the relevant time period, SeaWorld owned eleven theme parks, including SeaWorld Orlando, SeaWorld San Diego, and SeaWorld Texas. PSS No. 4; DSS No. 2. During this time, Mr. Atchison was the President and Chief Executive Officer of SeaWorld, PSS Nos 20, 22; Compl ¶ 29, Mr. Heaney was SeaWorld's Chief Financial Officer, *see, e.g.*, PSS No. 20; Compl. ¶ 30, and Mr. Swanson was SeaWorld's Chief Accounting Officer, PSS No. 18; Compl. ¶ 31.

---

[1] These material facts are taken from the parties' separate statements and responses thereto, as well as the supporting declarations and exhibits. This section is offered to provide background, and additional material facts, disputed or otherwise, are discussed in further detail where relevant to the Court's analysis.

[2] All citations in this Order are to the documents filed under seal. Further, citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

Plaintiffs are investment funds commonly managed by Highfields Capital Management.  PSS No. 5; DSS Nos. 21, 24.  Plaintiffs purchased and held SeaWorld common stock from 2013 through 2015.  PSS No. 5; DSS No. 23.  During this time, Peter Fleiss was a Managing Director at Highfields and also served as a portfolio manager of a portfolio that held SeaWorld stock.  PSS No. 7; DSS No. 25.  James Corcoran was a Highfields investment analyst who was responsible for Highfields' SeaWorld position.  PSS No. 8; DSS No. 39.

According to Plaintiffs, while they were invested in SeaWorld, they "repeatedly asked [SeaWorld] . . . whether (and if so, how) [*Blackfish*] was affecting SeaWorld."  PSS No. 20.  On summary judgment, Plaintiffs assert that Defendants made six false and misleading statements regarding *Blackfish*'s impact on SeaWorld:[3]

> 1.  November 13, 2013: Mr. Atchison's quote in a *Wall Street Journal* article;
>
> 2.  December 10, 2013: Messrs. Atchison and Heaney's statements during a meeting with Plaintiffs in Boston, Massachusetts;
>
> 3.  December 20, 2013: Mr. Atchison's quote in an *Orlando Sentinel* article;
>
> 4.  January 13, 2014: Mr. Fred Jacob's[4] quote in *The Dodo* article;
>
> 5.  March 13, 2014: Mr. Atchison's statement during a First Quarter 2014 earnings call with investors; and
>
> 6.  May 20, 2014: Mr. Heaney's statement during a J.P. Morgan Global Technology, Media, and Telecom Conference call.

---

[3] The specific statements will be transcribed and discussed in detail *infra* Parts V.A–B.

[4] Fred Jacobs was SeaWorld's Vice President of Communication and Spokesperson during the time period in question.  Doc. No. 137 ("Plaintiffs' Motion for Summary Judgment" or "PMSJ") at 2.

On August 13, 2014, SeaWorld reported its results for the second quarter of 2014[5] in SEC form 8-K.  DSS No. 104.  SeaWorld reported, among other things, a net loss of $15.9 million.  DSS No. 104.  SeaWorld also noted lower attendance due to a combination of factors, including the newly added factor: "demand pressures related to recent media attention surrounding proposed legislation in the state of California."  DSS No. 104.  The legislation refers to a bill in California proposed by Assembly Member Richard Bloom in March 2013 to ban orca performances in response to *Blackfish* (the "Bloom Bill").  DSS No. 61; PSS No. 106.

Plaintiffs assert that this amounted to a corrective disclosure and is the relevant corrective disclosure date.[6]  Compl. ¶ 189.

On August 13, 2014, SeaWorld stock dropped nearly 33%.  DSS No. 106.  In response, Plaintiffs sold nearly 1.1 million shares of SeaWorld stock and lost "millions of dollars."  Compl. ¶ 16; DSS No. 107.

## II. EVIDENTIARY OBJECTIONS

Defendants lodge two sets of evidentiary objections in connection with the summary judgment motions.  The Court addresses each in turn.

### A.    Defendants' First Set of Objections

Defendants first object to two pieces of evidence that Plaintiffs submitted in support of their motion for partial summary judgment: (1) Mr. Corcoran's declaration; and (2) MKM Partners' ("MKM") research and a marketing presentation by Initiative Media, LLC ("Initiative").

#### 1.    *Mr. Corcoran's Declaration*

According to Defendants, Mr. Corcoran's August 19, 2021 declaration, Doc.

---

[5] Hereinafter, the Court refers to all yearly quarters by shorthand.  For example, the second quarter of 2014 will read "2Q2014."

[6] Whether the August 13, 2014 8-K and statements made thereafter amounted to a corrective disclosure is not before the Court on summary judgment.  Nonetheless, for the sake of convenience, this memorandum refers to August 14, 2014 as the "Corrective Disclosure Date."

No. 137-84 ("Corcoran Decl."), is a sham.  As noted above, Mr. Corcoran is a former employee of Highfields.  Corcoran Decl. ¶ 3.  Mr. Corcoran made the declaration based upon "personal knowledge of the facts."  Corcoran Decl. ¶ 2.  However, Defendants take issue with three paragraphs, arguing that they are contradicted by the evidence:

> 30.     The first [representation] occurred on December 10, 2013, when we met with Messrs. Atchison, Heaney and Ballesteros in Boston.  The meeting was organized by Goldman Sachs, SeaWorld's banker in connection with the offering of Blackstone stock.

> 31.     During that meeting, I recall we asked Messrs. Atchison and Heaney whether Blackfish was having any impact on SeaWorld's business.  This was consistent with any meeting we would have had with Company management at this time, because we were constantly asking SeaWorld whether the film was impacting or affecting the business.

> 32.     Messrs. Atchison and Heaney stated that the film was having no impact on the Company.  Again, this was inconsistent with the responses we received from the Company during this time period, in which they repeatedly denied that Blackfish was having any impact at all.

Corcoran Decl. ¶¶ 30–32.

Defendants assert that Mr. Corcoran was not present at the December 10, 2013 meeting in Boston, based upon the following evidence: (1) Mr. Corcoran's two emails on December 9, 2013 stating that he could not attend the December 10, 2013 meeting in Boston because he was in New York City; (2) the absence of his name on Goldman Sachs' December 9, 2013 list of attendees for the meeting; and (3) the absence of his name on the "Confirmed Attendees" list on the December 10, 2013 agenda.  Doc. No. 151-143 at 2–3.  Defendants also explain that follow up communication within Highfields shows, not only that Mr. Corcoran was not present at the meeting, but that *Blackfish* was not discussed.  *Id.* at 3.  For example, when Mr. Corcoran asked Mr. Fleiss how the meeting went, Mr. Fleiss emailed a summary, which notes a new "Antarctica" attraction, "weather in pa," and "float in the Macy's [day] parade" but is silent as to

*Blackfish*.  *See* Defendant's Opposition Exhibit ("DOX") 22.

It is undisputed that Mr. Corcoran did not attend the December 10, 2013 meeting in Boston.  *See* Doc. No. 159-11 at 2.  Plaintiffs nonetheless argue that his declaration is not a sham because he never stated that he attended the meeting—he merely stated "we" as in Highfields.  Plaintiffs also explain that Mr. Fleiss's October 12, 2021 declaration, Doc. No. 148-96 ("Fleiss Decl."), confirms Mr. Corcoran's recollection of what transpired at the meeting.

The sham affidavit rule only applies where a declaration is clearly and unambiguously contradicted by prior testimony such that the Court can make a factual determination that the sham declaration is only offered to create an artificial factual issue.  *See Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 925 (S.D. Cal. 2019).

Contrary to Plaintiffs assertion, Mr. Fleiss's declaration does not confirm Mr. Corcoran's recollection of events.  Mr. Fleiss stated in his declaration that at the December 10, 2013 meeting "in response to a question from another investment manager, Atchison told us the musician cancellations were not material and he was not concerned about them."  Fleiss Decl. ¶ 39.  The import of this statement regarding musician cancellations relates to the assertion elsewhere that "musical acts had withdrawn . . . because of concerns relating to *Blackfish*."  Fleiss Decl. ¶ 37.  Mr. Corcoran, however, attests that "During that meeting, I recall we asked Messrs. Atchison and Heaney whether Blackfish was having any impact on SeaWorld's business."  Corcoran Decl. ¶ 31.  Because Mr. Fleiss was present at the meeting and his account differs from that of Mr. Corcoran's, Mr. Fleiss's declaration undoubtedly calls Mr. Corcoran's reliability into question, and in fact reveals that this particular statement is inaccurate.

However, Mr. Corcoran's declaration does not create an artificial factual dispute because Mr. Fleiss's declaration creates a dispute about what was said at the meeting.  *See* Fleiss Decl.  Accordingly, the Court **OVERRULES** Defendants' objection to Mr. Corcoran's August 2021 declaration because it is not a sham declaration.

Defendants also peripherally argue that the declaration should be disregarded

because Mr. Corcoran "cannot attest to who was at the meeting or what was said" because he was not there. Doc. No. 151-143 at 3. This argument appears to implicate Federal Rules of Evidence 602 and 802.

To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). With respect to evidence submitted by affidavit, Rule 56(e) requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). The Ninth Circuit has explained that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also* Fed. R. Civ. P. 56(c)(2).

Defendants cite to the case of *Block v. City of L.A.*, 253 F.3d 410 (9th Cir. 2001) in support for their position. In *Block*, the Ninth Circuit held that:

> The Menkus affidavit appears inadequate under Rule 56(e). Not made on personal knowledge, it did not set forth facts that would be admissible in evidence. It is clear from the affidavit that Menkus was not personally involved in any of the disciplinary suspensions, and that he did not personally review any business records containing information regarding such disciplinary suspensions. Menkus instead relied on information from (unsworn) departmental personnel officers, and the source of these officers' information is unclear. Rather than set forth facts that would be admissible in evidence, the affidavit was instead based on inadmissible hearsay. Fed. R. Evid. 802. It was thus an abuse of discretion to consider the information contained in the Menkus declaration.

*Id.* at 419.

Here, Mr. Corcoran claims to have made the declaration based upon on personal knowledge. While he was not present at the meeting in Boston, he apparently learned of what transpired from Mr. Fleiss. This raises a hearsay issue. However, even with this

hearsay issue, the Court must consider whether the content of his declaration can nevertheless be introduced at trial in admissible form. The content at issue is what was said during the Boston meeting. To understand whether this specific testimony will be admissible at trial, it is necessary to juxtapose the two declarations as they relate to the Boston meeting. Mr. Corcoran attests that:

> 31.    During that meeting, I recall we asked Messrs. Atchison and Heaney whether Blackfish was having any impact on SeaWorld's business. This was consistent with any meeting we would have had with Company management at this time, because we were constantly asking SeaWorld whether the film was impacting or affecting the business.

> 32.    Messrs. Atchison and Heaney stated that the film was having no impact on the Company. Again, this was consistent with responses we received from the Company during this time period, in which they repeatedly denied that Blackfish was having any impact at all.

Corcoran Decl. ¶¶ 31–32. However, Mr. Fleiss, who was present at the meeting and from whom Mr. Corcoran allegedly learned of what transpired, attests that:

> 39.    At that meeting, in response to a question from another investment manager, Atchinson told us the musician cancellations were not material and he was not concerned about them. (Ex. 14 ("Brookside asked Jim if it was material and if he was concerned about the cancellations . . . and he said no")). After the meeting, I sent an internal e-mail to Mr. Corcoran and others summarizing my discussion with Atchison, Heaney, and Ballesteros. (See Ex. 15). As I recounted, at the meeting Atchison, Heaney, and Ballesteros said that they thought 2014 would be a "trad[itional]" year for the Company and that they expected an increase in attendance from positive weather, new attractions, and SeaWorld's 50th Anniversary Celebration. (Id.) Atchison, Heaney, and Ballesteros also said that consumers were not pushing back their trips to SeaWorld. (Ex. 16).

> 40.    When asked about Bands, Brew & BBQ during the December 10 meeting, Atchison told me that the musical act cancellations were not material and that he was not concerned about them. (Ex. 17; Ex. 18). Atchison, Heaney, and Ballesteros also again denied that Blackfish was impacting SeaWorld's

brand, business, or attendance. (Ex. 19).

Fleiss Decl. ¶ 39–40 (emphasis added).

Mr. Fleiss will not testify that he asked Messrs. Atchison and Heaney "whether *Blackfish* was having any impact on SeaWorld's business." Corcoran Decl. ¶ 31. Moreover, he will not testify that in response, they "stated that the film was having no impact on the Company." Corcoran Decl. ¶ 32. Instead, he will testify as to their specific statements—in response to another analyst's question—about the music cancellations and attendance. Fleiss Decl. ¶¶ 39–40. He may also testify to the fact that all three speakers denied that *Blackfish* was impacting the brand, business, or attendance, generally. Fleiss Decl. ¶ 40. But these are not the same underlying facts and content. The discrepancy renders Mr. Corcoran not competent to testify as to what occurred at the Boston meeting at trial. To be sure, he was not there, and the specific content of his declaration as to what was said at the meeting will not be admissible because Mr. Fleiss—who was present—would not testify to the same facts. Accordingly, the Court **SUSTAINS** Defendants' objection and disregards Paragraphs 30, 31, and 32 of Mr. Corcoran's August 2021 declaration.[7]

### 2. *MKM Research and Initiative Presentation*

Defendants also take issue with Plaintiffs' reliance on the MKM survey and Initiative presentation. In February 2014, one of SeaWorld's minority investors commissioned MKM to conduct a national survey on SeaWorld, visitation, and "the *Blackfish* effect." Plaintiffs' Summary Judgment Exhibit ("PX") 7. In July 2014, SeaWorld retained Initiative to prepare a "media mix analysis" to determine how to allocate marketing resources. PX 30.

---

[7] Mr. Corcoran's August 2021 declaration is 40 paragraphs long, only three of which relate to the Boston meeting and are called into question. Therefore, because the Court finds that only Paragraphs 30, 31, and 32 will be inadmissible, the Court only disregards these paragraphs and not Mr. Corcoran's declaration in its entirety.

According to Defendants, in the Class Action, the Court ruled *in limine* to exclude these reports. Defendants also argue that neither MKM nor Initiative were "speaking on behalf of SeaWorld." Doc. No. 151-143 at 5.

In the Class Action, the Court tentatively granted Defendants' motion *in limine* to exclude these reports "to the extent such reports are offered for their truth. The Court tentatively f[ound] that these third-party market research reports do not qualify as statements of an opposing party under Federal Rule of Evidence 801(d)(2)(D)." Class Action, Doc. No. 506.

However, as Plaintiffs note, the standards for trial and summary judgment differ. The Court rejected Defendants' exact argument on summary judgment in the Class Action:

> Fourth, Defendants maintain that Plaintiffs improperly rely on two surveys prepared by third-parties and argue that both surveys constitute hearsay. *See* Doc. No. 419-11 at 5. However, the Ninth Circuit has held that survey evidence does not constitute hearsay and "should be admitted as long as [it is] conducted according to accepted principles and [is] relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). "Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of evidence, not its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988). Accordingly, the Court OVERRULES Defendants' objection to these surveys without prejudice at this stage of the proceedings.

*Baker*, 423 F. Supp. 3d at 928.

Moreover, as Plaintiffs explain, they do not offer these reports for hearsay purposes—that *Blackfish* actually impacted attendance. *See* Doc. No. 159-11 at 6. Instead, they offer these documents to show that Defendants knew of the "quantifiable impact from *Blackfish* well before August 13, 2014." *Id.* Accordingly, based upon the Court's ruling in the Class Action and in light of Plaintiffs' stated non-hearsay purpose, the Court **OVERRULES** Defendants' objection. *See United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) ("If an out-of-court statement is not introduced for the truth of

the matter asserted, but to establish the effect on the listener or a basis in fact for the listener's subsequent actions, the statement is not hearsay.").

## B.    Defendants' Second Set of Objections

Defendants also object to various statements in Mr. Corcoran's and Mr. Fleiss's declarations submitted in support of Plaintiffs' opposition to Defendants' summary judgment motion.  In addition to Mr. Corcoran's August 2021 declaration, discussed above, Mr. Corcoran submitted an October 14, 2021 declaration.  Doc. No. 148-18 ("Corcoran Opposition Declaration" or "Corcoran Opp. Decl.").  And as noted above, Mr. Fleiss submitted an October 12, 2021 declaration.  Fleiss Decl.

The statements at issue go to nine unpleaded instances where SeaWorld personnel allegedly stated that *Blackfish* had no impact on SeaWorld—on August 14, 2013, November 14, 2013, December 10, 2013, January 2, 2014, March 7, 2014, March 17, 2014, April 3, 2014, May 6, 2014, and May 20, 2014.

Defendants assert that Messrs. Corcoran and Fleiss's declarations are shams.  As noted above, the sham affidavit rule can only be applied where a declaration is clearly and unambiguously contradicted by prior testimony such that the Court can make a factual determination that the sham declaration is only offered to create an artificial factual issue.  *See Baker*, 423 F. Supp. 3d at 925.

Defendants argue generally that Messrs. Corcoran and Fleiss's statements are contradicted by the lack of contemporaneous notes and their deposition testimony, wherein they had trouble recollecting the events that occurred on these nine dates.  *See, e.g.*, Doc. No. 161-23 at 2.  However, as Plaintiffs correctly argue, this goes to the weight of the evidence and does not properly attack the declarations' admissibility.

That said, in his Opposition Declaration, Mr. Corcoran provides a new narrative of what transpired at the Boston meeting, essentially copying and pasting what Mr. Fleiss declared:

42.    On December 10, 2013, Mr. Fleiss met with Atchison, Heaney, and Ballesteros at a road show in Boston sponsored by Goldman, Sachs & Co. to

increase demand for SeaWorld stock in advance of a direct offering to investors of the stock owned by Blackstone, SeaWorld's largest shareholder. (Ex. 18).

43.    At that meeting, in response to a question from another investment manager, Atchinson told us the musician cancellations were not material and he was not concerned about them. (Ex. 19 ("Brookside asked Jim if it was material and if he was concerned about the cancellations…and he said no"); Ex. 20 ("they said the concert cancellations . . . were not material when we saw them")). After the meeting, Mr. Fleiss sent me an e-mail summarizing his discussion with Atchison, Heaney, and Ballesteros. (See Ex. 21). According to Mr. Fleiss's e-mail, Atchison, Heaney, and Ballesteros said that they thought 2014 would be a "trad[itional]" year for the Company and that they expected an increase in attendance from positive weather, new attractions, and SeaWorld's 50th Anniversary Celebration. (Id.) Atchison, Heaney, and Ballesteros also said that consumers were not pushing back their trips to SeaWorld. (Ex. 22), and again denied that Blackfish was impacting SeaWorld's reputation, brand, business, or attendance. (Ex. 23).

Corcoran Opp. Decl. ¶¶ 42–43.

The fact that Mr. Corcoran ultimately changed his Boston meeting testimony to conform to Mr. Fleiss's recollection and declaration further supports the Court's ruling on Defendants' evidentiary objection with respect to the three paragraphs in his August 2021 declaration discussed above.  Moreover, his testimony now appears to contradict his prior testimony.  While the statements are not in direct conflict, they are somewhat inconsistent.  Especially concerning is that no he no longer testifies that Plaintiffs' representative asked the question, but that the statement was given in response to another analyst's question.  He also now recounts specific details—including quotes—that he, apparently, could not previously recall.  Nonetheless, the argument befalls the same fate discussed above in that the Court cannot conclude that Mr. Corcoran's Opposition Declaration weas created for the sole purpose of creating a factual dispute because Mr. Fleiss's declaration creates the dispute.  Accordingly, Mr. Corcoran's Opposition

Declaration as to the Boston meeting does not implicate the sham affidavit rule.[8]

As to Mr. Fleiss's declaration and the remainder of Mr. Corcoran's Opposition Declaration, Defendants do not offer, or point to, any prior testimony that clearly and unambiguously contradicts the statements.  Nor is it clear that these declarations as a whole are offered for the sole purpose of creating a factual dispute.  Mr. Fleiss' declaration is specific, based upon personal knowledge of a meeting that he personally attended, and has remained unchanged, and therefore creates a genuine dispute.  Accordingly, the Court **OVERRULES** Defendants' objections to Mr. Fleiss's declaration and Mr. Corcoran's Opposition Declaration.

### III. *DAUBERT* MOTIONS

Both parties have filed two *Daubert* motions.  Plaintiffs move to exclude the expert testimony of Martin Dirks and Bruce Deal.  Defendants move to exclude the expert testimony of W. Scott Dalrymple and Chekitan S. Dev.

### A.    Legal Standard

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  As the Ninth Circuit explained:

> Under *Daubert* and its progeny, including *Daubert* II, a district court's inquiry into admissibility is a flexible one.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).

---

[8] While the Court and the parties can address the admissibility of trial evidence and testimony *in limine*, the Court cautions Plaintiffs that Mr. Corcoran's inconsistent declarations are of concern and render him incompetent to testify as to the Boston meeting.

"[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id*. at 564 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565 (citation and internal quotation marks omitted).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564 (citation omitted).  The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969.  Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969-70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge.  A district court should not make credibility determinations that are reserved for the jury." *Id*. at 1044.

**B.    Plaintiffs' Motion to Exclude the Expert Testimony and Evidence of Martin Dirks**

A central issue to be decided in this case is whether Defendants' allegedly false or misleading statements were material.  In support of Defendants' position on this point, Defendants will offer the expert testimony of Martin Dirks.  Plaintiffs argue that Mr. Dirks: (1) is not qualified to give expert testimony on the issue of relevancy; (2) does not base his opinions on reliable, objective methods; (3) improperly summarizes evidence; and (4) fails the "fit" *Daubert* requirement.  *See* Doc. No. 132-1 at 2–11.

Defendants do not offer Mr. Dirks' report or testimony at this time.  To be sure, neither Defendants nor Plaintiffs move for summary judgment as to the element of materiality, and Mr. Dirks' report is not in the summary judgment record.  Instead, his report is offered to the Court in the first instance as an exhibit to Plaintiffs' motion to

exclude his evidence.  *See* Doc. No. 132-12.  Accordingly, this is really a motion *in limine* for trial, and it is premature.  Therefore, the Court **DENIES** Plaintiffs' motion to exclude the not-yet-offered expert report and testimony of Mr. Dirks without prejudice to raising these issues at the motion *in limine* stage closer to trial.  *See VBS Distribution, Inc. v. Nutrivita Labs., Inc.*, No. SACV 16-01553-CJC(DFMx), 2018 U.S. Dist. LEXIS 230685, at *12–13 (C.D. Cal. May 7, 2018).

## C.   Plaintiffs' Motion to Exclude the Expert Testimony and Evidence of Bruce Deal

Defendants move for summary judgment as to damages: they argue that Plaintiffs failed to mitigate damages.  In support, Defendants offer the expert report of Bruce Deal, who, among other things, opines that—should the jury accept Defendants' position that Plaintiffs learned that *Blackfish* had impacted SeaWorld prior to the Corrective Disclosure Date—Plaintiffs could have and should have sold off their entire investment.  *See generally* Doc. No. 139-60; Defendants' Summary Judgment Exhibit ("DX") 56 ("Deal Report").

Mr. Deal is an economist and Managing Principal of the economic and financial consulting firm Analysis Group.  Deal Report ¶ 1.  Mr. Deal has served as an expert witness in several class action and securities litigation cases.  Deal Report ¶ 2.  He holds a Ph.D. in Public Policy from Harvard University and a B.A. in Economics from Pacific Lutheran University.  Deal Report at A-1.  Mr. Deal has submitted two reports: (1) March 12, 2021 affirmative report, *see* Deal Report; and (2) April 23, 2021 rebuttal report, responding to Mr. Dalrymple's report,[9] *see* Doc. No. 134-11; Defendants' Dalrymple *Daubert* Motion Exhibit 11 ("Deal Rebuttal Report").  Plaintiffs challenge one portion of each of Mr. Deal's reports.  As to the Deal Report, Plaintiffs challenge Mr. Deal's damages opinion based upon the alternative "Awareness Dates."  As to the Deal Rebuttal

---

[9] As will be discussed *infra* Part V.C.1, Mr. Dalrymple is Defendants' expert on loss causation and materiality.

Report, Plaintiffs challenge Mr. Deal's opinion of "alternative liability."  As explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

>  1.  *Deal Report—Awareness Dates & Damages*

In the Deal Report, Mr. Deal concludes in Part IV that Plaintiffs suffered no damages if the factfinder determines that they had learned of the fraud prior to August 6, 2014.  Deal Report ¶ 26.  Mr. Deal assumes four potential Awareness Dates based upon the record he reviewed: December 23, 2013, March 7, 2014, May 16, 2014, and August 5, 2014.  Deal Report ¶ 27.  According to Mr. Deal, these four Awareness Dates are examples and his "analysis and conclusions . . . would equally apply to any alternative [] Awareness Date should the fact finder determine that [Plaintiffs] had concluded that *Blackfish* was affecting SeaWorld's attendance or business on another date prior to August 5, 2014."  Deal Report ¶ 28.

In order to calculate Plaintiffs' damages if the factfinder accepts any one of these Awareness Dates—or any other date prior to the Corrective Disclosure Date—Mr. Deal analyzed four combinations of purchase and sale windows: (1) shares purchased before the Awareness Dates and sold before the Corrective Disclosure Date; (2) shares purchased after the Awareness Dates and sold before the Corrective Disclosure Date; (3) shares purchased after the Awareness Dates and kept through the Corrective Disclosure Date; and (4) shares purchased before the Awareness Dates and kept through the Corrective Disclosure.  Deal Report ¶ 29.

Plaintiffs argue that Mr. Deal's Awareness Dates opinions are irrelevant, unreliable, and amount to written advocacy.

>  a.  <u>Unreliability</u>

In order to determine if Plaintiffs could have sold their stock after the Awareness Dates and prior to the Corrective Disclosure Date, Mr. Deal analyzed, essentially, whether Plaintiffs' significant volume trading had any impact on SeaWorld's stock price and found that it did not.  Deal Report ¶ 36.  In coming to this conclusion, Mr. Deal looked at four days where Plaintiffs transacted over 500,000 SeaWorld shares.  Deal

Report ¶ 37.

First, Plaintiffs argue that Mr. Deal's selection of 500,000 as a threshold—thus leading to only 4 data points—is insufficient to form any conclusion. Doc. No. 135-1 at 22. They argue, for example, that an analysis of 300,000 shares would have revealed a significant abnormal return on April 8, 2014. *Id.* However, Plaintiffs do not provide any authority undermining the use of only 4 data points, or Mr. Deal's decision to select this threshold. Instead, "[c]ourts regularly find that concerns that a survey's sample size is too small or unrepresentative do not preclude its admission, but go to the weight to be accorded the survey results." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997)). Accordingly, the Court **DENIES** Plaintiffs' motion on this basis.

Second, Plaintiffs argue that Mr. Deal failed to look for any news on the four days in question and thus, he misused his own event study under his own standards. Doc. No. 135-1 at 21. According to Defendants, however, Mr. Deal's study only calls for the examination of other news "if one found such price movements." Deal Report ¶ 36 ("If one found such price movements in the absence of other news, then the price movements could potentially be attributed to Plaintiffs' trading activity and would need to be considered in any damages analysis."). Therefore, because there were no statistically significant abnormal returns on the four days, *id.* ¶ 37, Mr. Deal did not need to review the news on those days. Accordingly, Mr. Deal did not misapply his own event study and it is not inherently unreliable on this basis. Therefore, the Court **DENIES** Plaintiffs' motion in this respect.

Finally, Plaintiffs generally argue that Mr. "Deal's methodology is unreliable because it rests on untenable assumptions about trading behavior that Deal provides no analysis to substantiate and which he lacks expertise in . . . . Deal did not examine tick-by-tick or intraday data; did not examine order book data; indeed, he examined only closing prices and volume close to close." Doc. No. 135-1 at 22.

Plaintiffs' assertion that Mr. Deal lacks expertise in the disciplines within which he

opines is not well-taken.  Mr. Deal has qualified to serve as an expert on causation and damages in a litany of cases, including securities litigation.  Deal Report at A-2–A-16. Moreover, Plaintiffs do not offer any authority that Mr. Deal's failure to use these particular variables or data makes his analysis and report unreliable.  Instead, this goes to the weight of Mr. Deal's evidence, which Plaintiffs can attack on cross-examination.  *See SQM N. Am. Corp.*, 750 F.3d at 1044.  Accordingly, the Court **DENIES** Plaintiffs' motion on this basis as well.

### b.   Relevancy and Written Advocacy

As noted above, Mr. Deal analyzed whether Plaintiffs could have sold off their investment prior to the Corrective Disclosure Date.  Deal Report ¶ 36.  The average layperson does not have the skill to understand large-scale trading trends and the import of those trends—*to wit*, when a large-scale investor "can" sell.  So this evidence and testimony is certainly relevant and necessary.

Mr. Deal then attempted to ascertain Plaintiffs' damages for shares purchased after the first alleged misstatement based upon the assumption that the factfinder accepts any Awareness Date.  Deal Report ¶ 29.  As noted above, Mr. Deal's analysis in this respect is broken down into four windows of time: (1) shares purchased before the Awareness Dates and sold before the Corrective Disclosure Date; (2) shares purchased after the Awareness Dates and sold before the Corrective Disclosure Date; (3) shares purchased after the Awareness Dates and kept through the Corrective Disclosure Date; and (4) shares purchased before the Awareness Dates and kept through the Corrective Disclosure.  Deal Report ¶ 29.

As to the first two windows, Plaintiffs argue that these opinions are irrelevant because all parties agree that no damages are recoverable for shares sold before the Corrective Disclosure Date.  Doc. No. 135-1 at 18–19.  Defendants concede that if the Court believes it is unnecessary, Mr. Deal will not offer testimony on these points.  Doc. No. 141 at 14.

Mr. Deal relies on the first two windows in calculating whether Plaintiffs suffered

1    any damages under the Awareness Dates theory.  This is relevant if the factfinder accepts

2    Defendants' Awareness Dates or any other date prior to the Corrective Disclosure.  As

3    Defendants explain, these two "trading combinations are discussed as part of a larger

4    damages analysis for each Awareness Date."  *Id.*  Therefore, the use of these windows is

5    relevant to the overall damages analysis.

6         Evidence and testimony about damages for shares that fall within these two

7    windows, however, has no probative value.  While these two metrics are necessary and

8    relevant in the larger context of understanding Mr. Deal's methodology, discussion of the

9    purchase and selling of shares not at issue in this case, and similarly, damages not sought,

10   is irrelevant and will be unnecessarily confusing.  *See* Fed. R. Evid. 403 ("The court may

11   exclude relevant evidence if its probative value is substantially outweighed by a danger

12   of one or more of the following: unfair prejudice, confusing the issues, misleading the

13   jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

14   Accordingly, the Court **GRANTS** Plaintiffs' motion to exclude this portion of the Deal

15   Report—Mr. Deal's evidence and testimony that no damages were incurred for stock sold

16   prior to the Corrective Disclosure Date are subject to exclusion because no damages for

17   these shares are sought.  Discussion of these two metrics as part of the larger analysis,

18   however, is not subject to exclusion.

19        As to the two remaining windows, Plaintiffs argue that Mr. Deal "is offering legal

20   opinions in economic garb."  Doc. No. 135-1 at 19.  According to Plaintiffs "it is the

21   province of this court and the jury to determine if the relevant reliance link has been

22   severed and the rebuttable presumption of reliance in a fraud on the market case

23   rebutted."  *Id.*

24        Mr. Deal may not testify as to the legal import of his analysis—*i.e.*, that the causal

25   link was in fact severed if Plaintiffs purchased shares after any Awareness Date accepted

26   by the factfinder.  Defendants argue that "Mr. Deal will testify that Plaintiffs' damages

27   should be zero if the jury" accepts an Awareness Date.  Doc. No. 141 at 13.  That is

28   permissible.  However, Mr. Deal also opines that, as to the third transaction window, if

the factfinder accepts an Awareness Date, "Plaintiffs or HCM could not have been misled into buying these shares."  Deal Report ¶ 32.  While Mr. Deal should be permitted to testify as to his economic, analysis-driven conclusions regarding the ability for Plaintiffs to sell shares, and the import of that ability on the purchase-sale windows of time under an Awareness Date assumption, he should not be permitted to testify as to this legal conclusion.  *See Nationwide Transpo. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.") (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)); *see also Solid 21, Inc. v. Hublot of Am.*, 685 Fed. Appx. 530, 531 (9th Cir. 2017) (applying *Nationwide*'s proposition regarding expert witnesses and legal conclusions following the 2011 Amendment to Federal Rule of Evidence 704); *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) ("[A]n expert cannot testify to a matter of law amounting to a legal conclusion.").  Accordingly, the Court **GRANTS** Plaintiffs motion and excludes Mr. Deal's evidence and testimony in this respect.  The Court **DENIES** Plaintiffs motion as to the fourth window because Mr. Deal makes no similar conclusion.

Finally, Mr. Deal opines in conclusion that if Plaintiffs had sold their holdings when they learned of the fraud, "Plaintiffs suffered zero damages under each of the three HCM Awareness Dates."  Deal Report ¶ 40.  Mr. Deal appears to offer this opinion at least in part based upon the premise that Plaintiffs had a duty to mitigate damages.  As Plaintiffs correctly argue, this is a legal opinion.  However, as will be explained *infra* Part VIII.B, Plaintiffs did have a legal duty to mitigate their damages once they learned of the fraud.  Nonetheless, Mr. Deal cannot offer legal opinion.  *See Nationwide*, 523 F.3d at 1058.  Accordingly, the Court **GRANTS** Plaintiffs' motion to the extent Mr. Deal intends to offer evidence or testimony that Plaintiffs had a legal duty to mitigate.  However, to the extent Mr. Deal's opinion and evidence is based upon the assumption of a legal duty, the Court **DENIES** Plaintiffs' motion.

### 2.      Deal Rebuttal Report—Alternative Damage Opinions

In support of their motion to exclude Mr. Dalrymple's expert report, Defendants offer the Deal Rebuttal Report.  Plaintiffs argue Mr. Deal's Rebuttal evidence as to alternative damages is unreliable and irrelevant.  Doc. No. 135-1 at 8.

In the Deal Rebuttal Report, Mr. Deal asserts that Mr. Dalrymple's calculation of damages is flawed.  Deal Rebuttal Report ¶ 5.  Specifically, Mr. Deal asserts that Mr. Dalrymple's assumption that inflation is constant over the time period is flawed and thus, Mr. Deal was asked to calculate damages under alternative liability theories (where the factfinder concludes that a false statement was made) while correcting for Mr. Dalrymple's methods.  Deal Rebuttal Report ¶¶ 5, 62.

First, Plaintiffs' argument that the Deal Rebuttal Report is unreliable because he combines "no fewer than four variables" is unpersuasive.  Doc. No. 135-1 at 23.  This attack on Mr. Deal's variables goes to the weight of his Rebuttal Report and not its admissibility.  *See SQM N. Am. Corp.*, 750 F.3d at 1044.  Accordingly, the Court **DENIES** Plaintiffs' motion on this basis.

Second, Plaintiffs argue that the Court should exclude Mr. Deal's alternative damage opinions because Mr. Deal only picked two alternative "start dates" when Plaintiffs' interrogatory responses identify 28 separate dates that, under Deal's 'scenarios' and view of the matter could be used as potential start date."  *Id.* at 24.  The start date refers to the first allegedly misleading statement, and Mr. Dalrymple used the start date of August 29, 2013.  Doc. No. 137-14; PX 10 ("Dalrymple Report") ¶ 11.  In rebuttal, Mr. Deal uses Mr. Dalrymple's start date, as well as March 13, 2014—the date of the alleged misstatement in 1Q2014.  Deal Rebuttal Report ¶ 63.  However, again, Mr. Deal's particular choice of dates go to the weight of this evidence, *see SQM N. Am. Corp.*, 750 F.3d at 1044, and Plaintiffs offer no authority that two dates were insufficient, or that these two dates somehow render his analysis fundamentally unreliable.  Moreover, as Defendants explain, Mr. Deal will not opine on when SeaWorld's first allegedly misleading statement occurred.  *See* Deal Rebuttal Report ¶ 63.  Should a jury find,

however, that liability began on some other date, such as March 13, 2014, rather than Plaintiffs' start date, Mr. Deal's opinion will undoubtedly be relevant to damages. Accordingly, the Court **DENIES** Plaintiffs' motion in this respect.

In this same vein, Plaintiffs argue that Mr. Deal's testimony regarding these two start dates will prejudice the jury; they argue that it is the jury's task to determine which dates Defendants made misstatements and that there is no reason "to privilege" these two dates over the others. Doc. No. 135-1 at 24. In response, Defendants argue that their use of these two dates—dates they intend to prove at trial—is no more arbitrary or prejudicial than Mr. Dalrymple's start date. Doc. No. 141 at 24. The Court agrees. The risk of prejudice to the jury is something that can be addressed appropriately with instructions at trial but is not a basis to exclude the Deal Rebuttal Report. Accordingly, the Court **DENIES** Plaintiffs' motion on this basis.

Third, Plaintiffs take issue with Mr. Deal's alternative inflation amounts. Mr. Dalrymple opines that the *Blackfish* impact on attendance was 67% and 100% for SeaWorld Orlando and SeaWorld San Diego, respectively. Dalrymple Report ¶¶ 108, 114; Doc. No. 135-1 at 15. In rebuttal, Mr. Deal uses a 0% impact on SeaWorld Orlando and varies the impact on SeaWorld San Diego as either 100%, 50%, or 25%. Plaintiffs argue that Mr. Deal cannot pluck percentages out of thin air. Doc. No. 135-1 at 25 (citing *NetFuel, Inc. v. Cisco Sys.*, No. 5:18-cv-02352-EJD, 2020 U.S. Dist. LEXIS 46193, at *18 (N.D. Cal. Mar. 10, 2020)). In response, Defendants explain that several of Mr. Deal's scenarios "assume that the jury finds share price inflation to be lower than the values relied on by Plaintiffs' expert." Doc. No. 141 at 25. As Defendants correctly argue, this type of testing is will aid the jury in calculating damages if their percentages diverge from Plaintiffs' expert's. Moreover, Mr. Deal does not opine in his rebuttal report that these percentages are the correct calculations as to *Blackfish*'s impact on competition but are merely "assumptions" to "calculate damages using alternative measures." Deal Rebuttal Report ¶ 64. Accordingly, the Court **DENIES** Plaintiffs' motion in this respect.

Fourth, Plaintiffs take issue with Mr. Deal's inflation-over-time model as opposed to the use of the constant dollar methodology. Doc. No. 135-1 at 26. Mr. Dalrymple's Report concludes that SeaWorld stock artificially inflated to $7.57/share and remained at that price until the Corrective Disclosure Date. Dalrymple Report ¶ 11. In rebuttal, Mr.Deal attacks Mr. Dalrymple's failure to account for inflation. *See, e.g.*, Deal Rebuttal Report ¶ 6. Mr. Deal performed a comprehensive analysis to determine a variable inflation ribbon. Deal Rebuttal Report ¶ 54. There is no authority for the position that Mr. Deal's inflation-over-time model is unreliable. Instead, Plaintiffs' argument goes to the weight of this evidence. Accordingly, the Court **DENIES** this portion of Plaintiffs' motion.

Fifth, Mr. Deal opines as to an estimate of damages under the assumption that Plaintiffs are one single entity. Deal Rebuttal Report ¶ 66. As Plaintiffs point out, it is undisputed that Plaintiffs are all separate legal entities. Doc. No. 135-1 at 27. And the parties agree that whether Plaintiffs should be considered one entity is a legal question. *Id.*; Doc. No. 141 at 29. Mr. Deal explains that in rebuttal, he was asked to calculate damages "under the alternative assumption that Plaintiffs should be considered to be a single entity." Deal Rebuttal Report ¶ 66. While Plaintiffs argue that Mr. Deal does not opine as to whether Plaintiffs are or should be treated as one entity, Doc. No. 141 at 29, this is not entirely true. Mr. Deal states, in response to Plaintiffs' request that he conduct an alternate damages analysis, that the single-entity "approach effectively ignores the transfer of 1.9 million shares from Highfields Capital III L.P to Highfields Capital IV LP and Highfields Capital Ltd. on July 11, 2014. Deal Rebuttal Report ¶ 66.

Whether Plaintiffs are treated as one entity is a legal question and Mr. Deal cannot opine as to the legal import of the July 11, 2014 transfer or the legal conclusion that the entities are separate. *See Nationwide*, 523 F.3d at 1058. Accordingly, the Court **GRANTS** Plaintiffs motion to this extent. However, Mr. Deal, as an expert, may testify as to damages should Plaintiffs be deemed one entity, and to that end, the Court **DENIES** Plaintiffs' motion.

Finally, Plaintiffs argue, generally, that Mr. Deal should only be permitted to opine as to his true opinion on the matter—that Plaintiffs suffered no damages.  Doc. No. 135-1 at 7.  However, "a defendant may present expert rebuttal of the plaintiff's expert by putting forth its own expert who either (1) challenges the methodology of the plaintiff's expert, or (2) claims that the ultimate conclusion reached by the plaintiff's expert is flawed because a superior methodology provides a different result."  *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, 2020 U.S. Dist. LEXIS 9082, at *17–18 (N.D. Cal. Jan. 2, 2020) (citing *TCL Communs. Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. SACV 14-00341 JVS (Anx), 2016 U.S. Dist. LEXIS 194814, at *12–13 (C.D. Cal. Aug. 17, 2016)).  "Either tack would be rebuttal, even if the latter involves the use of an 'alternate methodology' as an aspect of rebutting the ultimate conclusions of the plaintiff's expert."  *TCL Communs.*, 2016 U.S. Dist. LEXIS 194814, at *13. Accordingly, Mr. Deal's analysis, which leads to an alternate conclusion, is appropriate rebuttal testimony and the Court therefore **DENIES** Plaintiffs' motion on this basis.

**D.    Defendants' Motion to Exclude the Expert Testimony and Evidence of W. Scott Dalrymple**

Mr. W. Scott Dalrymple is a partner at the consulting firm BVA Group. Dalrymple Report ¶ 4.  Mr. Dalrymple has provided expert testimony in various securities cases.  Dalrymple Report ¶ 5.  He holds a Master's degree in Economics from the London School of Economics and Political Science and a Bachelor of Business Administration degree from the University of Texas at Austin.  Dalrymple Report ¶ 6. Mr. Dalrymple has submitted two reports: (1) March 12, 2021 affirmative report, opining on materiality, loss causation, and damages, *see* Dalrymple Report; and (2) April 23, 2021 rebuttal report, responding to the Deal Report, *see* Doc. No. 135-22; Plaintiffs' Deal *Daubert* Motion Exhibit 19 ("Dalrymple Rebuttal Report").

Defendants assert that these reports should be excluded for two reasons: (1) his loss causation analyses are inherently unreliable and unsound; and (2) his materiality opinion should be excluded because Dalrymple is not qualified to give such expert

1  testimony.  Doc. No. 134-1 at 5–7.

2      *1.*   *Loss Causation*

3      Mr. Dalrymple found that SeaWorld's common stock traded in an efficient market

4  during the relevant period.  Dalrymple Report ¶ 10.  He conducted a scientific event

5  study using a market model.  Dalrymple Report ¶ 73.  His study accounted for market

6  factors using changes in the Russell 2500 Travel and Leisure Sector Growth Index and an

7  equal-weighted index of returns to shares of Six Flags Entertainment Corporation and

8  Cedar Fair, L.P.  Dalrymple Report ¶ 77.  Based upon this study, Dalrymple found that

9  SeaWorld stock exhibited a negative abnormal return on August 13, 2014 of $9.27.

10  Dalrymple Report ¶ 81.  Defendants do not take issue with any of this.

11      Mr. Dalrymple then sought to determine the cause of this abnormal return.  To do

12  so, Mr. Dalrymple performed a disaggregation analysis.  *See* Dalrymple Report ¶¶ 11, 75.

13  Mr. Dalrymple first analyzed transitory factors' (*i.e.*, weather, holidays) impact on the

14  abnormal return.  Dalrymple Report ¶ 97.  He found that $9.09 of the $9.27 abnormal

15  return "cannot be explained by transitory factors unrelated to *Blackfish*."  Dalrymple

16  Report ¶ 98.  He then concluded that "[h]aving subtracted the impact of transitory factors,

17  the remainder of SeaWorld's negative abnormal return is necessarily attributable to the

18  impact of new information released in the August 2014 Announcement."  Dalrymple

19  Report ¶ 99.  Mr. Dalrymple determined that the "positive news" would not account for

20  any portion of SeaWorld's negative abnormal return; if anything, would have attenuated

21  it."  Dalrymple Report ¶ 99.  Mr. Dalrymple then looked to the negative news—*Blackfish*

22  and competition.  Dalrymple Report ¶ 100.  Defendants take issue with this portion of

23  Mr. Dalrymple's methodology, arguing that his disaggregation analysis is unreliable for

24  several reasons.

25      Plaintiffs "can satisfy loss causation by showing that the defendant misrepresented

26  or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic

27  loss."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111,

28  1120 (9th Cir. 2013).  "A plaintiff is not required to show 'that a misrepresentation was

the *sole* reason for the investment's decline in value' in order to establish loss causation. 'As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *In re Daou Sys.*, 411 F.3d at 1025 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)); *Nuveen*, 730 F.3d at 1119.

As an initial matter, it cannot be disputed that Mr. Dalrymple's methodology, and specifically his disaggregation analysis, is a sound loss causation study. Because it is undisputed that the alleged Corrective Disclosure revealed various pieces of information, Plaintiffs will ultimately need to establish that the alleged fraud was nonetheless a substantial factor in the abnormal return on that date by apportioning or disaggregating the other market-known factors. The *Daubert* standard tests the reliability of an expert's methods and attacks on the specific data used goes to the weight of the evidence and is more appropriately addressed via cross-examination and argument to the jury. For this reason alone, the Court can deny Defendants' motion in its entirety. Nonetheless, the Court addresses Defendants' specific arguments as to reliability.

Defendants argue that Mr. Dalrymple improperly relied upon internal, non-public data. Doc. No. 134-1 at 9. This is a red herring. Defendants made this same argument in a *Daubert* motion attacking Chad Coffman's study in the related class action case of *Baker v. SeaWorld*, 14-cv-2129-MMA (AGS) (the "Class Action"), which the Court rejected. Again, Defendants rely on *Dzung Chu v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 383 (9th Cir. 2010), for their position on this issue. The *Oracle* case is inapposite. In *Oracle*, the Ninth Circuit condemned the use of an internal email to prove loss causation—*to wit*, in *Oracle*, the plaintiff's expert relied on one internal email to say that the contents of that email caused the price drop. The Ninth Circuit stated that the internal email is not evidence of what the market learned. This is not the case here.

Mr. Dalrymple does not rely on non-public information to prove that a factor unknown to the market caused the price drop, as was the case in *Oracle*. Here, he

analyzed to what extent a disclosed factor—competition—can account for the abnormal return.  Dalrymple Report ¶ 100.  Because he recognized that the effect of competition could also be intertwined with *Blackfish*, he analyzed SeaWorld's internal attendance data to disentangle the latter from the former.  This involves neither the non-public information related to the fraud (*Blackfish*), nor an analysis of the fraud's impact on the price drop.  Moreover, as Defendants correctly argued, unlike in *Oracle*, which involved the first step in the loss causation analysis—identifying the factors that impacted the abnormal return—here, Mr. Dalrymple's use of non-public information is within the final step: disaggregating the known factors.  Accordingly, the Court **DENIES** this portion of Defendants' motion.

Further, the Court declines Defendants' request to certify this question for appeal.  Section 1292(b) provides that:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, [the judge] shall so state in writing in such order.

28 U.S.C. § 1292(b).

While there may be no Ninth Circuit precedent directly addressing Defendants' position on this issue, none is needed to materially advance the case.  The argument Defendants once again make does not implicate a controlling legal issue, nor would it save the Court or the parties unnecessary trouble and expense.  *See In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982).  Presumably Defendants are of the opinion, as will be discussed *infra* Part VI.C, that this issue would materially affect the outcome of the litigation because if Mr. Dalrymple's disaggregation analysis is found unreliable, his expert report and testimony would be excluded in its entirety and therefore Plaintiffs would fail to establish the element of loss causation.  However, the Court is dubious that

an issue with this specific portion of Mr. Dalrymple's disaggregation analysis would result in wholesale exclusion of his evidence and testimony, the remainder of which is untouched by the contested methodology and unscathed by Defendants' reliability arguments.

Defendants further argue that even if Mr. Dalrymple's use of non-public data is permissible, his disaggregation analysis should still be excluded as unreliable because: (1) he failed to control for differences among the parks and how that would impact his attendance analysis; and (2) he failed to control for the differences between Discovery Cove and SeaWorld Orlando.  Doc. No. 134-1 at 14–20.  However, this argument goes to the weight of Mr. Dalrymple's testimony and evidence and not its admissibility. Moreover, Mr. Dalrymple does discuss the parks' similarities and his reasons for choosing them.  *See* Dalrymple Report at ¶¶ 111–12.  Accordingly, the Court **DENIES** Defendants' motion on this basis as well.

### 2. Materiality

As explained above in connection with Plaintiffs' motion to exclude the evidence and testimony of Mr. Dirks, materiality is not before the Court on summary judgment. So for the same reasons, the Court **DENIES** Defendants' motion to exclude Mr. Deal's materiality opinions and evidence as premature without prejudice to raising the issue via motion *in limine* prior to trial.

### E. Defendants' Motion to Exclude the Expert Testimony and Evidence of Chekitan S. Dev

Dr. Chekitan S. Dev is a tenured professor at Cornell University's School of Hotel Administration.  Doc. No. 137-30; PX 26 ("Dev Report") ¶ 1.  He holds a Ph.D. in Hospitality Management from Virginia Polytechnic Institute and State University.  Dev Report ¶ 1.  Dr. Dev was retained by Plaintiffs to analyze and opine as to whether *Blackfish* damaged SeaWorld's brand and if that damage translated to harm to the business.  Dev Report ¶ 8.  Dr. Dev ultimately offers the opinions that: (1) brands are critically important in the industry; (2) brand damage can be measured scientifically; and

(3) scientific evidence establishes that SeaWorld's brand damage from *Blackfish* was the leading indicator of harm to its business—*i.e.*, was the leading indicator of attendance decline in Spring and Summer 2014.  Dev Report ¶ 10.

Defendants take issue with Dr. Dev's report, specifically, the first and third opinions noted above, arguing that he failed to employ a reliable methodology and that his opinions usurp the role of the jury and will not assist the trier of fact.

### 1.   Importance of Brand in the Industry

First, Dr. Dev opines that SeaWorld derives value from its brand.  Dev Report ¶ 35.  However, as Defendants point out, SeaWorld repeatedly admits that "Our brands and our reputations are among our most important assets" in its SEC filings.  *See, e.g.*, DOX 35.  Defendants argue that a jury does not need an expert's assistance on this point. Doc. No. 129-1 at 28.  Expert witness testimony is proper under Rule 702 only if it illuminates matters not within the common knowledge of the average juror.  *U.S. v. Seschille*, 310 F.3d 1208, 1212 (9th Cir. 2002).  If the issues in the case are ones that jurors can understand and evaluate through their own knowledge and experience, expert testimony is not needed and should be excluded.  *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962).

The general notion that brands are important appears to be common sense. However, it may not be common knowledge to the average juror.  And even though the point is not in dispute, it would assist the jury in ultimately determining if *Blackfish* harmed SeaWorld's business to hear that businesses, like SeaWorld, derive value from its brand.  Accordingly, the Court **DENIES** Defendants motion as to Dr. Dev's opinion on the importance of brand in the industry.

### 2.   Brand Damage and Attendance Decline

According to Defendants, Dr. Dev did not employ any methodology, nonetheless a reliable one, reaching his primary conclusions: that *Blackfish* harmed SeaWorld's brand and that the brand harm was the leading indicator of attendance decline.  Doc. No. 129-1 at 10.  Defendants argue that Dr. Dev merely reviewed statements, documents, testimony,

and outside articles on the relevant subjects and reached his conclusions.  *Id.*

Defendants correctly point out that the Court accepted this same argument in the Class Action in granting SeaWorld's motion to exclude the evidence and testimony of Dr. Gibson.  In the Class Action, the Court found that Dr. Gibson "perform[ed] no such technical analysis in reaching his conclusions" and that "the data Gibson reviewed in reaching his conclusions does not require an expert's interpretation."  *Baker*, 423 F. Supp. 3d at 911.  In the Class Action, the Court stated that it was "unable to find any case law supporting Gibson's methodology consisting of solely evaluating empirical research."  *Id.*  The Court further rejected Dr. Gibson's "triangulation method" as unreliable because it merely:

> involved reviewing data from the same body of evidence that he relied on in applying his 'empirical analysis' methodology and concluding that the deposition testimony and company documents corroborated his initial findings.  In *Ramah Navajo Sch. Bd., Inc.* and *Garcia*, the experts conducted independent research and verified their results using additional research methods. Neither expert applied triangulation by solely reviewing deposition testimony and internal company documents.

*Id.* at 912.

Defendants argue that the same outcome is appropriate here because Dr. Dev similarly only relies on "empirical data in SeaWorld's possession" and his "multi method" approach is effectively the same as Dr. Gibson's triangulation method.  Doc. No. 129-1 at 12.

As the Ninth Circuit has explained, "[t]he *Daubert* 'requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under *Daubert* factors renders the expert's testimony inadmissible*.*'"  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 983 n.12 (9th Cir. 2021) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (collecting cases)) (emphasis in original).  Having meticulously reviewed Dr. Dev's report and evidence, the Court finds that the

methodology he employed in reaching his two final conclusions is unreliable and therefore his evidence and testimony in this respect are subject to exclusion.

The first issue with Dr. Dev's methodology relates to his matrix, based upon which he concludes that SeaWorld became a "Troubled Brand" as a result of *Blackfish*. The matrix is derived from a study, wherein he and a co-author developed a method to assess brand performance. Keshav Prasad & Chekitan S. Dev, *Managing Hotel Brand Equity: A Customer-Centric Framework for Assessing Performance*, CORNELL HOTEL AND REST. ADMIN. QUARTERLY, June 2000, at 22–31. In the study, they explain that "BrandTracker expresses as percentages customers' quantitative ratings of satisfaction and of other positive ratings. These percentages are then converted into the two indices of brand performance and awareness." *Id.* at 26. They lay out six steps to turn ratings—survey results—into percentage points, compute "mean-performance-indicator scores" based upon four performance indicators: guest satisfaction, return intent, price-value performance, and consumers' "first choice," and then plot those points on a graph. *Id.* at 27–28. For example, in the article they provide the following charts:



*Id.* at 28–29.

However, below is Dr. Dev's matrix in his report:



Page 22 of 108

FIGURE 5: SEAWORLD BECAME A TROUBLED BRAND POST-*BLACKFISH*

Source: Prasad, Keshav, and Dev, Chekitan S. (2000), "Managing Hotel Brand Equity: A Customer-centric Framework for Assessing Performance," *Cornell Quarterly*, 41(3), pp. 22–31.

Dev Report at 22.

There is no corresponding chart, or explanation, for what variables or categories of information he considered. Dr. Dev does not identify when the "pre-*Blackfish*" and "post-*Blackfish*" time periods occurred. *See* Doc. No. 129-6; Defendants' Dev *Daubert* Motion Exhibit 3 ("Dev Tr.") 69:20 – 22 ("So I've not made a mathematical calculation as to precisely what date the impact struck"); 70:21–23 ("I'm not pinpointing precisely what point in time the damage started happening."). Nor does Dr. Dev explain how any of the data he reviewed translates into points, or even general areas, on the graph. To be sure, the matrix he created for this case has no numerical values on the axes. Moreover, there is simply no explanation for how or why he chose these points on the graph. Instead, he testified that it was his "sense" of the "sort of [] zone." Dev Tr. 206:8–25. This is clearly in direct contrast to the quantitative, analytical steps undertaken in the study on which he relies.

Plaintiffs argue that Dr. Dev relied on evidence and his experience to come to this conclusion. It may be that Dr. Dev has extensive experience that could independently lead him to creating this matrix. However, in doing so, Dr. Dev expressly relies on his own, previously created scientific method, and yet does not follow his own methodology

to create the matrix or form the resulting opinion that SeaWorld became a "Troubled Brand" post-*Blackfish*.  Moreover, Dr. Dev does not sufficiently explain how experience alone led him to bypass several methodological steps in his own study.  Accordingly, Dr. Dev's evidence and testimony in this respect are subject to exclusion.

Third, Dr. Dev summarily concludes that because the Omnibus Survey revealed a 15% association nationally between *Blackfish* and SeaWorld and "anyone who sees the movie was then unlikely to go to SeaWorld, this 15% association nationally translates to a potential 15% attendance decline."  Dev Report ¶ 61.  His only basis for concluding that anyone who sees *Blackfish* was then unlikely to go to SeaWorld is testimony in the record and is in conflict with evidence that some respondents were more interested in visiting a marine life park such as SeaWorld after seeing *Blackfish*.  Moreover, absent some method to correlate *Blackfish* viewership with park attendance, this conclusion is not based on any reliable methodology.

Fourth, Dr. Dev opines "The data I've reviewed indicates that, in mid-2013, *Blackfish* was, in fact, having a negative effect on SeaWorld's brand. This brand damage was a leading indicator for impending attendance declines, and market share and revenue losses, consistent with what Cleeren, Van Heerde, and Dekimpe (2013) found in their research, discussed above."  Dev. Report ¶ 57.

Dr. Dev appears to come to this conclusion based upon the notion that because vacations to parks such as SeaWorld involve planning months in advance, Dev Report ¶ 28, brand damage in Summer 2013 would be a leading indicator of harm to the business in 2014, Dev Report ¶ 93.  However, Dr. Dev did not analyze planning habits of park visitors.  Moreover, Dr. Dev acknowledged the importance of many other factors that impact attendance.  Dev Tr. at 35:22–25.  But his opinion accounts for no other factors.  To be sure, Dr. Dev testified that he neither analyzed nor opines on the impact of factors such as competition, weather, and school calendars.  Dev Tr. at 64:4–24.

Further, Dr. Dev leaps from the conclusion that Blackfish was harming SeaWorld's brand to the conclusion that that brand harm translates, not only to attendance decline, but

that it was the "leading indicator" of the attendance decline.  The sole basis for this leap is the Cleeren study.

Three times in his report, Dr. Dev quotes or summarizes the Cleeren study solely for the proposition that "product harm related crises can cause major revenue and market-share losses and destroy carefully nurtured brand equity."  Dev Report ¶ 40.  The Cleeren study is only mentioned these three times.

There is simply too great an analytical gap between the data Dr. Dev reviewed and these conclusions.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The resulting conclusion is too far removed from the single study which, by Dr. Dev's own explanation, stands only for a general proposition regarding market share and revenue. For example, Dr. Dev does not explain how revenue and market share correlate to park attendance.  As with the matrix discussion above, there is no scientific or methodological analysis of any data to say that, even among many factors, *Blackfish* was the leading cause of declining attendance.

Moreover, the Cleeren study involved the collection and analysis of "a unique and comprehensive data set" to "assess the effects of postcrisis advertising and price adjustments on the change in consumers' brand share and category purchases . . . . [and] consider the extent to which the effects are moderated by two key crisis characteristics: the extent of negative publicity surrounding the event and whether the affected brand had to publicly acknowledge blame."  Kathleen Cleeren et al., *Rising from the Ashes: How Brands and Categories Can Overcome Product-Harm Crises*, 77 J. Mktg. 58 (2013). For example, the study undertakes a complex methodology involving a significant number of mathematic equations, such as:

$$\Delta CP_{ij} = \frac{CP_{ij}^{AFTER} - CP_{ij}^{BEFORE}}{\left(CP_{ij}^{BEFORE} + CP_{ij}^{AFTER}\right)/2}.$$

$$\Delta CP_{ij}^{\bullet} = \ln\left(\frac{\Delta CP_{ij} + 2.01}{2.01 - \Delta CP_{ij}}\right).$$

[8] Because brand share is a ratio, this measure is already comparable across categories. Because this variable is constrained to [−1, 1], we again apply the logit-type transformation Lesaffre, Rizopulos, and Tsonaka (2007) describe:

$$\Delta BS_{ij}^{\bullet} = \ln\left(\frac{\Delta BS_{ij} + 1.01}{1.01 - \Delta BS_{ij}}\right).$$

*Id.* However, Dr. Dev does not employ any mathematical analysis of data and therefore does not apply the same methodology as the Cleeren study.

Further, to the extent Dr. Dev comes to these conclusions based on his experience, he does not sufficiently explain how he drew on this experience to come to these conclusions. Dr. Dev's opinions were excluded in the District of Colorado case for this same reason as well. *RCHFU, Ltd. Liab. Co. v. Marriott Vacations Worldwide Corp.*, No. 16-cv-01301-PAB-GPG, 2020 U.S. Dist. LEXIS 95270, at *23–24 (D. Colo. June 1, 2020) ("Dr. Dev does not connect [his] experience in a meaningful way to his opinions . . . . He does not explain how his experience leads to his conclusions or how he applied his experience to the facts of this case."). Accordingly, because Dr. Dev does not otherwise provide an experience-based explanation, his opinions are subject to exclusion.

Therefore, Dr. Dev's conclusions that *Blackfish* harmed SeaWorld's brand, and that the brand harm translates to the leading cause of attendance decline in Summer 2014, are unreliable because: (1) there is no underlying methodology or analysis; and (2) he does not explain how his experience alone led him to these conclusions. For these reasons, the Court **GRANTS** Defendants' motion. *See GE v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

However, even further, the Court finds that Dr. Dev's opinions improperly invade the province of the jury. A juror can reach these same conclusions based upon the same

information Dr. Dev reviewed.  For example, Plaintiffs can offer the evidence, data, surveys, and studies that Dr. Dev relies on and conclude that the brand was harmed, and that the attendance decline is more attributable to *Blackfish* than anything else. Therefore, his evidence and opinion usurp the role of the jury.  *See In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB), 2011 U.S. Dist. LEXIS 133105, at *13–14 (S.D. Cal. Nov. 17, 2011) (excluding expert's opinion because it "invades the authority of the trier of fact to determine for itself the plain meaning of the facts and documents" and "contains no professional standards or principles and utilizes no specialized knowledge"). Moreover, "[j]uries are likelier to credit experts, who are expected to help the jury reach the right conclusion, more than simple documentary evidence." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-cv-00630-LHK, 2014 U.S. Dist. LEXIS 24506 (N.D. Cal. Feb. 25, 2014).  As with Dr. Gibson's testimony in the Class Action, permitting Dr. Dev's testimony runs the risk of unduly influencing the jurors who are competent to review the evidence and reach their own conclusions about SeaWorld's attendance and market research.  *See Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063–64 ("Maintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony."); *Baker*, 423 F. Supp. 3d at 912–13.  So for this reason as well, the Court **GRANTS** Defendants' motion.

In sum, Dr. Dev's conclusions that increased viewership (and a resulting negative impact on brand) is the leading cause of attendance decline, is unreliable and not qualified expert testimony.  And given his status as an expert, his conclusions impermissibly usurp the role of the jury.  Accordingly, the Court **GRANTS** Defendants' motion to exclude Dr. Dev's evidence and testimony in this respect.

# IV. LEGAL STANDARDS

## A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56,

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the outcome of the suit under applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.*

The party opposing summary judgment cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).  Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,* 690 F.2d 1235, 1238 (9th Cir. 1982).

Where cross-motions for summary judgment are at issue, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas,* 466 F.3d 784, 790–91 (9th

Cir. 2006) (citations omitted).  That said, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme,* 632 F.3d 526,532 (9th Cir. 2011).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## B.   Relevant Law – Securities Fraud

Only Plaintiffs' cause of action under section 10(b) of the Exchange Act and Rule 10b-5 are before the Court on summary judgment.  Section 10(b) "makes it unlawful for 'any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (quoting 15 U.S.C. § 78j(b)).  Rule 10b-5, promulgated under the Securities Exchange Act, makes it unlawful "for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *Id.* at 989–90 (quoting 17 CFR 240.10b-5(c)).

"The required elements for a private securities fraud action are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (internal quotation marks omitted).

## V. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs seek partial summary judgment on the element of falsity—they ask the Court to find that six statements were false and misleading as a matter of law.

**A.      Statements Not Duly Pleaded**

Before turning to the alleged falsity of the six statements, the Court must address an initial matter.  In opposition, Defendants argue that three (and part of a fourth) of the six statements were not duly pleaded: Statement 2 (December 10, 2013); Statement 4 (January 13, 2014); Part 3 of Statement 5 (March 13, 2014) and Statement 6 (May 20, 2014).  According to Defendants, the Private Securities Litigation Reform Act ("PSLRA") requires that a complaint specify each statement alleged to be misleading.  In response, Plaintiffs argue that there is no controlling Ninth Circuit case on this point and instead, that a later change in legal theory is prohibited, but that Plaintiffs are permitted to provide additional proof to advance the claims.

*1.      Misstatements: Complaint versus Motion*

In their Complaint, Plaintiffs identify and plead the following seven alleged misstatements:

1.      2Q2013 SEC Form 10-Q dated August 14, 2013, Compl. ¶ 149;[10]

2.      *Los Angeles Times* article dated August 29, 2013, *id.* ¶ 151;

3.      3Q2013 SEC Form 10-Q dated November 13, 2013, *id.* ¶ 153;

4.      *Wall Street Journal* article dated November 13, 2013, *id.* ¶ 155;

5.      *Orlando Sentinel* article dated December 20, 2013, *id.* ¶ 156;

6.      SEC Form 10-K dated March 13, 2014 and Earnings Call, *id.* ¶ 157; and

7.      1Q2014 SEC Form 10-Q dated May 14, 2014, *id.* ¶ 159.

*See generally* Compl.  However, Plaintiffs move for summary judgment as to the

---

[10] The Court previously dismissed this statement.  *See* Doc. No. 44.

following six statements:

1.   *Wall Street Journal* article dated November 13, 2013, PMSJ at 16;

2.   Statements made to Plaintiffs at a meeting in Boston, Massachusetts on December 10, 2013, *id.* at 22;

3.   *Orlando Sentinel* article dated December 20, 2013, *id.* at 25;

4.   *The Dodo* article dated January 13, 2014, *id.* at 27;

5.   1Q2014 Earnings Call on March 13, 2014, *id.* at 29; and

6.   J.P. Morgan Global Technology, Media, and Telecom Conference call on May 20, 2014, *id.* at 32.

*See generally* PMSJ.  Therefore, it is clear that the statements Plaintiffs seek summary judgment on are not the same as those pleaded.

### 2.   New Statements Require Amendment

In 1995, the PSLRA amended the Exchange Act to require heightened pleading requirements for both falsity and scienter.  *Zucco Partners*, 552 F.3d at 990.  As relevant, under the PSLRA, the Exchange Act now expressly provides that a private securities fraud "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.S. § 78u-4.

In *Dura Pharmaceuticals*, the Supreme Court stated, in rejecting the Ninth Circuit's "inflated purchase price" loss causation approach, that the PSLRA "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  It is therefore true—and undisputed—that a complaint must state with

particularity the alleged misstatements.  But *Dura* does not address whether additional statements can be introduced to the litigation at the summary judgment stage.

Plaintiffs rely on the Northern District's summary judgment order in *Oracle* in arguing that amendment is not necessary.  In *Oracle*, the Northern District clearly stated that permitting plaintiffs to "add an unpled fraud theory to the case now, when the case is at summary judgment, would effectively dispense with the 'formidable' pleading requirements of the PSLRA."  *In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 U.S. Dist. LEXIS 50995, at *56 (N.D. Cal. June 16, 2009).  However, in *Oracle*, the plaintiffs originally pleaded a fraud theory based upon the defendant's misstatements about a new product, inflated earnings reports, and misleading financial condition forecast.  *Id.* at *8.  Later, however, the plaintiffs sought to introduce a new "accounting fraud" theory.  *Id.* at *56.  Thus, *Oracle* is similarly unhelpful because Plaintiffs' theory of fraud has not changed.  The question is whether new misstatements are similar to new theories such that they cannot be introduced later under the PSLRA.  Therefore, *Oracle* does not assist the Court in its inquiry.

There appears to be a Ninth Circuit case directly on point.  In *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994),[11] a securities fraud action under the Exchange Act, the Ninth Circuit directly considered this issue and held:

> The four statements are missing entirely from Kaplan's second amended complaint and, at the time when the motions for summary judgment were filed, were not present in any pleading before the district court, except for Kaplan's summary judgment motion. We therefore conclude that the four

---

[11] *Kaplan* appears to have been overruled by *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).  However, the *Align Tech* case does not expressly overrule *Kaplan*.  Instead, it overruled *Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014), which (citing *Kaplan*) held that a misstatement is actionable if "there is no reasonable basis for the belief."  The current Ninth Circuit standard is that the "no reasonable basis" approach to falsity is only applicable for omissions—not misstatements.  *See Align Tech., Inc.*, 856 F.3d at 616.  Therefore, to the extent *Align Tech* overruled *Kaplan*, it did so on other grounds.

statements are not fairly reflected in the complaint. The district court did not err in refusing to consider them.

*Id.* at 1370.  The Ninth Circuit then went on to consider whether the District Court abused its discretion in not allowing the addition of these statements by way of amendment.  *Id.* The Ninth Circuit ultimately held that the District Court did not, based upon the prejudice, expense, delay, nearness of trial, two prior amendments, and the knowledge of at least two of the statements at the beginning of the litigation.  *Id.*  Therefore, the Court is required to treat the inclusion of additional statements at summary judgment as an implicit request to amend.

Plaintiffs' attempt to distinguish *Kaplan* is unpersuasive.  Plaintiffs correctly note that in *Kaplan*, the Ninth Circuit found the statements were "missing entirely" from the complaint.  *Id.*  They argue that because these statements were in the competing Class Action complaint, Defendants were on notice of them.  Doc. No. 159 at 13.  However, the concepts of notice and prejudice fall within the Rule 15 analysis, not whether to apply an amended pleading standard.  Moreover, allegations contained in the Class Action complaint have no bearing on the pleadings in this case.

Plaintiffs' reliance on *In re Twitter Sec. Litig.*, No. 16-cv-05314-JST, 2020 U.S. Dist. LEXIS 129955, at *12 (N.D. Cal. May 19, 2020) and *In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009) are similarly misplaced.  First, neither are controlling precedent, one of which is out of circuit.  Moreover, as with *Dura* and *Oracle*, they are inapposite.  In *Twitter*, the Northern District considered whether leave to amend to include a new theory was appropriate.  In *St. Jude*, the District of Minnesota considered whether new allegations that changed the theory of liability was appropriate for amendment at summary judgment.  Both courts found that amendment was inappropriate.

Plaintiffs' attempt to distinguish these two cases and establish a "rule" that only new legal theories may not be introduced absent amendment has no basis in the law.  The only case Plaintiffs rely on for this alleged rule is the Second Circuit case of *In re*

*Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 (2d Cir. 2016).  In a footnote, the Second Circuit appears to have opined directly on this issue.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 n.11 (2d Cir. 2016).  However, it directly conflicts with *Kaplan* and so the Court must disregard it.

Finally, Plaintiffs assert that the Ninth Circuit rule is that the complaint does not control the issues before the Court on summary judgment.  However, the case Plaintiffs cite to in support explicitly acknowledged that while a complaint "does not control the issues properly before th[e] court," a district court is required to construe the new issues raised as a request to amend.  *Apache Survival Coal. v. United States*, 21 F.3d 895, 910 (9th Cir. 1994).  The Ninth Circuit has repeatedly expressly or implicitly approved a district court's application of Rules 15 and 16 at the summary judgment stage.  Therefore, the Court must construe Plaintiffs' inclusion of additional misstatements on summary judgment as a request for leave to amend.

### 3. *Rule 16 versus Rule 15*

The next question is which standard—Rule 16 or Rule 15—applies.  Defendants argue that Rule 16 governs the addition of the misstatements.  According to the operative scheduling order, the parties' deadline to seek leave to amend was on May 15, 2020.  Doc. No. 63, *amended on other grounds at* Doc. No 122.  Plaintiffs filed their summary judgment motion on August 20, 2021.  Therefore, had this been an explicit motion for leave to amend, Rule 16 would apply.

That said, as discussed above, the Ninth Circuit appears to have applied Rule 15 in *Kaplan*; while it is not apparent from the decision, presumably this was after an amended pleadings deadline as the case was at the summary judgment stage.  Moreover, the Ninth Circuit has stated that: "Where plaintiffs 'fail to raise a claim properly in their pleadings, . . .if they raised it in their motion for summary judgment, they should be allowed to incorporate it by amendment under Fed.R.Civ.P. 15(b).'"  *Desertrain v. City of L.A.*, 754 F.3d 1147, 1154 (9th Cir. 2014) (quoting *Jackson v Hayakawa*, 605 F.2d 1121, 1129 (9th Cir. 1979)).

However, the *Desertrain* case specifically mentions claims, and not misstatements. Further, *Desertrain* did not involve claims under the Exchange Act and thus was not subject to the heightened pleading standards of the PSLRA.

Moreover, in *Neidermeyer v. Caldwell*, 718 F. App'x 485, 488 (9th Cir. 2017), the Ninth Circuit seemed to, at least implicitly, do away with any "rule" that amendments at summary judgment are governed by Rule 15 not 16.  In *Neidermeyer*, the Ninth Circuit found that the district court had not abused its discretion in denying leave to amend through a summary judgment motion under Rule 16.  Importantly, the dissenting judge specifically noted the *Desertrain* case and "standard" for liberal amendment under Rule 15 at summary judgment. *Id.* at 491 (Settle, J., dissenting).  The majority nonetheless affirmed the district court's application of Rule 16.

The Ninth Circuit has also recently distinguished the *Desertrain* case in 2018 and 2021, finding that allowing amendment, virtually automatically, via a summary judgment motion is inappropriate. *See Perez v. Vitas Healthcare Corp.*, 739 F. App'x 405, 407 (9th Cir. 2018); *Ray v. State Farm Mut. Auto. Ins. Co.*, No. 20-55989, 2021 U.S. App. LEXIS 31707, at *3 (9th Cir. Oct. 21, 2021).

Thus, it appears that there is no clear rule in the Ninth Circuit that amendment through summary judgment motion—after a Rule 16 scheduling order is in place—falls within the purview of Rule 15 and not Rule 16.  Moreover, such a rule would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.  Therefore, the Court is required to first apply Rule 16.

### 4.   Application of Rule 16

Rule 16 provides that a scheduling order may be modified for "good cause."  Fed. R. Civ. P. 16(b)(4).

[To] demonstrate diligence under Rule 16's "good cause" standard, the movant may be required to show the following: (1) that she was diligent in

assisting the Court in creating a workable Rule 16 order; (2) that her noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding her diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference; and (3) that she was diligent in seeking amendment of the Rule 16 order, once it became apparent that she could not comply with the order.

*D.C. v. Cty. of San Diego*, No. 15-cv-1868-MMA (NLS), 2021 U.S. Dist. LEXIS 13445, at *7–8 (S.D. Cal. Jan. 25, 2021) (quoting *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 608 (E.D. Cal. 1999) (citations omitted)).  "If the District Court finds a lack of diligence, 'the inquiry should end.'"  *Id.* (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992)).

Defendants argue that there is no good cause to allow amendment at this late stage of the litigation.  Doc. No. 151 at 21.  They argue that two of the statements were made directly to Plaintiffs in 2013 and 2014 and the third was published online in 2014.  *Id.*  Moreover, they assert that the two statements made directly to Plaintiffs are not similar to the statements pleaded because those pleaded are all public statements.  *Id.*

In response, Plaintiffs strongly argue that amendment and thus good cause is not needed.  However, as discussed above, their position is inconsistent with the law.  The Court must first consider whether amendment is appropriate under Rule 16.  And what is fatal here is that the additional misstatements at issue were likely known to Plaintiffs at the time they initiated the action, or at least before the amended pleadings deadline, and there is no explanation for why they did not timely seek amendment.

The first newly added statement relates to the Boston meeting on December 10, 2013.  Mr. Fleiss recalls:[12]

---

[12] According to Plaintiffs' motion, the alleged misstatement comes from Mr. Corcoran's declaration, which, for the reasons discussed above, the Court disregards.  Therefore, there is no Statement 2.  However, for the sake of completeness, the Court nonetheless looks to Mr. Fleiss's declaration as to what was allegedly said at the December 10, 2013 Boston meeting.  *See* Fleiss Decl. ¶¶ 39–40.

"At that meeting, in response to a question from another investment manager, Atchinson told us the musician cancellations were not material and he was not concerned about them.

. . . .

Atchison, Heaney, and Ballesteros also again denied that Blackfish was impacting SeaWorld's brand, business, or attendance."

Fleiss Decl. ¶¶ 39–40. The statement was made directly to Mr. Fleiss. According to Mr. Fleiss, Messrs. Atchison and Heaney allegedly made these statements in response to another analyst's question. There is no explanation for how this statement—made in Mr. Fleiss's presence—was not known at the inception of the case or prior to the amended pleadings deadline. To the contrary, Mr. Fleiss has no doubt been instrumental in bringing and prosecuting this action.

On January 13, 2014, Mr. Jacobs is quoted in the online publication *The Dodo* saying:

"[T]here is no truth to the suggestion that SeaWorld's reputation or business has been harmed by Blackfish."

PX 53; PMSJ at 27. However, several statements duly pleaded were also found in online articles. For example, the November 13, 2013 *WSJ* article, December 20, 2013 *Orlando Sentinel* article, and the August 29, 2014 *LA Times* article. There is no explanation for why the *The Dodo* article statement was not also included in the Complaint.

In part three of the March 13, 2014 statement, Mr. Atchison says during the 2Q2013 Earnings Call:

"But ultimately the assertions by the animal rights, animal activist community -- they don't necessarily burden themselves with fact, and we have to deal with that from time to time. But we have seen no impact on the business."

PX 71; PMSJ at 29. Plaintiffs duly pleaded other portions of this statement, however, the

third and final portion included on summary judgment was not mentioned in the Complaint.  Surely Plaintiffs knew of this third part because it was within the same answer provided by Mr. Atchison to one of the questions—in fact, it was in the following paragraph of the transcript.  There is no explanation for why only the first two parts were pleaded as alleged misstatements.

And finally, on May 20, 2014, Mr. Heaney stated during a J.P. Morgan Global Technology, Media, and Telecom Conference call:

> "It is difficult for us to meaningfully attribute attendance impacts from drivers beyond [macro-economic conditions, weather, pricing, holiday timing, marketing programs, competition, and the impact of new attractions] factors."

PX 64; PMSJ at 32.  Mr. Fleiss was present during this call, Fleiss Decl. ¶ 70, and Plaintiffs do not argue that that they were unaware of these statements prior to the amended pleadings deadline.

The outcome appears plain that Plaintiffs were not diligent in seeking amendment or in their attempt to comply with the deadline.  Instead, Plaintiffs remain under the impression that amendment is not needed.  However, as discussed above, that assumption is misplaced.

While there is significant tension here between Rules 15 and 16, the law in the Ninth Circuit seems clear that once a Court has issued a pretrial scheduling order, a "party [can] not appeal to the liberal amendment procedures afforded by Rule 15" but must "satisfy the *more stringent* "good cause" showing required under Rule 16. *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006) (emphasis in original).  Therefore, because Plaintiffs have not shown that they were diligent in seeking to amend the scheduling order, the Court **DENIES** Plaintiffs' motion for partial summary judgment as to Statements 2, 4, Part 3 of 5, and 6 and instead

**GRANTS** summary judgment in Defendants' favor as to these statements.[13]

**B.    Falsity**

Having determined that only three statements are properly before the Court on summary judgment, the Court next considers whether Plaintiffs are entitled to summary judgment as to their alleged falsity.

"In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)).  "Under Rule 10b-5, an affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.*

As an initial matter, Plaintiffs argue that the statements are false, therefore falling under the misstatement theory of liability.  But in briefing this matter, they also frame their arguments as "What SeaWorld knew but did not disclose." *See, e.g.*, PMSJ at 20. Moreover, in their Complaint, Plaintiffs appear to plead both misstatements and omissions, repeatedly stating: "These statements were false and misleading when made and omitted material facts." *See, e.g.*, Compl. ¶ 12.  However, the Ninth Circuit has recently stated:

> As we noted before, "[a]ll misrepresentations are also nondisclosures, at least
> to the extent that there is a failure to disclose which facts in the representation
> are not true." *Little v. First Cal. Co.*, 532 F.2d 1302, 1304 n.4 (9th Cir. 1976).
> But while fraud necessarily involves concealing the truth, we cannot allow

---

[13] At the March 16, 2022 hearing, Plaintiffs argued that should the Court affirm its tentative ruling in this respect, the ruling should not prohibit Plaintiffs from introducing these statements as proof related to other elements such as scienter.  Defendants do not argue that these statements are inadmissible under the Federal Rules of Evidence at this time.  Accordingly, the Court's ruling does not prohibit Plaintiffs from seeking to introduce these statements into evidence, or Defendants from arguing against their admissibility, at trial.

such concealment to transform affirmative misstatements into implied omissions.

*In re Volkswagen "clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 20-15564, 2021 U.S. App. LEXIS 18987, at *21 (9th Cir. June 25, 2021).  Moreover, at the hearing, Plaintiffs clarified that these statements are based upon a misstatement theory of liability and not an omission.[14]  Accordingly, based upon the record and the arguments at the hearing on this matter, the Court proceeds with analyzing these three statements as misstatements and not fraudulent omissions.

 1.   *Statement 1: November 13, 2013* WSJ *Article*

On November 13, 2013, Mr. Atchison is quoted in the *Wall Street Journal* saying:

I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it.

PX 25.

Plaintiffs assert that this statement is false because Defendants knew by October 2013 that Blackfish had a significant measurable impact on SeaWorld's brand and corporate reputation.[15]  Doc. No. 137-1 at 20.  In the Class Action, SeaWorld moved for summary judgment in its favor as to the falsity of this same statement and the Court found that material factual disputes prevented summary judgment.  *Baker*, 423 F. Supp. 3d at 939.  The same outcome is appropriate here.  Based upon the totality of the facts presented in the record on summary judgment, there is a dispute as to whether *Blackfish* did "impact" SeaWorld by November 2013.

---

[14] At the hearing, Plaintiffs explained that in addition to the misrepresentation theory of liability, if the statements were not false at the time they were made, Defendants had a duty to correct the statements once they became false.  However, "[n]either this circuit nor the Supreme Court has recognized a duty to correct."  *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1112 (9th Cir. 2021).

[15] Plaintiffs rely in part on Dr. Dev's report and opinion to support this argument.  However, as explained above, Dr. Dev's testimony that *Blackfish* was the leading indicator of attendance decline is subject to exclusion.

a.   <u>Plaintiffs' Record Evidence as to Falsity</u>[16]

SeaWorld knew about *Blackfish* prior to its release.  PX 17.  In an email dated December 28, 2012, Mr. Ballesteros[17] warned Mr. Atchison regarding the film: "I worry that this is a real Achilles heel for the company."  PX 17.

On January 19, 2013, *Blackfish* premiered at the Sundance film festival.  PSS No. 9; DSS No. 14.  Three persons at SeaWorld—Mr. Jacobs, Chuck Tompkins (staff member and trainer), and Matt Rearden (IP attorney)—were sent to attend the premiere.  PX 4 at 60:4–15.

On July 1, 2013, SeaWorld held an "all-hands meeting" to view *Blackfish* and discuss SeaWorld's *Blackfish* response strategy.  PX 12.  On July 19, 2013, *Blackfish* premiered in theaters.  PSS No. 9; DSS No. 15.

On July 24, 2013, Mr. Heaney stated in an email to SeaWorld executives, including Messrs. Jacobs and Atchison, "████████████████████ ████████████████"  PX 73.  On July 25, 2014, Mr. Atchison responded via email "█████████████████████████ ████████████████████████████████"  PX 73.

On July 27, 2013, a scheduled protest took place at SeaWorld San Diego and between 148–300 protesters attended.  PX 8.

On July 31, 2013, Mr. Atchison was informed that ████████ was considering not

_____

[16] Plaintiffs' reliance on evidence that took place after the statements were made, such as the Initiative presentation and notes, cannot show that the statements was false when they were made and are therefore not included in this recitation.  *See, e.g.*, PX 30.

[17] Blackstone Group and one of its principals, Gene Ballesteros, are frequently referenced in this case and in the papers.  Prior to SeaWorld's IPO in 2013, SeaWorld was privately owned by Blackstone.  PMSJ at 5.  Mr. Ballesteros was the former Treasurer and head of SeaWorld's Investor Relations during the time in question, PSS No. 20; DSS No. 76, as well as a director at Blackstone.

Because Mr. Ballesteros is not a party to this action, and because scienter is not before the Court on summary judgment, all discussion of the individual Plaintiffs', Blackstone's, and Mr. Ballesteros' motive to lie is irrelevant.

1   bidding to produce the ███████ due to concerns about *Blackfish*.  PX 40.

2   ████████████████████████████████████████████████

3   ████████████████████ PX 74.

4        On September 1, 2013, an estimated 151 persons protested at SeaWorld San Diego.

5   PX 39.

6        On October 16, 2013, Mr. Josh Powers[18] explained to SeaWorld personnel that the

7   ████████████████████████████████████████████████

8   ███████████ PX 29.

9        On October 17, 2013, SeaWorld had a meeting during which a corporate reputation

10  study was presented—referred to by the parties as the "reputational charrette."  PX 3 at

11  30:6–13. ████████████████████████████ PX 1.

12  ████████████████████████████████████████████

13  ████████████████████ PX 1.  In an email that same day with the subject line

14  "Survey Results," Mr. Atchison stated: "This was painful."  PX 2.  When asked what he

15  recalled about the discussion of *Blackfish* at the "reputational charrette," Mr. Jacobs

16  testified that "████████████████████████████████████████

17  ████████████████" PX 4 at 210:22–24.

18        On October 21, 2013, SeaWorld lost its deal with ████ PX 41.

19        On October 24, 2013, CNN aired *Blackfish* to approximately 1.36 million viewers.

20  DSS No. 16.

21        On November 6, 2013, Mr. Swanson wrote an email to Mr. Atchison stating

22  "████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████"

25  ─────────────────

26

27  [18] Mr. Josh Powers was a "SeaWorld employee."  PSS No. 57.  According to his declaration, Doc.
    No. 151-87, he was the Director of Forecasting and Budgeting at SeaWorld during the time in question.

28  Id. at ¶ 2.  Based upon the record, his job included SeaWorld's tracking of attendance.  *See* PX 29, 51,
    74 (emails regarding attendance records).

1   During this time, SeaWorld was receiving email and written complaints from

2   consumers.  PX 32–37.

3         b.   <u>Discussion</u>

4   Defendants argue in opposition that Statement 1 is a qualified opinion statement

5   and is not actionable.  While Statement 1 does appear to be an opinion, it may

6   nevertheless be actionable.  In support of their position, Defendants in a footnote cite to

7   *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175,

8   192 (2015).

9   The Ninth Circuit interpreted *Omnicare* in *Align Tech.* and held that an opinion

10  statement is actionable under a misstatement theory only if the statement is not actually

11  believed or if the speaker is aware of undisclosed facts tending seriously to undermine the

12  statement's accuracy.  *Align Tech.*, 856 F.3d at 616.  As to statements of opinion under an

13  omission theory, a securities fraud plaintiff may also allege that there is no reasonable

14  basis for the belief.  *Id.*

15  As noted above, Plaintiffs do not base their section 10(b) claim on an omission

16  theory of liability and therefore cannot establish the element of falsity by showing there is

17  no reasonable basis for Mr. Atchison's belief that the statement was true.  Nonetheless,

18  Plaintiffs adequately allege and produce evidence tending to show that Mr. Atchison did

19  not believe Statement 1 at the time he made it.  Put another way, that Mr. Atchison could

20  attribute an impact from *Blackfish*.  Accordingly, Statement 1 is not a nonactionable

21  opinion statement as a matter of law.

22  While it is true based on the permissible Dr. Dev testimony that SeaWorld derives

23  value from its brand, the totality of the evidence precludes the Court from finding as a

24  matter of law that Mr. Atchison did not believe Statement 1 when he made it.  Defendants

25  have put forth evidence creating a genuine dispute as to Statement 1's falsity.  For

26  example, on November 13, 2013, SeaWorld released its 8-K, revealing that revenue

27  increased some 3% during the 3Q2013 year over year.  DOX 35.  SeaWorld's 8-K also

28  reported a 9.1% increase in admission per capita.  DOX 35; *see also* DOX 47 (marketing

summary revealing that attendance revenue was up 7% as of November 10, 2013 compared to the prior year). And the "unexplained" attendance decline, as Plaintiffs argue, was not unexplained but rather, according to PX 74, attributable to several non-*Blackfish* related factors. Also important to the analysis is that Statement 1 was immediately followed by Mr. Atchison saying, "Ironically, our attendance has improved since the movie came out." PX 25. A reasonable jury could conclude that "impact" referred to SeaWorld's bottom line, financially, and therefore find that Mr. Atchison believed the statement. On the other hand, a jury could find that "impact" refers to reputation and that Mr. Atchison did not believe the statement when made. Therefore, there is a genuine issue of material fact as to whether Mr. Atchison actually believed his statement. Accordingly, the Court **DENIES** Plaintiffs' motion as to Statement 1.

    *2.*    *Statement 3: December 20, 2013* Orlando Sentinel *Article*

On December 20, 2013, Mr. Atchison is quoted in an *Orlando Sentinel* article:

> As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business.

PX 50.[19]

    a.    <u>Plaintiffs' Record Evidence as to Falsity</u>

In addition to the timeline above, several other events occurred prior to Statement 3. On November 27, 2013, the band "Barenaked Ladies" announced that it cancelled a scheduled concert at SeaWorld due to *Blackfish*. PX 19.

On December 5, 2013, SeaWorld noted via email that their partners ███████████ ████████████████ had requested to align their promotional efforts with Busch Gardens

---

[19] Plaintiffs also argue that Mr. Atchison "insisted that *Blackfish* and the negative publicity it has spawned have not hurt SeaWorld's business." While this sentence is in the article, it is not clearly attributable to Mr. Atchison. So the Court disregards it.

and not SeaWorld due to *Blackfish* publicity.  PX 46.

On December 6, 2013, Mr. Jacobs forwarded an email to Messrs. Atchison and Heaney reflecting ██████████ concerns over its relationship with SeaWorld.  PX 21.

On December 9, 2013, SeaWorld reflected via email that several bands had backed out of scheduled performances at SeaWorld Parks due to *Blackfish*.  PX 42.

On December 10, 2013, Mr. Atchison was involved on an email chain noting the fact that "several bands have canceled with SeaWorld Orlando citing social media pressure over *Blackfish*."  PX 22.

On December 10, 2013, SeaWorld had a call with ██████ wherein ██████████ indicated an intent to put their deal with SeaWorld on hold due to *Blackfish* controversy.  PX 47.

During this time, SeaWorld was receiving additional email and written complaints from consumers.  PX 48–49.

> ### b.   Discussion

For the same reasons above, summary judgment as to the falsity of Statement 3 is inappropriate at this time. It is unclear as to what "data" Mr. Atchison is referring. Plaintiffs argue that SeaWorld reviewed no data.  However, Plaintiffs' own evidence reveals that this is not entirely true.  For example, the record shows that prior to Statement 3, SeaWorld was monitoring revenue and attendance data, as well as awareness of *Blackfish* as early as August 2013.  *See, e.g.*, PX 29 (dated October 16, 2013); PX 4 ("Jacobs Tr.").

A reasonable fact finder could conclude that Mr. Atchison was speaking about revenue and attendance data, in which case he could have believed Statement 3. Moreover, "effect on business" is similarly too vague for the Court to impute its meaning on summary judgment.  Further, 4Q2013 attendance was up at SeaWorld Orlando and San Diego parks, and SeaWorld achieved record revenue for 2013.  PX 71.  Therefore, there is a genuine issue of material fact as to whether Mr. Atchison believed his statement.  Therefore, the Court **DENIES** Plaintiffs' motion as to Statement 3.

Defendants also argue that this statement is nonactionable opinion. Statement 3 appears to be an opinion. But as noted, Plaintiffs have put forth evidence tending to show that Mr. Atchison did not believe Statement 3 when he made it, and there is a question of fact. Accordingly, Defendants are not entitled to a ruling that Statement 3 is nonactionable opinion.

### 3. Statement 5: March 13, 2014 Earnings Call

On March 13, 2014, during a 4Q2013 Earnings Call, Mr. Atchison stated in response to a question:

> With respect to the impact on our business, I get asked that a lot, too. As much as we're asked it, we can see no noticeable impact on our business. If you follow this -- even this recent announcement, our SeaWorld parks had record attendance in the fourth quarter of the year, and are out-performing our other parks by considerable margin.
>
> With respect to national surveys and data that we collect around our reputation efforts and image, there's awareness of the movie that kind of peaks and drops as CNN -- who is one of the owners of the movie, by the way -- CNN shows it repeatedly from time to time, so that does spike on occasion. But our surveys don't reflect any shift in sentiment about intent to visit our parks.

PX 71.

### a. Plaintiffs' Record Evidence as to Falsity

In addition to the events above, a new addition to the mix of information available to Defendants began in January 2013, when SeaWorld began asking respondents in their weekly surveys if they—as a result of having seen *Blackfish*—were more or less likely to visit a marine life park. Plaintiffs contend that the Omnibus Survey reveals that 28.1% of respondents said they were less likely to visit a marine life park because of *Blackfish*. Doc. No. 137-1 at 30. However, as Defendants argue, this argument mischaracterizes the results of the survey. The Omnibus Survey found that 24% of respondents were aware of *Blackfish* and that—of those respondents who had seen the film—21% were more

interested, 55% stated it had no impact, and 24% stated it made them less interested. PX 6.

On December 16, 2013, SeaWorld learned that the band ███████ had backed out of their scheduled performance.  PX 43.

On January 2, 2013, an email to SeaWorld personnel wrote: "████████████████ ████████████████████████████████████████████ ██████████████████████████████████ " PX 44.

On January 10, 2014, SeaWorld learned that ███████████████████████ ████████████████████ PX 57.

Plaintiffs also point to a February 10, 2014 "Performance Update & Outlook" document.  PX 60.  However, despite Plaintiffs' contention, the document clearly shows mixed information regarding SeaWorld's performance.  Blackfish was listed as the first "worst" factor regarding the YTD results.  However, the document also reveals that, for example, ████████████████████████████ PX 60.

On February 12, 2014, MKM Partners produced a study of consumers regarding, among other things, SeaWorld and the impact of *Blackfish*.  PX 7.

As of February 23, 2014, ████████████████████ ████████████ PX 62.  ████████████████████ ████████████ PX 63.

On March 9, 2014, Mr. Atchison was made aware via email of the Bloom Bill—to "phase out Orca captivity for entertainment purposes."  PX 24.

b.   <u>Discussion</u>

The statement in the first paragraph—"we can see no noticeable impact on our business"—suffers from the same issue regarding the import of the phrase "impact on business" discussed above.  Moreover, while there is evidence that ████████████ ███████████████████████████ , PX 62–63, on March 13, 2014, SeaWorld

reported "record fourth quarter total attendance" at the SeaWorld branded parks[20] and the "third consecutive year of record revenue and adjusted EBITDA."  PX 71.  Therefore, a reasonable jury could conclude that "impact on business" refers to SeaWorld, financially and not reputational harm.

As to the second paragraph, use of the word "shift" presents a complicated question, one more appropriate for the factfinder and not the Court on summary judgment.  For example, if shift means more negative than positive and neutral combined, the statement would appear to be true.  This especially given the immediately following paragraph from this transcript:

> A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us. We have seen that reflected through certain visitor profiles, and certain guest comments and things we get. The movie did not get an Oscar nomination in January, and we continue to take proactive efforts around communicating with our guests and business partners and others.

PX 71.  Moreover, and importantly, on January 23, 2014, Messrs. Heaney and Atchison exchanged emails discussing the results from a weekly survey fielded January 16, 2014.  PX 6.  Mr. Heaney stated "Of those aware of the movie… 15% are MORE interested in marine life parks and aquariums[,] 57% same[,] 28% are less interested[.]  PX 6.  He went on to state "If you net the more and less (13%) and apply 20% awareness, you get 2.6% impact."  PX 6.

However, if shift means that people who see *Blackfish* then change their mindset about visiting, for example, from positive or neutral to negative, then the statement could be deemed false.  Accordingly, the Court finds that the issue of Statement 5's falsity is not appropriate for summary judgment and **DENIES** Plaintiffs' motion on this basis.

---

[20] Oral argument revealed an apparent dispute about which parks are "SeaWorld branded."  This dispute further supports denying summary judgment as to falsity at this time.

**C.      Summary**

In sum, the Court finds that Plaintiffs have not shown good cause to amend the Rule 16 scheduling order to amend their Complaint to include the newly introduced Statements 2, 4, Part 3 of 5, and 6.  Therefore the Court **DENIES** Plaintiffs' motion for partial summary judgment and **GRANTS** summary judgment in Defendants' favor as to those statements.  Further, genuine material factual disputes exist concerning the falsity of Statements 1, the remainder of 3, and 4, and therefore the Court **DENIES** Plaintiffs' motion for partial summary judgment as to those statements.

## VI. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on three grounds: (1) the element of reliance; (2) that Plaintiffs failed to mitigate their damages; and (3) the element of loss causation.

**A.      Reliance**

In support of their motion, Defendants argue that Plaintiffs concluded by no later than: (1) March 7, 2014, that Blackfish had negatively impacted SeaWorld's attendance; (2) May 16, 2014, that Blackfish had damaged SeaWorld's brand; and (3) July 15, 2014, that the "brunt of Blackfish" was affecting SeaWorld's second quarter revenue.  Doc. No. 139-1 at 8.  Accordingly, Defendants assert that Plaintiffs cannot satisfy the reliance element for any purchases of SeaWorld shares after any of these three dates.

*1.      Actual Reliance*

"The reliance element 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'"  *Halliburton Co. v Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 488 (2013)).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.,* purchasing common stock—based on that specific misrepresentation."  *Halliburton*, 573 U.S. at 267.

Plaintiffs pleaded that they actually relied on the misrepresentations.  Compl.

¶ 175.  However, Defendants' motion focuses solely on rebutting the fraud-on-the-market presumption.  For the sake of completeness, this Order first addresses Plaintiffs' actual reliance as well.

Plaintiffs have raised a genuine issue of material fact as to whether they actually relied on the statements.  For example, Mr. Corcoran states that he "read, reviewed, and analyzed" the statements.  Corcoran Opp. Decl. ¶ 7.  Mr. Corcoran also explains why he relied on these statements.  Corcoran Opp. Decl. ¶¶ 13–17.  Importantly, Mr. Corcoran explains that in his financial model, he would not have projected revenue and attendance growth had he "believed that *Blackfish* was having an impact on SeaWorld's reputation, brand, business, or attendance."  Corcoran Opp. Decl. ¶ 91.  Therefore, a reasonable jury could conclude that, notwithstanding Defendants' evidence, Plaintiffs actually relied upon the misstatements.  Accordingly, to the extent Defendants seek summary judgment as to Plaintiffs' actual reliance, the Court **DENIES** the motion.

### 2.    Rebutting the Presumption of Reliance

In *Basic*, the Supreme Court "recognized that requiring such direct proof of reliance 'would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.'"  *Halliburton*, 573 U.S. at 267 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988)).

> To address these concerns, *Basic* held that securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation. The Court based that presumption on what is known as the "fraud-on-the-market" theory, which holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."

*Halliburton*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246).

To invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the

misrepresentations were made and when the truth was revealed.  *Halliburton*, 573 U.S. at 277–78.

"Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at 248.

Plaintiffs pleaded the *Basic* fraud-upon-the-market presumption "in the alternative."  Compl. ¶ 182.  When the presumption of reliance arises, the burden of proof then shifts to the defendant.  A defendant can rebut the presumption in different ways, including disproving the materiality of the alleged omissions or misrepresentations; establishing that the shares were not traded in an efficient market; or with evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  *Basic*, 485 U.S. at 248–49; *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 50 L. Ed. 2d 75, 97 S. Ct. 57 (1976); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1262 (S.D. Cal. 2010); *In re Fortune Systems Sec. Litig.*, 680 F. Supp. 1360, 1372 (N.D. Cal. 1987).

Defendants offer a detailed timeline, based upon evidence in the record, that they argue shows Plaintiffs "concluded" by the three dates above that *Blackfish* had negatively impacted SeaWorld.

- By March 7, 2014, Plaintiffs were aware that *Blackfish* had impacted SeaWorld's attendance:
    - August 19, 2013: Mr. Fichthorn[21] conveyed to Mr. Corcoran that "Blackfish doesn't help – will go away eventually but doesn't help this year."  DX 19 at 230–32.

---

[21] According to this exhibit, Mr. Andrew Fichthorn was the President of SeaWorld from 2004–2010. DX 19 at 230.

- January 9, 2014: Mr. Mullins[22] noted that "Blackfish having bigger impact than he would have thought, but won't really impact things (if at all) until Spring Break." DX 19 at 240–41.
- January 13, 2014: Mr. Fichthorn relayed that "Blackfish goes to the core of the SeaWorld brand." DX 19 at 243–45.
- January 14, 2014: Mr. Heffelfinger[23] told Mr. Corcoran that "Blackfish [was] going to have some impact" on the Company but that it would be "short lived." DX 19 at 246–47.
- During that same period, Highfields also attempted to independently discern any Blackfish-related impact on SeaWorld through other means. Those efforts included:
  - Performing weather analyses of SeaWorld's top markets in August 2013, DX 20;
  - Monitoring band cancelations in late 2013 for SeaWorld's upcoming Bands, Brew & BBQ event due to negative publicity surrounding Blackfish, DX 23, 25, 26, 27;
  - Contacting a market research firm in December 2013 and contemplating whether to commission a survey to determine if Blackfish had impacted consumers' decisions to visit SeaWorld, DX 28; and
  - Tracking Blackfish viewership and internet downloads in January 2014 by using statistics available from Netflix, iTunes, and CNN, DX 29.
- On March 7, 2014, Plaintiffs concluded that there "probably [had] been

---

[22] According to this exhibit, Mr. Joseph Mullins was the Chief Information Officer of SeaWorld from 2008–2010. DX 19 at 240.

[23] Mr. James Heffelfinger was SeaWorld's former Corporate Director of Entertainment. DSS No. 60.

some pressure on attendance from Blackfish," which Mr. Corcoran acknowledged Highfields had "sort of accepted . . . as a risk."  DX 32.

- By May 16, 2014, Plaintiffs had tracked SeaWorld's revenue:
    - o March 12, 2014, Highfields consulted a "channel checker," that used its "proprietary panel of . . . US credit cards" to estimate and track SeaWorld's revenue.  DX 33.
    - o In March and April 2014, Highfields twice contacted a California lobbyist to "better understand the procedural dynamics at play" with respect to the California legislation.  DX 19.
    - o Beginning in May 2014, Highfields began acquiring information from the City of San Diego (pursuant to public records requests) and the State of Texas in an effort to reverse engineer the revenue of SeaWorld's San Diego and Texas parks—which was otherwise non-public information—through analyzing rent payments and beverage tax records.  DX 16, 37–38.
    - o On May 16, 2014, Mr. Corcoran had a discussion with Mr. Ballesteros and noted that "Blackfish definitely has done some damage to the brand" and that SeaWorld "[n]ow acknowledge[s] that negative publicity is going to be bad for them; massive distraction."  DX 19.  When presented with Mr. Corcoran's call notes, Mr. Fleiss "[w]onder[ed] why they now all of a sudden [were] admitting [Blackfish] has impacted them."  DX 39.  And in a subsequent email to Mr. Fleiss, Mr. Corcoran drafted a list of follow-up questions to ask SeaWorld which included: "What happened/changed that now you seem to admit that Blackfish has had an impact (change from Q4 to Ql call)?"  DX 40.
- By July 15, 2014, Plaintiffs reverse engineered revenue through rent payments and beverage taxes:
    - o In mid-July 2014, Highfields received rent roll data from the City of San Diego in response to one of its public records requests.

o On July 15, 2014, Highfields concluded that rent data for SeaWorld San Diego showed that "April rent payments (generally % of revenue) [were] down 2% y/y" (which Mr. Corcoran described as "bad given Easter shift") and that "YTD through April was down 9%." DX 48. Upon receiving this data, Mr. Corcoran expressed to Mr. Fleiss that the results were "not surprising" because "SD was weak when we met w them last—probably feeling the brunt of Blackfish." *Id.* In response, Mr. Fleiss noted: "Means blackfish still having an impact there I guess." *Id.*

Based upon this evidence, Defendants contend that Plaintiffs cannot rely on the market's integrity when their independent research undermined the allegedly fraudulent statements—that is to say, Plaintiffs independently learned the truth. Doc. No. 139-1 at 20.

In support for their position that they have rebutted the *Basic* presumption, Defendants rely on a summary judgment order in *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016). In *Vivendi*, the Southern District of New York found on summary judgment that the defendant had rebutted the presumption because the plaintiff "was indifferent to the fraud." *In re Vivendi*, 183 F. Supp. 3d at 466. In particular, the court found that the plaintiff was a sophisticated value investor, which "pursued an investment strategy that relied on [the plaintiff's analyst's] own, carefully researched evaluation of Vivendi's assets and liquidity — which 'dr[ew] largely from his familiarity with the [C]ompany's assets and tapp[ed] into resources unavailable to the average investor.'" *In re Vivendi*, 183 F. Supp. 3d at 466 (internal citation omitted).

Similar to the defendant in *Vivendi*, Defendants have put forth substantial evidence that Plaintiffs were value investors that relied on their own internal, proprietary research to value companies and make investment decisions. DSS Nos. 29–30. It is undisputed that, for example, Plaintiffs' analysts conducted interviews with a company's management team, held discussions with customers, suppliers, and competitors, reviewed

a company's products and services, and consultation with industry experts.  DSS No. 31; DX 17; *see also* DX 14, 16 (Messrs. Corcoran and Fleiss describing their decision-making process).  As to SeaWorld in particular, Plaintiffs internal "due diligence" included consulting experts, DSS No. 37, and lobbyists, DSS Nos. 68, 70.  Plaintiffs also independently researched and obtained data as to rent, DSS Nos. 71–75, and revenue based upon credit card usage, DSS No. 67, and beverage taxes, DSS No. 79.

In opposition, however, Plaintiffs explain that Defendants have not rebutted the presumption because this evidence does not show that Plaintiffs did not nonetheless rely on the integrity of the market.  Doc. No. 148 at 25.  As Plaintiffs argue, Messrs. Corcoran and Fleiss testified that they did not believe that the market had "mispriced" the stock.  *See, e.g.*, Doc. No. 148-3; Plaintiffs' Opposition Rolnick Exhibit 1 ("Corcoran Tr.") 243:15–17.

It is true that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at 248.  However, the Ninth Circuit has stated that "[d]ifferences in sophistication, etc., among purchasers have no bearing in the impersonal market fraud context, because dissemination of false information necessarily translates through market mechanisms into price inflation which harms each purchaser identically . . . . Sophisticated investors are as entitled to rely on the fraud-on-the-market theory as anyone else."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 506 (9th Cir. 1992) (quoting *Blackie*, 524 F.2d at 905).  While Defendants have put forth evidence that Plaintiffs are sophisticated value investors that relied upon their internal "mosaic of data points," Plaintiffs have raised a genuine issue of material fact as to whether they nonetheless relied on the integrity of the market—including the price of the stock.  Therefore, the Court **DENIES** Defendants' motion for summary judgment based upon their argument that they have rebutted the fraud-upon-the-market presumption.

**B.      Mitigation of Damages**

Defendants assert that mitigation principles apply to 10b-5 cases and that summary judgment is appropriate where a plaintiff had actual or reasonable notice of the fraudulent nature of the defendant's representations.  Doc. No. 139-1 at 27.  In response, Plaintiffs argue that they had no duty to mitigate damages and, if such a duty existed, they reasonably discharged this duty through their pre-Corrective Disclosure sale.  Doc. No. 148 at 32.

The Ninth Circuit applies

> ordinary . . . mitigation principles in 10b-5 cases. Plaintiffs' damages in a 10b-5 case are limited by what they would have realized had they acted to preserve their assets or rights when they first learned of the fraud or had reason to know of it. They cannot recover that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm. Foster v. Financial Technology Inc., 517 F.2d 1068, 1072 (9th Cir. 1975).

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981); *see also Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 774 (9th Cir. 1984) (finding that the district court "properly instructed that plaintiffs are required to mitigate their damages").

Other than a generic summary denial, Plaintiffs do not actually dispute that they have a duty to mitigate damages once they learned of the fraud; that damages are limited to mitigated losses after discovery of the fraud.

As Plaintiffs correctly point out, however, the District Court in *Arrington* held a bench trial and ultimately determined the date on which the plaintiffs learned of the fraud.  Thus, if and when Plaintiffs "learned" of the fraud is a question of fact for the jury to decide and is improper for summary adjudication.[24]  Unlike in *In re Fortune*, and

---

[24] At the hearing, the parties vehemently argued about whether a partial disclosure triggers a duty to mitigate.  But that is not the appropriate question.  The question is whether Plaintiffs learned or had

similar cases, it is not "absolutely clear" from the summary judgment record when Plaintiffs knew or had reasonable notice of the fraud. 680 F. Supp. at 1370. Moreover, Plaintiffs' alleged knowledge—evidenced through internal documents and stock sales—must be taken in context with Defendants' statements to the public that *Blackfish* had not impacted the business. So there is a genuine dispute of material fact as to when Plaintiffs learned of the alleged fraud. Similarly, whether Plaintiffs discharged this duty through "reasonable" mitigation efforts is a question for the jury. *See Interstate Restoration, LLC v. Seaman*, No. SACV 13-00706 DOC(RNBx), 2014 U.S. Dist. LEXIS 199667, at *55 (C.D. Cal. July 9, 2014). Accordingly, the Court should **DENY** Defendants' motion for summary judgment on this basis.

## C.    Loss Causation

Finally, Defendants argue that they are entitled to summary judgment because Plaintiffs cannot prove loss causation. Doc. No. 139-1 at 30. In support of this position, they rely solely on the argument that Mr. Dalrymple's evidence and opinion must be excluded. *Id.* As discussed above, the Mr. Dalrymple's expert opinion and evidence are not subject to exclusion and therefore Defendants are not entitled to summary judgment on this basis.

---

reason to know—either through their own research or Defendants' statements to them—of the alleged fraud. This is inherently a factual question that is not proper for resolution at this stage.

More importantly, this case does not involve partial disclosures by Defendants; Defendants did not make—to the market—a "series of disclosures, [that] when 'viewed in tandem,' may be adequate if '[t]he combined force of the[] statements . . . suggest that the market was alerted to' the relevant misrepresentations." *In re Bofi Holding Sec. Litig.*, No. 3:15-cv-02324-GPCKSC, 2018 U.S. Dist. LEXIS 243339, at *9 (S.D. Cal. Mar. 15, 2018) (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008)). For this reason, the parties' disagreement as to the import of Judge Whyte's orders in *In re Cypress Semiconductor Sec. Litig.*, has no bearing on the Court's analysis. To be sure, Judge Whyte expressed that both decisions were based upon allegations that the defendant company "began to disclose its fraud to the market," and ultimately held that such a partial disclosure to the market "adjusted the value of plaintiffs' stock" and because "plaintiffs could not mitigate their losses by selling" thereafter, the plaintiffs should not be precluded from seeking damages after the partial disclosure. *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 713 (N.D. Cal. 1993). There are no relevant similarities between the *Cypress* case and the present facts.

The Securities Exchange Act defines "loss causation" as the plaintiff's "burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "This inquiry requires no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). As such, "the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Daou*, 411 F.3d at 1055).

As discussed in detail above, the parties have submitted competing experts as to whether the Corrective Disclosure regarding *Blackfish* caused the price drop (and relatedly, to what extent). *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case."). As such, this issue is ripe for trial and not appropriate for summary judgment. Accordingly, the Court **DENIES** Defendants' motion on this basis.

**D.    Summary**

In sum, the Court finds that genuine material factual disputes preclude summary judgment as to the elements of reliance, damages, and loss causation. For that reason, the Court **DENIES** Defendants' motion for summary judgment.

## VII. CONCLUSION

Based upon the foregoing, the Court **AFFIRMS** its tentative rulings. Accordingly, the Court **DENIES** Plaintiffs' motion to exclude the testimony and evidence of Martin Dirks [Doc. No. 170]; **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to exclude the testimony and evidence of Bruce Deal as discussed above [Doc. No. 169]; **DENIES** Defendants' motion to exclude the testimony and evidence of W. Scott

Dalrymple [Doc. No. 177]; **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to exclude the testimony and evidence of Chekitan S. Dev as discussed above [Doc. No. 178]; **DENIES** Plaintiffs' motion for partial summary judgment [Doc. No. 174]; **GRANTS** summary judgment in Defendants' favor as to Statements 2, 4, (Part 3) of 5, and 6; and **DENIES** Defendants' motion for summary judgment [Doc. No. 176].

As Plaintiffs' claims must proceed to trial, the Court **ORDERS** the parties to jointly contact the undersigned's chambers within five (5) business days of the date this Order is filed for the purpose of discussing pretrial conference and trial dates. Thereafter, the Court will issue a separate pretrial scheduling order in due course.

**IT IS SO ORDERED**.

Dated:  March 25, 2022

HON. MICHAEL M. ANELLO
United States District Judge